# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE PATTERN ENERGY GROUP )      C.A. No. 2020-0357-MTZ
INC. STOCKHOLDERS LITIGATION )

## MEMORANDUM OPINION
Date Submitted: December 10, 2020
Date Decided: May 6, 2021

Ned Weinberger and Mark Richardson, LABATON SUCHAROW LLP, Wilmington, Delaware; David MacIsaac and John Vielandi, LABATON SUCHAROW LLP, New York, New York; Chad Johnson, Noam Mandel, and Desiree Cummings, ROBBINS GELLER RUDMAN & DOWD LLP, New York, New York; Brian Schall and Rina Restaino, THE SCHALL LAW FIRM, Los Angeles, California, *Attorneys for Lead Plaintiff Jody Britt.*

A. Thompson Bayliss and April M. Kirby, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Alan S. Goudiss, K. Mallory Brennan, and Deke Shearon SHEARMAN & STERLING LLP; Christina Urhausen, SHEARMAN & STERLING LLP, San Francisco, California; *Attorneys for Defendants Alan R. Batkin, Edmund John Philip Browne, Richard A. Goodman, Douglas G. Hall, Patricia M. Newson, Mona K. Sutphen, Michael Garland, Hunter Armistead, Daniel Elkort, Michael Lyon, and Esben Pedersen.*

Rudolf Koch, Matthew D. Perri, and Andrew L. Milam, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Matthew A. Schwartz, Y. Carson Zhou, John-Francis S. Flynn, SULLIVAN & CROMWELL LLP, New York, New York; *Attorneys for Defendants Riverstone Holdings LLC, Riverstone Pattern Energy II Holdings, L.P., and Pattern Energy Group, Holdings 2 LP.*

**ZURN, Vice Chancellor.**

The sales process of Pattern Energy Group Inc. (the "Company") was run by an undisputedly disinterested and independent special committee that recognized and nominally managed conflicts, proceeded with advice from an unconflicted banker and counsel, and conducted a lengthy process attracting tens of suitors that the special committee pressed for value. But, even having acknowledged that one eager bidder offered superior value, the special committee ultimately selected a different bidder as the buyer. The buyer was preferred by a private equity investor, who formed the Company and its upstream supplier, which the investor controlled; appointed the Company's management team; and held a consent right over Company changes of control. The investor favored the buyer because its proposal, as shaped by the investor, accomplished the investor's goals of taking the Company private and consolidating it with the upstream supplier, while permitting the investor to retain its equity stake in the new company.

In apportioning fault for the selection of the buyer's inferior bid, the plaintiff primarily points to three forces: (1) the investor's control over the Company together with the upstream supplier and management; (2) the Company's CEO, who was conflicted in favor of the investor yet ran point on the sales process to stockholders' detriment; and (3) the special committee's prioritization of the investor's goals over stockholder value and inability to say "no." In her post-closing class action complaint, the plaintiff seeks entire fairness review due to the investor's alleged

1

control group standing on both sides of the transaction, or due to the CEO's alleged fraud on the board. She claims the special committee and management breached their fiduciary duties in a cash-out merger, and that the investor and supplier either controlled that process or participated as third-party tortfeasors. The defendants—the investor, the supplier, the conflicted directors, the special committee, and conflicted management—contend that the cash-out merger with Buyer was cleansed by an informed stockholder vote; that the directors were exculpated; and that no breaches of fiduciary duty or third-party liability torts have been pled.

On the defendants' motion to dismiss, the plaintiff prevails on most of her arguments. Recognizing that neither the investor nor the supplier owned Company stock, I leave open the possibility that the plaintiff may establish the investor, supplier, and management stockholders formed a control group, given the investor's consent right and other pervasive sources of soft power over the Company and its sales process. Thus, it remains possible that the transaction may be subject to the entire fairness standard of review under a controller theory—but not a fraud on the board theory.

At a minimum, the plaintiff has pled the special committee and management failed to manage conflicts and prioritized the investor's goals over stockholder value in bad faith (as distinguished from dereliction of duty), and so states nonexculpated claims for breach of fiduciary duty that will be reviewed under enhanced scrutiny.

All but two management defendants allegedly contributed to flaws in the process. The sales process is not presumptively subject to the business judgment rule: the votes in favor fall below a majority of disinterested stockholders because the block at the tipping point was subject to a voting agreement that compelled favorable votes that were not informed, disinterested, or voluntary. Plaintiff has also pled the special committee improperly and completely delegated drafting the merger proxy (the "Proxy") to conflicted management, and that the Proxy was inadequate.

## I.  BACKGROUND[1]

The Verified Stockholder Class Action Complaint, filed on May 28, 2020 (the "Complaint"), challenges the March 16, 2020 all-cash acquisition (the "Merger") of Pattern Energy Group Inc. by Canada Pension Plan Investment

---

[1] I draw the following facts from the Verified Consolidated Stockholder Class Action Complaint, available at Docket Item ("D.I.") 101 [hereinafter "Compl."], as well as the documents attached and integral to it. *See, e.g.*, *Himawan v. Cephalon, Inc.*, 2018 WL 6822708, at *2 (Del. Ch. Dec. 28, 2018); *In re Gardner Denver, Inc. S'holders Litig.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014). Citations in the form of "Kirby Decl. —" refer to the exhibits attached to the Declaration of April M. Kirby, Esq. in Support of the Opening Brief in Support of Defendants' Motion to Dismiss, available at D.I. 75 and D.I. 76. Citations in the form of "Weinberger Decl. —" refer to the exhibits attached to the Transmittal Declaration of Ned Weinberger in Support of Plaintiff's Answering Brief in Opposition to Defendants' Motions to Dismiss, available at D.I. 82. Citations in the form of "Proxy —" refer to the Company's Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934, filed February 4, 2020, attached as Exhibit 1 to the Kirby Declaration and available at D.I. 75. On the Motion, the Court may consider the Proxy, as well as other publicly filed documents regarding the Merger. *See Orman v. Cullman*, 794 A.2d 5, 15–16 (Del. Ch. 2002); *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 727 (Del. Ch. 1999), *aff'd sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000); *Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1168 n.3 (Del. Ch. 2002).

Board ("Buyer").[2]  Lead Plaintiff Jody Britt ("Plaintiff") was a Company stockholder at all relevant times, and brings her claims on behalf of all other similarly situated former public Company stockholders.[3]

### A. The Company's Longstanding Relationship To Riverstone Contextualizes And Bears On The Sales Process At Issue.

The Company was formed by Riverstone to operate energy projects developed by another Riverstone entity.[4]  Riverstone "is a private equity fund investing primarily in energy, power, and infrastructure," including renewable energy.  The developer entity's structure and ties to the Company changed with the energy market.  The chronology of those changes is helpful background to this matter, as the Company's ties to Riverstone and the developer loom large in the Company's sales process.

Riverstone has owned and controlled Pattern Energy Group LP ("Developer 1") at all times.[5]  In October 2012, Riverstone, via Developer 1, incorporated the Company and thereafter controlled the Company through Riverstone's stake in Developer 1.[6]  Riverstone arranged the Company and

---

[2] *See generally* Compl.

[3] *Id.* ¶ 23.

[4] *Id.* ¶¶ 37, 43.  Riverstone Pattern Energy II Holdings, L.P. is an affiliate of Riverstone Holdings LLC; this opinion refers to those entities collectively as "Riverstone."  *Id.* ¶ 39.

[5] *Id.* ¶¶ 42, 46.

[6] *Id.* ¶ 47.

Developer 1 in a symbiotic business relationship, in which Developer 1 created and constructed renewable energy projects, but did not operate them, and the Company had a right of first offer to purchase and operate Developer 1's projects.[7] Developer 1 and the Company were run as a single entity out of the same offices, and Developer 1 enjoyed the benefits of a management services agreement with the Company.[8]

In 2013, Developer 1 took the Company public via an initial public offering (the "IPO").[9] After the IPO, Riverstone still indirectly controlled the Company via Developer 1, which retained a 67.9% majority interest; public investors and Company management held the other third.[10] Developer 1 also executed a shareholder agreement with the Company in connection with the IPO. That agreement gave Developer 1, and therefore Riverstone, a consent right over the Company's major corporate transactions, including sales and acquisitions worth more than 10% of the Company's market capitalization, so long as Developer 1 owned at least one third of the Company's shares.[11] Developer 1 continued to

---

[7] *Id.* ¶ 46 n.2.

[8] *Id.* ¶¶ 51–52.

[9] *Id.* ¶ 47.

[10] *Id.* ¶¶ 47, 49.

[11] *Id.* ¶ 50. By February 2015, Developer 1's ownership had dipped below the one-third threshold, so its consent right lapsed. *Id.*

develop new projects.[12] The Company paid steady dividends and attracted long-term investors, but its share price remained flat.[13]

In 2017, inspired by record demand for renewable energy,[14] Riverstone restructured its relationship with the Company, as Developer 1 seemingly lacked the capital resources needed to develop projects to keep up with demand.[15] Developer 1 was replaced with a Riverstone-sponsored and controlled private equity fund, Pattern Energy Group Holdings 2, LP (together with any subsidiaries, "Developer 2"). Developer 2 was funded and owned by Riverstone, the Company, and Company management, with total capital commitments of nearly $1 billion.[16] The Company became Developer 2's limited partner with the goal of "[c]reat[ing] strong, lasting alignment between [Developer 2] and [the Company]."[17] Developer 2 acquired Developer 1's assets and replaced Developer 1 as the Company's symbiotic counterpart.[18] The Company primarily acquired its operating assets from Developer 2, while Developer 2 retained development assets,[19] and the Company

---

[12] *Id.* ¶¶ 2, 38, 43–44, 46.

[13] *Id.* ¶ 53.

[14] *Id.* ¶ 54.

[15] *Id.* ¶ 55.

[16] *Id.* ¶¶ 2, 38, 57, 58.

[17] *Id.* ¶ 60.

[18] *Id.* ¶¶ 2, 38, 57.

[19] Proxy at 36.

held a downstream right of first offer on all projects Developer 2 sold.[20] Crucially, Developer 2 acquired a consent right over the Company's transfer of its Developer 2 stake (the "Consent Right"); in view of its domination over Developer 2, Riverstone ultimately controlled the Consent Right.[21]

As Developer 2 took the stage, Developer 1 wound down, selling its equity in the Company between late 2017 and October 2018 such that Riverstone no longer held any direct interest in the Company at the time of the Merger.[22] Still, Riverstone and the Company remained intertwined operationally (as the Company bought and operated the projects Riverstone's Developer 2 operated) and structurally (as the Company and its management were minority owners in Developer 2, and as Riverstone controlled the Consent Right over a transfer of the Company's minority interest). Their investments also aligned: at the time of the Merger, Riverstone held approximately 71% of Developer 2's equity; the Company held 29%; and Company management held the remaining 1% interest.[23]

Riverstone and the Company also had a great number of overlapping fiduciaries, including Michael Garland, Hunter Armistead, Daniel Elkort, Michael

---

[20] Compl. ¶¶ 57, 62.

[21] *Id.* ¶¶ 62–63.

[22] *See id.* ¶¶ 76–80.

[23] *Id.* ¶¶ 58–59; Proxy at 36.

Lyon, and Esben Pedersen (collectively, the "Officer Defendants").[24]  The Officer Defendants have a long history with Riverstone:  "[f]or over a decade Riverstone has been their co-investor, partner, employer, sponsor, and financial patron."[25] Riverstone and the Officer Defendants formed Developer 1 together, buying Developer 1's portfolio from the Officer Defendants' previous employer.[26] Riverstone and the Officer Defendants also co-created the Company and Developer 2.[27]

Garland served as Developer 2's President, as well as Developer 1's President and director.[28]  Armistead took over as Developer 2's President in April 2019, after having served as Developer 1's Executive Director.[29]  Garland and Armistead would

---

[24] *See* Compl. ¶¶ 32–36, 51.

[25] *Id.* ¶ 45; *see also id.* ¶¶ 32–36.

[26] *Id.* ¶¶ 44–45.  Riverstone purchased the portfolio from Babcock & Brown LLP, a now-defunct Australian global investment and advisory firm.  *Id.* ¶ 44.  In 2009, Riverstone and the management team of Babcock & Brown's North American Energy Group, which included the Officer Defendants, acquired Babcock & Brown's wind development portfolio to form Developer 1.  *Id.*  Defendant Hunter Armistead touted Riverstone's acquisition, stating that Babcock & Brown's management team, including the Officer Defendants, was "free of Babcock, which is a great thing[.]"  *Id.*  ¶ 45 (emphasis omitted). Armistead stated "[i]t was clear we needed to find another party that was interested in investing in renewables and valued our team . . . . We found the perfect partner in Riverstone—we have a new backer."  *Id.*

[27] *See id.* ¶¶ 42, 46, 57.

[28] *Id.* ¶ 24.

[29] *Id.* ¶ 32.

also serve as Company officers, alongside Elkort, Lyon, and Pedersen.[30] Garland was the Company's first Chief Executive Officer, and Armistead was the Company's Executive Vice President, Business Development.[31] Elkort has held multiple roles at the Company, but most recently acted as its Executive Vice President and Chief Legal Officer.[32] Lyon was the Company's Chief Financial Officer since 2012, and he took over as Company President in April 2019.[33] Pedersen assumed the Chief Financial Officer role at that time, after having served as the Company's Chief Investment Officer.[34] In addition to their roles at the Company, Elkort, Lyon, and Pedersen served Developer 1 and Developer 2. Elkort served as Developer 1's Director of Legal Services and Co-Head of Finance since June 2009 and also served as a Developer 2 officer.[35] Lyon served as Developer 1's Head of Structured Finance since May 2010.[36] And Pedersen served as Developer 2's Chief Financial Officer since May 2018 and Developer 1's Co-Head of Finance since June 2009.[37]

---

[30] *Id.* ¶¶ 24, 32, 51.

[31] *Id.* ¶¶ 24, 32.

[32] *Id.* ¶ 33. Elkort also served as the Company's General Counsel and Chief Compliance Officer. *Id.*

[33] *Id.* ¶ 34.

[34] *Id.* ¶ 35.

[35] *Id.* ¶ 33.

[36] *Id.* ¶ 34.

[37] *Id.* ¶ 35.

Thus, the Officer Defendants were simultaneously tethered to Riverstone, Developer 1 and then Developer 2, and the Company, facing potential conflicts of interest as dual fiduciaries of the Company and Developer 1 or 2.[38] The Company repeatedly noted in public filings these potential conflicts and the likelihood that they would manifest.[39]

The entities also had overlapping directors. Of Developer 2's five directors, Riverstone appointed three,[40] and the Company appointed two: Garland and Armistead.[41] As for the Company's directors, Riverstone, via Developer 1, appointed at least four of the initial directors on the Company's seven-member board of directors (the "Board"), including Garland.[42] Riverstone itself appointed Edmund John Philip Browne, The Lord Browne of Madingley, who was hired as a Riverstone Managing Director and Partner in 2007 to help expand its existing energy practice and identify Company opportunities in the alternative and renewable energy markets.[43] Browne served as a director through the Merger and was involved in the

---

[38] *Id.* ¶ 52 & n.5.

[39] *Id.* ¶ 52.

[40] *Id.* ¶ 38. Riverstone appointed longtime colleagues of Company director Edmund John Philip Browne, The Lord Browne of Madingley: Chris Hunt, Robin Duggan, and Alfredo Marti. *Id.* ¶ 37.

[41] *Id.* ¶¶ 58–59, 63.

[42] *Id.* ¶¶ 47, 323.

[43] *Id.* ¶ 37.

sales process.[44]  Riverstone also appointed Patricia Bellinger, who had previously worked under Browne from 2000 through 2007 and left the Board by the time of the Merger.[45]  Finally, Developer 1 initially appointed Michael Hoffman, who left the Board by the time of the Merger.[46]  In addition to Garland and Browne, Alan R. Batkin, Richard A. Goodman, Douglas G. Hall, Patricia M. Newson, and Mona K. Sutphen (collectively, the "Director Defendants," and together with the Officer Defendants, the "Individual Defendants") served as Company directors at the time of the Merger.[47]  Batkin, Goodman, Hall, Newson, and Sutphen never held and do not currently hold positions at Riverstone, Developer 1, or Developer 2.[48]

The interconnectedness of Riverstone, Developers 1 and 2, and the Company significantly influenced the Merger process, which lasted from June 2018 through November 2019.  In the end, the two competing bidders were Brookfield Asset Management Inc. ("Brookfield") and Buyer, Riverstone's preferred bidder.  Buyer, a pension fund that had previously invested over $700 million in Riverstone funds, was a financial acquirer offering cash that would not disturb Riverstone and

---

[44] *Id.* ¶ 47.

[45] *Id.*  Bellinger resigned from the Board on December 28, 2018.  *Id.* ¶ 47 n.4.

[46] *Id.* ¶ 47.  Hoffman resigned from the Board on August 6, 2018.  He founded one of the bidders that would go on to express interest in the Company and participate in the Merger process.  *Id.* ¶ 47 n.3.

[47] *Id.* ¶¶ 24–31.  Because of Garland's dual role as director and officer, he is included in references to both the Director and Officer Defendants.  *See id.* ¶¶ 31, 36.

[48] *See id.* ¶¶ 25, 27–30.

Developer's operational and structural relationship with the Company. Rather, Buyer funded Riverstone's goals of taking the Company private, internalizing Developer 2, and maintaining the roles of Riverstone, the Officer Defendants, and the and Director Defendants—all for a low price.

Brookfield, a strategic acquirer, offered a stock-for-stock combination with its subsidiary, a successful business in the energy sector.[49] This offered superior value to Company stockholders, but nothing for Riverstone and Developer 2. While Brookfield contemplated internalizing Developer 2 and meeting Riverstone's other wants, in the end, Brookfield envisioned and specifically offered the Company and its public stockholders a clean break from Riverstone and its affiliates.

In the end, Brookfield walked away and Buyer emerged victorious. According to Plaintiff, Buyer prevailed because Riverstone, armed with insider Individual Defendants, a conflicted advisor, and the Consent Right, put the Company up for sale; partnered with Buyer to present a bid for both the Company and Developer 2 that would cash out the Company's public stockholders (except for certain preferred and interested stockholders) at an inadequate price, while capturing a premium for Developer 2; tilted the scale in favor of Buyer's bid and against Brookfield's premium bid; and failed to adequately disclose material conflicts and process flaws to Company stockholders. Plaintiff disputes the fairness of the Merger

---

[49] *See, e.g.*, *id.* ¶ 194.

12

consideration received from the all-cash transaction; contends that Company fiduciaries breached their duties to stockholders by agreeing to the Merger, prioritizing Riverstone over Company stockholders, and issuing a supposedly false and misleading proxy statement; and alleges that the Company's non-stockholder affiliates, Riverstone and Developer 2, influenced and controlled the Merger process to steer the Company toward Buyer and away from more favorable bidders.

With this overview of the Company's relationship with Riverstone and the allegedly resultant outcome of the sales process, our story begins in 2017 with the details of Developer 2's creation.

> **B. The Company Launches Pattern Vision 2020 To Meet Record Demand; Riverstone Obtains The Consent Right Over Transfers Of The Company's Stake In Developer 2; And Company Fiduciaries Tout Excellent Performance.**

Riverstone and the Company leveraged the public focus on renewable energy to improve the Company's supply chain and capital structure.[50] In June 2017, the Officer Defendants announced "Pattern Vision 2020," a strategic initiative to double the Company's size and revamp its capital structure within three years, with positive results beginning in 2020.[51] The first part of the plan was to wind down Developer 1's operational relationship with the Company, replacing Developer 1

---

[50] *See id.* ¶¶ 53–54.

[51] *Id.* ¶ 56.

with Developer 2.[52] The Company pitched its investment in Developer 2 as aligning the Company's interests with Developer 2 based, at least in part, on the Company's rights of first offer.[53]

Riverstone and the Company became Developer 2 limited partners under its Second Amended and Restated Limited Partnership Agreement (the "Partnership Agreement").[54] Section 12.01 of the Partnership Agreement gave Developer 2 the Consent Right over transfers of any limited partner's interests in Developer 2 by a limited partner other than Riverstone—such as the Company.[55] Developer 2's board could withhold its consent in its "sole discretion"; was "entitled to consider only such interests and factors as it desires and shall have no duty or obligation to give any consideration to any interest of, or factors affecting, the Partnership, any Partner or any Transferee"; and could exercise its discretion without being "subject to any

---

[52] *Id.* ¶¶ 2, 38, 57–59.

[53] *Id.* ¶ 60.

[54] *Id.*

[55] Riverstone is the only limited partner exempted from the Consent Right. *Id.* ¶ 62. The Company also had substantial leverage over Developer 2 under the Partnership Agreement. Under Section 3.2, if Developer 2 proposed to "Transfer any material portion of the Equity Interests or all or substantially all of the assets of [Developer 2]," the Company had a right to receive notice and offer to purchase those equity interests or assets within 45 days. *Id.* ¶ 69. If the Company's offer was rejected, Developer 2 could only sell the equity interests or assets within six months for an amount greater than or equal to 110% of the Company's offer price. *Id.* And under Section 9.06(g), Developer 2 was required to obtain the Company's consent before initiating or settling litigation concerning over $10 million. *Id.* ¶ 70 (emphasis omitted).

14

other or different standards imposed by this Agreement or any other agreement contemplated hereby or under the Act or any other law, rule or regulation."[56]  The Consent Right restricted transfers only if the Company *sold* its stake via merger or consolidation.  It did not restrict the Company's right to *acquire* a third party, and therefore left an opportunity to structure a potential Company merger to avoid triggering the Consent Right.[57]  Because Riverstone dominated over Developer 2 and its board, Developer 2's Consent Right effectively gave Riverstone power over any third-party acquisition of the Company, even if Riverstone liquidated its Company stake.[58]

The second part of Pattern Vision 2020 involved selling a significant stake in the enterprise to a third party, Public Sector Pension Investment Board ("PSP").[59] PSP purchased 9.9% of the Company directly from Developer 1.[60]  PSP also indirectly acquired 22% of Developer 2 through Riverstone funds, which was not publicly disclosed at the time of the acquisition or later in connection with the

---

[56] *Id.* ¶ 63 (emphasis omitted).

[57] *Id.* ¶¶ 62, 67–68; Proxy at 36.

[58] Compl. ¶¶ 62–64.  The Company and Developer 2 acknowledged this reality in the Amended and Restated Purchase Rights Agreement dated as of June 16, 2017 (the "Purchase Rights Agreement").  *Id.* ¶ 66.  At this time, Developer 1's consent right lapsed under the shareholder agreement Developer 1 and the Company executed in connection with the IPO, and therefore Riverstone could not use Developer 1 as a vehicle to block the Company mergers.  *Id.* ¶ 64.

[59] *Id.* ¶ 71.

[60] *Id.* ¶¶ 71–72.

Merger.[61]  Thus, PSP became both the Company's largest individual stockholder and a significant undisclosed Developer 2 stakeholder alongside Riverstone.[62]

The Company assured investors that Pattern Vision 2020 was progressing as planned.[63]  In November 2017, Garland told public investors that the Company had "a plan for creating long-term value for investors."[64]  Garland pressed that the Company's June 2017 Developer 2 investment, along with an October 2017 equity raise, "allows us to begin the next phase of our growth strategy" with "excellent growth opportunities," including "the near-term iROFO [identified right of first refusal] assets . . . , our investment in [Developer 2], and the expanded development pipeline of more than 10 gigawatts at [Developer 2]."[65]

Garland made similar assurances to Company investors throughout 2018, repeating that the Company continued to execute on Pattern Vision 2020 and expected resultant and substantial benefits as early as 2020.[66]  Among those

---

[61] *Id.* ¶¶ 71–75, 277.

[62] *Id.* ¶ 71.  PSP also entered into a joint venture agreement with the Company where it received the right to co-invest in renewable energy projects alongside the Company up to an aggregate amount of $500 million.  *Id.* ¶ 72.  The joint venture agreement contained a twelve-month standstill provision.  *Id.* ¶ 73.  Thus, despite the fact that the Company's strategic plan was a three-year plan and forecasted positive results beginning in 2020, PSP was free to facilitate a sale of the Company by June 16, 2018.  *Id.*

[63] *Id.* ¶ 76.

[64] *Id.* ¶ 78 (emphasis omitted).

[65] *Id.* (first alteration in original).

[66] *Id.* ¶ 79.

assurances was the representation that "that the operating portfolio can sustain the existing level without raising common equity any time soon."[67]

Company management continued to crow about Pattern Vision 2020 and its trajectory through 2019.[68] In particular, on March 1, May 10, and August 6, Garland and Pederson told investors there was limited risk that the Company would need to access additional capital to keep its asset portfolio operating; that the Company did not intend to raise common equity capital; that even so, the Company had ample liquidity and financing options for future growth, including ready access to outside capital; and that the Company's investment in Developer 2 would break even and net positive by 2020.[69] In August, Garland projected that gains realized from Developer 2's third-party sales would come to subsidize future development projects and reduce the Company's future capital contributions to Developer 2 and concluded that the Company's investment in Developer 2 "secure[d] [the Company] access to continued growth opportunities as well as material and durable returns that [the Company] anticipate[d] [would] begin next year."[70]

---

[67] *Id.*

[68] *Id.* ¶¶ 81–90.

[69] *Id.* ¶¶ 81–89.

[70] *Id.* ¶ 89 (four of five alterations in original). The projections that formed the basis of the Merger's fairness opinion projected hundreds of millions of dollars in distributions from Developer 2 and only $11 million of future investments from the Company into Developer 2. *Id.* ¶ 82 n.9.

Thus, throughout 2018 and 2019, Company investors repeatedly heard about the Company's stable and promising liquidity and growth as a standalone entity under Pattern Vision 2020, with no need to raise common equity capital through acquisition. Peddling these upward projections, the Company did not face an exigent need to be acquired. But, unbeknownst to the investors, in June 2018, Riverstone and the Officer Defendants had commenced a sales process with the Board's full cooperation.[71]

### C. The Company Commences A Sales Process With Riverstone's Involvement.

At some time prior to June 2018, Riverstone considered taking the Company private, retaining Goldman Sachs & Co. ("Goldman") and using the Company's confidential information in the process.[72] Riverstone did not follow through on taking the Company private. Rather, on June 5, 2018, the Board held its annual meeting, during which it resolved to commence a sales process, despite the Company's strong independent performance.[73] Without raising the issue to the Board's disinterested and independent members, Garland and Riverstone-affiliated management had contacted an advisor, Evercore Group LLC ("Evercore"), in time to get a complete presentation that "included preliminary potential valuations for

---

[71] *Id.* ¶ 90.

[72] *Id.* ¶ 93; Proxy at 36.

[73] Compl. ¶¶ 98, 106–07.

various strategic options."[74]   Before the June 5 meeting, management circulated Evercore's presentation, together with a memo outlining its view on the Company's strategic alternatives.[75]

Garland led the meeting, and advocated that the Board "consider a potential sale of the business."[76]   The Board discussed "the value which investors and potential buyers ascribed to development activities" and "the assumptions made in the Evercore valuation materials[.]"[77]   Chris Hunt, a Developer 2 director and Riverstone partner, but not a Company fiduciary, attended the meeting and accessed Evercore's evaluation.[78]   The Board solicited Riverstone's views on a potential transaction, while simultaneously identifying Riverstone as a prospective acquirer that "may be interested in participating in a potential transaction."[79]   Despite having the opportunity to speak, Riverstone did not disclose to the Board that it had tinkered with the idea of a take-private before the June 5 meeting.   The Board concluded that the Company should begin to engage in negotiations with interested parties.[80]   The

[74] *Id.* ¶ 95 (emphasis omitted).

[75] *Id.*   The Company refused to produce both the management memo and the Evercore presentation in response to Plaintiff's Section 220 Demand.

[76] *Id.* ¶ 94.

[77] *Id.* ¶ 96 (emphasis omitted) (alteration in original).

[78] *Id.* ¶¶ 93, 97.   Hunt's attendance at the June 5 meeting was not disclosed in the Proxy. *Id.* ¶ 93.

[79] *Id.* ¶ 97 (emphasis omitted).

[80] *Id.* ¶ 92; Proxy at 36–37.

Board recognized at the outset that Riverstone was conflicted with respect to any sale, including because Riverstone was a potential acquirer.[81]

### D. The Board Forms The Special Committee, Which Kicks Off The Sales Process.

On June 5, the Board adopted a resolution creating a special committee (the "Special Committee") comprised of Bellinger, Batkin (chairperson), Hall, and Newson.[82] The resolution stated that the Board "determined that it is in the best interests of the Company and its shareholders to conduct a strategic review and consider and evaluate possible strategic transactions outside of the ordinary course of business with the potential to increase value to the Company's shareholders," and that "the Board believes that it is in the best interests of the Company and its shareholders to establish a special committee of the Board comprised solely of disinterested and independent directors . . . to consider and evaluate Strategic Transactions and all matters pertaining thereto on behalf of the Company."[83] The Board exclusively delegated to the Special Committee "all the power and authority of the Board to consider and evaluate Strategic Transactions and all matters

---

[81] Compl. ¶ 105.

[82] *Id.* ¶¶ 99–100; Weinberger Decl. Ex. 1; Proxy at 37.

[83] Weinberger Decl. Ex. 1 at PEGI-00000472.

20

pertaining thereto on behalf of the Company," as well as the authority to appoint advisors and Company officers to assist in the process.[84]

In December 2018, Bellinger resigned from the Board, and Goodman and Sutphen were appointed to the Board.[85] Goodman and Sutphen were then appointed to the Special Committee.[86] Accordingly, the Special Committee that ultimately oversaw the sales process from December 2018 until the Merger's closing consisted of Batkin as chairperson, Hall, Newson, Goodman, and Sutphen, all of whom the Company characterized as disinterested and independent.[87]

Garland and Browne were disqualified from serving on the Special Committee because they harbored obvious conflicts arising out of their relationships with Riverstone: Garland was a Developer 2 officer, director, and investor, and Browne was a longtime Riverstone partner and managing director.[88] Even so, the Special Committee allowed Browne to attend the majority of Special Committee meetings in his capacity as Riverstone's representative and to attend the Special Committee's executive sessions where Company management was specifically

---

[84] *Id.* at PEGI-00000472, -73.

[85] Compl. ¶ 100.

[86] *Id.*

[87] *Id.* ¶¶ 99–100; Proxy at 36, 38.

[88] Compl. ¶¶ 101–02.

excluded due to conflicts.[89]  The Special Committee also permitted Garland to have substantial involvement in its process.[90]  The Special Committee delegated primary responsibility for engaging with the Company's potential suitors to Garland, despite his status as a Riverstone fiduciary and the risk he would disclose material sales process information to Riverstone.[91]

The Special Committee met for the first time on July 13, 2018 and considered retaining financial advisors.[92]  Before that meeting, Batkin and Hall discussed potential advisors with Garland and Lyon.[93]  Garland and Lyon preferred Goldman, which had a longstanding relationship with Riverstone.[94]  Riverstone was founded and operated by Goldman alumni; Goldman owned at least a 12% stake in Riverstone that entitled certain Goldman funds to a proportional cut of management fees and profits; and in the years before the Merger, Goldman received tens of millions of dollars in fees from Riverstone.[95]  Furthermore, Goldman had advised

---

[89] *Id.* ¶¶ 102–04.  The Proxy does not disclose Browne's attendance at any Special Committee meeting.  *Id.* ¶ 104.

[90] *Id.* ¶ 103.

[91] *Id.* ¶ 105.

[92] *Id.* ¶ 106.

[93] *Id.*

[94] *Id.* ¶¶ 98, 106–07.

[95] *Id.* ¶ 107.

Riverstone on its exploration of taking the Company private, which was disclosed in a July 2, 2018 letter to the Special Committee.[96]

Despite Garland and Lyon's push for Goldman, the Special Committee decided to retain only Evercore and to revisit the possibility of retaining Goldman at a later time.[97] The Special Committee also engaged Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss") as independent legal counsel.[98]

The Special Committee met again on August 2.[99] Batkin proposed the Special Committee approach "both Riverstone and [PSP] . . . at the outset, given their current investments in the Company and the Pattern Development Companies, . . . their knowledge of potential partners and their familiarity with management."[100] In accordance with Batkin's suggestion, when the Special Committee met next on October 29, a PSP representative attended, as well as Browne, as Riverstone's representative.[101] At that meeting, an Evercore presentation reviewed the Company's projections and valuations under different strategic alternatives.[102] With Riverstone and PSP at the table, meeting participants also discussed the

---

[96] *Id.* ¶ 98.

[97] *Id.* ¶ 108; Proxy at 37.

[98] Proxy at 37.

[99] Compl. ¶ 109; Proxy at 37.

[100] Compl. ¶ 109.

[101] *Id.* ¶ 110; Proxy at 37.

[102] Compl. ¶ 111.

"potential for a transaction with PSP, Riverstone, or another party."[103] Garland also explained that he had been approached by both Brookfield and Party B about a potential transaction.[104] Paul Weiss outlined a number of process.[105]

The Special Committee, plus Browne, met again the following day, October 30.[106] The Special Committee authorized Garland to meet with both Brookfield and Party B and solicit their interest in making a strategic proposal for the Company.[107]

In early November 2018, the Special Committee established conduct guidelines for management and Board members who were not members of the Special Committee "in order to help ensure that the Special Committee would be able to function independently and effectively execute its mandate."[108] These guidelines prohibited Company management from engaging with any potential parties to a strategic transaction without the Special Committee's express consent.[109]

---

[103] *Id.* (alteration omitted).

[104] *Id.* This opinion and the Proxy refer to other bidders as "Party —" for confidentiality purposes. *See* D.I. 69 at 13–17.

[105] Proxy at 37.

[106] *Id.*; Compl. ¶ 112.

[107] Compl. ¶ 112.

[108] Proxy at 37.

[109] *Id.* at 37–38.

On November 19, the Board met, and Garland informed the Board that meetings and negotiations were progressing with Brookfield, but Party B was not interested in pursuing a transaction at that time.[110]

### E. The Special Committee Engages With Numerous Bidders.

Over the next year, the Special Committee would engage with several bidders, gaining momentum in the summer of 2019. While the Complaint's allegations focus primarily on the tale of two bidders—Buyer and Brookfield—other bidders' indications of interest and the Special Committee's response are important to a full understanding of the sale process. The Special Committee's engagement with these other bidders, referred to in the Proxy as Party B and Party D, was interspersed with its engagement with Brookfield and Buyer.[111] Each bidder was pressed for a premium, and Party B and Party D received confidential information and executed confidentiality agreements with both the Company and Riverstone, just as Brookfield and Buyer would do.[112]

And, just as Brookfield and Buyer would, Party B and Party D demonstrated an understanding that any transaction needed to include Developer 2 and to satisfy

---

[110] *Id.* at 38.

[111] *See id.* at 37–53. Buyer, Brookfield, Party B, and Party D emerged as the primary prospects, but other bidders also expressed interest and were considered.

[112] *See, e.g.*, *id.* at 43, 48. After the Special Committee noted it could not give competitively sensitive due diligence to Party B because Party B was a significant competitor, on September 6, Party B and the Company entered into a confidentiality agreement; the

Riverstone. Party D's first offer, on July 8, 2019, was to acquire the Company for $25 in cash and Developer 2 at a multiple of 1.6x invested capital in either cash or equity.[113] On July 15, Party D revised its offer for Developer 2 to 1.8x invested capital plus a potential earn-out, in response to feedback that an attractive and competitive offer would offer a premium for Developer 2.[114] On August 15, reaffirming its interest to cash out the Company's public stockholders and merge the Company with Developer 2 in an equity-based transaction, Party D noted that, "[a]s you are aware, we are engaged in productive discussions with [Riverstone] on the terms under which we would govern the new combined company."[115] Bidders were under the impression that any post-closing entity would be subjected to Riverstone's continued presence.

On August 19, the Special Committee discussed Party D's offer and authorized Evercore and Goldman to request written proposals based on publicly available information.[116] At an August 26 Special Committee meeting, Evercore reported Party D orally raised its offer for the Company to $26.50 per share.[117] The

---

Company, Party B, and a Riverstone affiliate entered into a side letter. *See* Compl. ¶¶ 170; Proxy at 47, 48.

[113] Compl. ¶ 149; Proxy at 38.

[114] Compl. ¶ 149; *see also* Proxy at 43.

[115] Compl. ¶ 160.

[116] Proxy at 45.

[117] Compl. ¶ 168 n.20.

next day, August 27, Party B submitted to a non-binding letter of interest to acquire the Company in an all-cash transaction for $25 to $28 per share, and 100% of Developer 2 at an unspecified price.[118]

On September 20, Party D upped its cash offer for the Company to $26.75 per share, which included Developer 2 at a valuation of approximately $800 million plus an earnout for the 71% not owned by the Company.[119] Party D would have allowed Riverstone to hold equity in the combined entity.[120] Party D stated it had reached an agreement on all key terms with Riverstone, describing Riverstone as one of "the three legs of the stool that are critical to accomplishing our objective of acquiring and combining [the Company] and [Developer 2]."[121] On September 23, Evercore sent Party D a draft merger agreement, and eventually arranged a meeting with Party D, the Company, and Riverstone to discuss the transaction.[122]

In the final weeks of the process, the Special Committee was considering Brookfield, Buyer, Party B, and Party D. On September 29, the Special Committee determined to proceed cautiously with Party B, given that Party B was a competitor

---

[118] *Id.* ¶ 169; Proxy at 46.

[119] Compl. ¶ 181.

[120] *Id.*

[121] *Id.*

[122] Proxy at 49; *see also id.* at 50 (noting the Company met with Party B and Riverstone on September 25).

and its "indicative price did not exceed prices offered by other potential buyers."[123] By mid-October, Party B had determined it was not willing to move forward.[124] On October 17, Evercore instructed Brookfield, Buyer, and Party D to submit their "best and final" offers by October 28.[125] Party D did not submit a best and final offer and ultimately withdrew.[126]

### F. Brookfield Proposes A Merger With The Company; The Special Committee Seeks A Premium; And The Parties Begin Due Diligence.

Throughout January and February 2019, Garland and other members of Company management continued discussions with Brookfield.[127] On January 14 and January 15, management met with Brookfield representatives.[128]

On January 16, the Board met with Company management.[129] Garland informed the Board that at the Special Committee's direction, he and other members of Company management had met with Brookfield and engaged in initial discussions regarding a potential strategic transaction involving the Company, Brookfield, and

---

[123] *Id.* at 50.

[124] *Id.* at 51.

[125] *Id.*; Compl. ¶ 191.

[126] Proxy at 52.

[127] Compl. ¶ 113.

[128] Proxy at 38.

[129] *Id.*

TerraForm Power, Inc. ("TerraForm").[130]  TerraForm is publicly traded and Brookfield-controlled.[131]  At that time, none of the Company's material confidential information had been shared with Brookfield and TerraForm.[132]

On January 25, the Special Committee met for an update on management's discussions with Brookfield.[133]  Management developed and summarized a stock-for-stock combination of the Company and TerraForm at an at-market exchange ratio (*i.e.*, no premium).[134]  The Special Committee excused management from the meeting and held an executive session to further evaluate the TerraForm proposal and consider next steps.[135]  The Special Committee asked its advisors, Paul Weiss and Evercore, to evaluate an at-market share exchange as a potential transaction.[136]

On February 7, Garland revisited Brookfield and TerraForm.[137]  On February 15, at the Special Committee's direction, Batkin, Garland and Evercore representatives met with Brookfield representatives, and Brookfield proposed an at-

---

[130] *Id.*

[131] *Id.*

[132] *Id.*

[133] *Id.*; Compl. ¶ 113.

[134] Proxy at 38.

[135] *Id.*

[136] *Id.*

[137] *Id.*

29

market all-stock merger of the Company and TerraForm.[138]  On February 21, Brookfield submitted a term sheet.  Brookfield expressly indicated that its offer was not conditioned an acquisition of Developer 2:  under the proposal as submitted, Riverstone could be excluded from the transaction.[139]

That same day, after receiving Brookfield's proposal, the Special Committee met.[140]  At that meeting, Garland flagged Developer 2's Consent Right, telling the Special Committee that Brookfield's proposed transaction could "trigger existing consent rights held by" Riverstone.[141]  The Special Committee also considered that Brookfield's offer did not include a premium, but decided to respond to the offer.  It directed Paul Weiss and Evercore "to analyze the proposed transaction's structure and terms, including with respect to issues relating to [the Company's] relationship with [Developer 2] and the absence of any premium to be offered to holders of Company Common Stock,"[142] and to prepare a response.[143]  The Special Committee also authorized mutual due diligence, subject to a confidentiality agreement.[144]

---

[138] *Id.*

[139] Compl. ¶ 114.

[140] *Id.* ¶ 116; Proxy at 39.

[141] Compl. ¶ 116.

[142] Proxy at 39.

[143] Compl. ¶ 118.

[144] Proxy at 39.

Accordingly, on February 28, the Company executed a confidentiality agreement with Brookfield and TerraForm that included standstill provisions.[145]

The Special Committee met again on March 9 to review Brookfield's term sheet, joined by Paul Weiss, Evercore, Garland, Browne, and Elkort, Chief Legal Officer for the Company and Developer 2.[146] Batkin and Garland updated the Special Committee regarding recent discussions with Brookfield. Garland told the Special Committee that it would need to evaluate the Consent Right.[147] Elkort was even more explicit.[148] The meeting minutes state that Elkort "emphasized" to the Special Committee that "the need for [Riverstone's] support for any potential . . . transaction should not be underestimated because [Riverstone's] rights to consent that would likely be implicated by the proposed transaction appeared to be very broad."[149] Nonetheless, based on Evercore's advice, the Special Committee determined to seek from Brookfield a 15% premium to the trading price of Company common stock.[150]

---

[145] *Id.*

[146] Compl. ¶¶ 116–17; Proxy at 39.

[147] Compl. ¶ 116.

[148] *Id.* ¶ 117.

[149] *Id.*

[150] Proxy at 39.

At the meeting's conclusion, the Special Committee met in executive session, with management "excused from the meeting," but with Browne still in attendance.[151] During that session, the Special Committee directed Paul Weiss and Evercore to revise Brookfield's term sheet.[152] The Special Committee also established "guidelines for management's discussions with the various parties."[153] The Special Committee determined that the Company would deliver the revised term sheet to Brookfield; Batkin would continue to coordinate, and have the option to be involved in, discussions with Brookfield and any other potential transaction parties; and Batkin would continue to serve as the Special Committee's representative.[154] The Special Committee authorized Garland to "notify" Developer 2 and Riverstone about the Company's discussions with Brookfield, but directed that Garland was not to "divulg[e] any specific terms" to Developer 2 or Riverstone.[155] At the close of the executive session, the Special Committee instructed Paul Weiss to inform management of the following:

---

[151] Compl. ¶ 117; Proxy at 39.

[152] Compl. ¶ 118.

[153] *Id.*

[154] Proxy at 39.

[155] Compl. ¶ 119.

> The Committee noted that it shall continue to be informed of developments arising from any of the discussions that it had authorized, that management and the advisors shall refrain from taking any further steps or engaging in any further discussions without the express authorization of the Committee and that the Committee shall retain final decision-making authority with respect to [the sales process].[156]

These instructions bolstered the instructions the Special Committee provided management and Browne in November 2018. The Special Committee did not formally meet again until May.[157]

Paul Weiss and Evercore revised the Brookfield term sheet as instructed; management did not assist.[158] On March 11, the Company provided Brookfield with a revised term sheet that contemplated a Company-TerraForm merger with a 15% premium for Company stockholders.[159] The revised term sheet recognized the Consent Right was readily circumvented, stating that the parties would "need to structure the transaction as a merger of [TerraForm] into a subsidiary of [the Company] due to" the Consent Right and that that the "structure" would "not affect the economic terms of the transaction."[160] On March 20—with the Special Committee's authorization—Batkin, Company management, Evercore, and Paul

---

[156] *Id.* ¶ 120 (emphasis omitted).

[157] *Id.* ¶ 122.

[158] *Id.* ¶ 121.

[159] *Id.*; Proxy at 39.

[160] Compl. ¶ 121 (emphasis omitted).

Weiss met with Brookfield to discuss the potential Company-TerraForm merger.[161] They decided to move forward with due diligence.[162]

After it became evident that a Company-Terraform merger could be accomplished without including Developer 2 or triggering the Consent Right, Garland engaged in discussions with Brookfield, Riverstone, and Buyer that were not sanctioned by the Special Committee.[163] On March 12, Garland had an unauthorized communication with representatives of Brookfield and TerraForm about a potential transaction involving the Company, Brookfield, and TerraForm.[164] And on April 11, the Company, Brookfield, and a Riverstone affiliate entered into a three-party side letter to the Company-Brookfield confidentiality agreement to facilitate Brookfield's due diligence review of Developer 2.[165] The Company and Riverstone's affiliate entered into a mutual confidentiality agreement.[166] From this timeline, it is reasonable to infer that Company representatives revealed to

---

[161] Proxy at 39–40.

[162] *See id.* at 40.

[163] Compl. ¶¶ 120, 123–24.

[164] Compl. ¶ 123; *compare* Proxy at 39 ("On March 12, 2019, Mr. Garland spoke with representatives of [Brookfield] and [TerraForm] about a potential transaction involving Pattern, [Brookfield] and [TerraForm]."), *with* Compl. ¶ 123 ("On March 20, 2019, *as authorized by the Special Committee*, Mr. Batkin, [Company] management and representatives of Evercore and Paul Weiss met with representatives of Party A to discuss the terms of a potential transaction involving [the Company] and Company A." (emphasis added)).

[165] Proxy at 40.

[166] *Id.*

Brookfield the sales process' goal of internalizing Developer 2 and including Riverstone. This conclusion is consistent with Brookfield's later statement that "it had been told early in the process that [the Company] believed it was desirable for [Company]'s senior management to maintain their positions in the combined company, including their dual positions at [Developer] 2" and "that it was a priority for [the Company] to internalize [Developer] 2 as part of a transaction."[167]

Aware that Developer 2 was in play, on April 16, Brookfield met with Batkin, Company management met, and the "Riverstone Representatives"—specifically, two Developer 2 directors[168]—"to discuss how [Developer 2] would be affected by a transaction."[169] The Riverstone Representatives indicated Riverstone would be open to considering any proposals from Brookfield involving Developer 2 and the Company.[170] Brookfield responded that would be potentially interested in a combination of the Company and TerraForm, with the surviving company directly acquiring Developer 2.[171] Throughout April 2019, at the direction of the Special Committee, the Company continued due diligence into Brookfield's proposal.[172]

---

[167] Compl. ¶ 174.

[168] *Id.* ¶ 124.

[169] Proxy at 40.

[170] *Id.*

[171] *Id.*

[172] *Id.*

35

As due diligence progressed with Brookfield, Goldman resurfaced.  In early April, the Special Committee retained Goldman as "a second financial advisor" with respect to evaluating proposals for a potential transaction, notwithstanding the fact that Goldman had long-term and lucrative relationships with Buyer and Riverstone,[173] and had advised Riverstone on a potential take-private of the Company using confidential information provided by Riverstone shortly before the sales process began.[174]   The Special Committee never requested access to the materials Goldman prepared for Riverstone, even after Goldman offered to provide them.[175]

Interestingly, the Special Committee retained Goldman only informally in April and, as alleged, involved Goldman in the sales process throughout April and May.[176]  It did not formally engage Goldman to evaluate a potential transaction and

---

[173] Compl. ¶ 271 & n.26.

[174] *Id.* ¶¶ 107, 134, 136; Proxy at 40.

[175] Compl. ¶ 107.   The Partnership Agreement restricted Riverstone from using any confidential information relating to, among others, the Company, which had been entrusted to Developer 2 with the expectation that the information be kept confidential.  Kirby Decl. Ex. 25 § 15.06.  Plaintiff alleges that the Board did nothing to prevent Riverstone from leveraging its access to the Company's confidential information and that no information regarding Riverstone's allegedly impermissible information sharing with Goldman was disclosed in the Proxy.  Compl. ¶ 98.

[176] *Compare* Proxy at 40 ("In early April 2019, the members of the Special Committee determined to continue to engage Evercore with respect to evaluating proposals with respect to a potential transaction.  The Special Committee also determined to retain

36

execute an engagement letter until May 24.[177] Goldman's engagement letter provided it stood to receive $2 million upon the announcement of a Merger and an additional $4 million upon the execution of the Merger.[178] The Company, Riverstone, and Buyer also retained the right to provide Goldman with an additional $3 million following the execution of the merger if they saw fit.[179] This information was not disclosed in the Proxy, and neither the Proxy nor the Section 220 production explain why the Special Committee decided to belatedly retain Goldman.[180]

Throughout April, the push to satisfy Riverstone and Developer 2 continued. In addition to expanding the scope of the potential Brookfield transaction to include Developer 2, Garland turned his attentions to another potential bidder: Buyer, which had established investment ties to Riverstone investment funds and would ultimately prevail in purchasing the Company and Developer 2.[181] On April 15, Garland had an unauthorized meeting with the Riverstone Representatives and Buyer

---

Goldman . . . ."), *with id.* at 41 (stating that "[o]n May 24, 2019," Goldman attended a Special Committee meeting, and after being excused from that meeting, the Special Committee "considered amending its formal engagement of Evercore and formally engaging Goldman Sachs" and ultimately "adopted resolutions to amend its formal engagement letter with Evercore and to execute an engagement letter with Goldman Sachs with respect to evaluating a potential transaction").

[177] *Id.* at 41.

[178] Compl. ¶ 271.

[179] *Id.*

[180] *Id.*

[181] *Id.* ¶ 124.

(the "April 15 Meeting").[182]  There, Buyer "indicated that [it] was potentially interested in acquiring [the Company]."[183]  According to Merger disclosures, while Garland eventually disclosed the April 15 Meeting to Batkin and the Special Committee, it took him a month to do so.[184]

The Special Committee met on May 2 with Company management, Paul Weiss, Evercore, and Goldman.[185]  While the Proxy states Garland disclosed the April 15 Meeting at the May 2 Special Committee meeting, this is unsupported by the meeting minutes.[186]  The meeting minutes do not mention Buyer, let alone that Garland had met with Riverstone and Buyer weeks earlier to discuss Buyer potentially acquiring the Company.[187]  In another wrinkle, the minutes state Garland told the Special Committee that Riverstone had suggested taking the Company private, but "dropped the suggestion following consideration of conflicts and certain contractual obligations."[188]  According to Plaintiff, Riverstone had not "dropped the suggestion" as Garland represented.[189]  Rather, Riverstone, with Garland's active

---

[182] *Id.*

[183] *Id.*; Proxy at 40.

[184] Proxy at 40.

[185] Compl. ¶¶ 126–27; Proxy at 40.

[186] *Compare* Compl. ¶¶ 125–27, 137, *with* Proxy at 40.

[187] Compl. ¶ 126.

[188] *Id.* ¶ 127.

[189] *Id.*

involvement, sought a deal by which it would take the Company private along with Buyer.[190]

On May 15, a month after Garland's April 15 Meeting, Batkin informed the Special Committee that Garland had spoken to Buyer via a memo (the "Batkin Memo").[191] The Batkin Memo stated that Garland had discussions with Riverstone and Buyer concerning a potential acquisition by Buyer and that Garland "spoke to" a Buyer representative who Garland "knew when this person worked at General Electric."[192] The Batkin Memo did not disclose to the Special Committee that Garland's unauthorized discussions had occurred a full month earlier.[193] It also gave the impression that Garland spoke to Buyer independently, while the Proxy discloses Garland met with Buyer and Riverstone together.[194] This was the only memo Batkin sent to the Special Committee throughout the sales process.

A May 24 Special Committee meeting focused on Buyer's arrival.[195] The meeting minutes state that Garland "noted that in addition to meeting with [Brookfield], there would also be meetings the following week with [Buyer] and

---

[190] *Id.*

[191] *Id.* ¶ 128.

[192] *Id.*

[193] *Id.*

[194] *Compare id.*, *with* Proxy at 40.

[195] Compl. ¶ 139.

[Riverstone], as [Buyer] had expressed interest in potentially structuring a strategic transaction," and that Buyer's "approach to the Company . . . had come about indirectly."[196] Garland still did not fully disclose to the Special Committee that he had met with Buyer and Riverstone together over a month earlier, and that Buyer's interest as a potential bidder was piqued more directly than Garland suggested.[197]

On May 28, Buyer and the Company entered into a confidentiality agreement, and Riverstone entered into a side letter to facilitate sharing Developer 2 information.[198] By June, Buyer and Riverstone were believed to be working together on a proposal.[199] At some point, without the Special Committee's approval, Goldman joined these discussions which included talk of a take-private action.[200]

After receiving the Batkin Memo and learning of Garland's unauthorized communications, the Special Committee took no steps to reestablish control of the merger process; rather, it continued delegating substantial authority and responsibility to Garland.[201] The Special Committee permitted Garland to continue meeting alone with Brookfield, Buyer, and Riverstone.[202] And he continued

---

[196] *Id.* ¶ 140.

[197] *Id.*

[198] Proxy at 41.

[199] Compl. ¶ 143.

[200] *See id.* ¶¶ 306, 311(a)–(b).

[201] *Id.* ¶ 133.

[202] *Id.* ¶ 141.

wielding authority in the sales process.[203]  Plaintiff alleges this passivity suspiciously followed Brookfield's expression of interest in proceeding with a transaction that might exclude Developer 2, as well as the tension between (1) Garland and Elkort's insistence to the Special Committee that Riverstone had a "broad" Consent Right such that Riverstone would have to approve of any merger, and (3) Paul Weiss and Evercore's statements that the Consent Right was easily circumvented. [204]

## H.    The Special Committee Continues Considering Brookfield.

The Special Committee continued to court Brookfield.  At the May 2 meeting, Batkin and Garland summarized recent discussions with Brookfield and Riverstone, and Garland detailed the ongoing due diligence process.[205]  The meeting minutes indicate that Brookfield remained interested, regardless of whether the transaction included Developer 2.[206]  But Garland noted that Riverstone preferred any merger to involve Developer 2.[207]  The Special Committee excused management and commenced an executive session to evaluate potential issues with Brookfield, including the Consent Right.[208]  The Special Committee reiterated the "potential

---

[203] *Id.* ¶ 133.

[204] *Id.* ¶ 130.

[205] Proxy at 40.

[206] Compl. ¶ 138.

[207] *Id.*

[208] Proxy at 40.

conflicts involving certain members of senior management."[209]   Yet the minutes show Browne attended the entire meeting, including the executive session.[210]

Brookfield was also considered at the May 24 meeting.  Goldman and Evercore noted that Brookfield had "indicated a desire to seek" Riverstone's consent to any transaction with the Company, but that a "[Company]-on-top triangular merger may not trigger [Riverstone's] consent right."[211]  Goldman and Evercore also listed the benefits of a Brookfield transaction:  the creation of a leading renewables platform with enhanced scale and diversification; a strong sponsor in Brookfield that would team with best-in-class management at the Company; synergies that would drive cash flow and support dividend growth; an expanded project development portfolio; a reduced reliance on external financing with no need to raise common equity through 2023; a stronger credit profile; and a better governance structure that aligns the incentives of the sponsor and public stockholders.[212]

On May 29, at the Special Committee's direction, Garland met again with Brookfield; Riverstone attended that meeting, despite having started working with Buyer on a potential acquisition.[213]  Garland and Riverstone "provide[d] an overview

---

[209] Compl. ¶ 138.

[210] *Id.* ¶ 134 n.14.

[211] *Id.* ¶ 139.

[212] *Id.*

[213] *Id.* ¶ 141.

of [Developer 2] and its business plan to [Brookfield]" and answered questions.[214] That same day, at the Special Committee's direction, Garland met with representatives of Buyer and Riverstone to do the same.[215]

On May 30, Batkin met with Company management, Paul Weiss, Evercore, and Brookfield "to discuss key open issues identified by the Special Committee with respect to a combination of [the Company] and [TerraForm], including price and the need to insulate holders of Company Common Stock from the risks associated with" litigation TerraForm was embroiled in.[216] Those conversations proved productive. On May 31, Brookfield submitted a revised term sheet reflecting not only TerraForm's all-stock acquisition at the 15% premium that the Company had contemplated back in March, but also a concurrent acquisition of Developer 2 for a cash price to be negotiated by the Company and Riverstone, such that Riverstone would be cashed out and no longer have any ownership interest in the Company or Developer 2 post-closing.[217]

The Special Committee met on the next day to review Brookfield's submission and "discuss[] next steps with respect to [Brookfield]'s recent

---

[214] Proxy at 41.

[215] *Id.*

[216] *Id.*

[217] Compl. ¶ 142; Proxy at 41.

proposal";[218] consistent with ongoing practice, Browne was present for the entire meeting.[219] Garland reported to the Special Committee that "[Riverstone] had indicated it would work with all parties potentially interested in [Developer 2] to provide information," but that "it also appeared that [Buyer and Riverstone] may be working with each other regarding a potential proposal."[220] As alleged, this statement was a half-truth: Garland had known since at least mid-April that Buyer and Riverstone were working together.[221]

Nonetheless, the Special Committee pressed forward with Brookfield.[222] On June 4, at the Special Committee's direction, Paul Weiss sent Brookfield a marked-up term sheet, along with a request that Brookfield confirm that the 15% premium was not subject to continued due diligence.[223] The revised term sheet reflected certain structural changes designed to insulate the Company's common stockholders from potential liabilities associated with ongoing litigation involving TerraForm.[224]

---

[218] Proxy at 41.

[219] Compl. ¶ 143 & n.16.

[220] *Id.* ¶ 143 (emphasis omitted); Proxy at 41 ("The Special Committee also discussed [Buyer]'s interest in a potential transaction.").

[221] Compl. ¶ 143.

[222] Proxy at 41.

[223] *Id.*

[224] *Id.*

On June 5, Paul Weiss and Company management met with Brookfield and its outside counsel; they met again on June 7.[225]

### I. The Special Committee Entertains Competitive Bids From Brookfield, Buyer, And Others.

Between May and October 2019, Brookfield presented "several updated and enhanced offers" to the Special Committee and Riverstone.[226] The terms of Brookfield's offers were economically superior to Buyer's.[227] But Buyer stayed in the running with Riverstone's vote of confidence, Garland's support, and the Special Committee's active interest.[228]

On June 12, the Special Committee and Browne reconvened.[229] The Special Committee noted that, among other things, Buyer and Riverstone had been negotiating directly without the Special Committee's involvement.[230] Yet, to the extent those negotiations were relevant to acquiring the Company, the Special Committee did not attempt to intervene.[231]

---

[225] *Id.* at 41–42.

[226] D.I. 82 at 20; *see* Compl. ¶¶ 142–97.

[227] *See* Compl. ¶¶ 142–97.

[228] D.I. 82 at 20.

[229] Compl. ¶ 144 & n.17.

[230] *Id.* ¶ 144.

[231] *Id.*

The Special Committee met again on June 18.[232]  Batkin reported that Riverstone contacted Garland and stated that Buyer had offered to purchase Developer 2 for a 2x multiple of Riverstone's invested capital.[233]  But Buyer had not yet made an offer to acquire the Company:  it was focused on Developer 2.[234]

The Special Committee consulted with its advisors and, on June 27, gave management instructions and guidelines regarding next steps.[235]  Management was authorized and requested to seek written proposals from Buyer and Brookfield.[236]  Management could not discuss "role or compensation arrangements in connection with any potential transaction without specific authorization from the Special Committee, except for limited non-compensation related discussions regarding potential key personnel, operational integration, or staffing in the event a transaction were to occur."[237]

On June 28, Buyer finally submitted a nonbinding proposal to purchase the Company for $25.50 per share, a 14% premium over the volume weighted average price ("VWAP") for the three month period ending June 27, 2019.[238]  Buyer

---

[232] *Id.* ¶ 145.

[233] *Id.*

[234] *Id.*

[235] Proxy at 42.

[236] *Id.*

[237] *Id.*

[238] *Id.*; Compl. ¶ 147.

contemplated merging the Company and Developer 2 and allowing Riverstone and the Officer Defendants to maintain or receive an equity interest in the combined company.[239] Buyer's offer specifically assumed it would reach a separate agreement with Riverstone with respect to Developer 2, as well as separate agreements with the Company's senior management.[240] Buyer also stressed that it needed to continue its discussions with Riverstone and to discuss the matter with PSP.[241]

On July 1, Brookfield submitted a competitive bid, disclosing it had completed its due diligence and proposing that TerraForm acquire the Company in an all stock merger representing a 15% premium based on trading prices leading up to the time of the announcement.[242] The offer contemplated that the combined entity concurrently acquire Developer 2 for cash at a 1.75x multiple of invested capital, cashing Riverstone out.[243] Brookfield also disclosed it was open to providing Company stockholders with a cash option.[244] The offer hedged that Brookfield needed to reach an agreement with the Company and Riverstone on Developer 2's

---

[239] Compl. ¶ 147.

[240] *Id.*

[241] *Id.*

[242] *Id.* ¶ 148.

[243] *Id.*

[244] *Id.* ¶ 148 n.18.

valuation.[245]  With competitive offers on the table, the Special Committee began probing other bidders, and received interest as described above.

On July 12, Brookfield's counsel sent Paul Weiss a draft merger agreement, which provided that Brookfield, but not the Company, would have a termination right in the event that a proposed Developer 2 acquisition failed to close with or before the proposed Company-TerraForm merger.[246]  And on July 15, Batkin met with Buyer, which reiterated its interest.[247]

On July 16, Batkin, Paul Weiss, Company management, Evercore, and Brookfield met.[248]  They reviewed specifics of the pro forma business plan of the combined company that would result from any Company-TerraForm merger.[249]  The parties met again on July 17.[250]  On July 16 and 17, Brookfield and the Company exchanged revised term sheets that reflected the same economic terms as Brookfield's July 1 offer, and additionally addressed the "governance of the pro forma combined company."[251]

---

[245] *Id.* ¶ 148.

[246] Proxy at 43.

[247] *Id.*

[248] *Id.*

[249] *Id.*

[250] *Id.*

[251] *Id.*; Compl. ¶ 150.

Brookfield submitted a new offer on July 23.[252] Acknowledging Riverstone's influence, Brookfield noted that the Company's "Board and management wish to also internalize [Developer 2] as part of this transaction" and reiterated that it was open to buying Developer 2 for partial cash in a deal that included a 15% premium to Company stockholders.[253] Brookfield also stated that it would be willing to offer a 20% premium to Company stockholders in a simpler transaction that did not include acquiring Developer 2.[254] This laid bare that including Developer 2 in a transaction would result in less consideration for the Company's public stockholders, and that Riverstone and the Officer Defendants, as Developer 2 stockholders, were competing with Company stockholders for value.[255]

The Special Committee met on July 31 and August 1 to discuss the pending offers, including Brookfield's offer to pay more for the Company alone, without Developer 2.[256] The Special Committee noted that the two offers internalizing Developer 2 provided similar value to Company stockholders; but in a key difference, Brookfield would cash out Riverstone, while Buyer would allow

---

[252] Compl. ¶ 151.

[253] *Id.*

[254] *Id.*

[255] *Id.*

[256] *Id.* ¶ 152. The July 31 meeting was unusual in that Paul Weiss and Evercore did not attend the meeting, but Goldman did. *Id.*

Riverstone to continue to own an equity interest.[257]   In addition, the Special Committee weighed "the complexity of [Brookfield]'s proposal" against the proposals from Buyer and Party D, as well as "the certainty of value of [Buyer]'s and [Party D]'s all-cash proposals relative to [Brookfield]'s proposed all-stock transaction with an option to include up to $750 million in cash."[258]   The Special Committee recognized that Brookfield's offers exceeded Buyer's then-current offer, estimating that Brookfield's offer at a 15% premium equated to a 1.8413 exchange ratio, or approximately $28.25 per share, based on a 90-day VWAP.[259]

But Evercore flagged that Buyer was already in "advanced stages of negotiation" with Riverstone, and that a combination of the Company and Developer 2 was "in line with management's vision."[260]   The Special Committee also discussed PSP's conflicts of interests in any transaction, allegedly recognizing that PSP was not similarly situated to the Company's public stockholders.[261]

According to Plaintiff, at the August 1 meeting, the Special Committee decided to see if Buyer would increase its offer, while holding off on further

---

[257] *Id.* ¶ 154; Proxy at 44.

[258] Proxy at 44.

[259] Compl. ¶ 158.

[260] *Id.* ¶ 157.

[261] *Id.* ¶ 153.

50

substantive negotiations with Brookfield.[262] The Special Committee determined that, when it did re-engage with Brookfield, it would convey the importance of reaching an agreement with Riverstone that included Developer 2 and was therefore consistent with management's expectations.[263]

Even so, between August 1 and August 12, the Special Committee directed Evercore and Goldman to encourage Buyer, Brookfield, and Party D to improve their previous proposals.[264] Around this time, Buyer asked for exclusivity.[265] Evercore and Goldman indicated to Buyer that the Special Committee would consider exclusivity only if Buyer raised its offer price for the Company.[266] Buyer declined.[267]

The market soon caught wind of the Company's suitors. On August 12, *Bloomberg* reported that Brookfield and TerraForm were in merger discussions with

---

[262] *Id.* ¶ 156.

[263] *Id.* ¶ 157.

[264] Proxy at 44 (providing the Special Committee determined that Evercore and Goldman should encourage each bidder to "improve their offers and to accelerate their work"); *id.* ("Between August 1 and August 12, 2019, at the direction of the Special Committee, representatives of Evercore and Goldman Sachs contacted representatives of [Brookfield], [Buyer] and [Party D] to encourage each potential buyer to improve its previous proposal.").

[265] *Id.*

[266] *Id.*

[267] *Id.*

the Company.[268]  That day Company stock closed at $25.15 per share, representing an increase of $1.85 per share over the closing price on August 9—the last full trading day prior to the *Bloomberg* report.[269]  The next day, as requested by Canadian regulators, the Company issued a press release stating that "it had responded to inquiries from third parties, but that no definitive agreement had been reached with respect to a strategic transaction with any party and that there was no assurance that [the Company] would agree to any strategic transaction."[270]

That same day, August 13, Batkin met with Company management, Paul Weiss, Evercore, and Goldman to discuss structuring a Company-TerraForm transaction, including excluding Developer 2.[271]  They met again on August 16.[272] Garland reported that, since August 12, the Company received indications of interest from at least seven new potential buyers.[273]  After Evercore and Goldman's consideration, Batkin authorized Garland and the advisors to contact these parties.[274]

Later that day, Buyer submitted an updated offer to purchase both the Company and Developer 2 in a transaction that valued the Company in range of

---

[268] *Id.*; Compl. ¶ 159.

[269] Proxy at 44.

[270] *Id.*

[271] *Id.* at 45.

[272] *Id.*

[273] *Id.*

[274] *Id.*

$26.25 to $26.50 per share.[275] At that time, this reflected a 15.8% premium over the three-month weighted average price for the Company, which was lower than the 20% premium Brookfield offered to pay in a deal that did not include Developer 2.[276] Buyer did not indicate its valuation of Developer 2.[277] But Buyer expressed its confidence that it could negotiate a definitive price with Riverstone, as they had already engaged in productive discussions.[278] Buyer's offer also assumed that it would reach satisfactory agreements with Company management for their roles in the post-closing entity.[279] In conjunction with the offer and these assumptions, Buyer reiterated its desire to discuss the proposed transaction with PSP.[280]

The Special Committee met on August 19.[281] Buyer had offered to acquire Developer 2 at a price equal to 1.8x of Riverstone's invested capital, subject to an earn-out that could increase the total purchase price to up to 2.25x Riverstone's invested capital; Riverstone believed this offer acceptable.[282] The Special Committee recognized that an integrated offer for both the Company and

---

[275] *Id.*; Compl. ¶ 161.

[276] Compl. ¶ 161.

[277] *Id.*

[278] *Id.*

[279] *Id.*

[280] *Id.*

[281] *Id.* ¶ 162.

[282] *Id.* ¶ 163.

Developer 2 meant an increase in consideration for the Company would result in a decrease in consideration for Developer 2 and vice versa, requiring the companies to compete for value.[283] Specifically, the Special Committee noted that the Developer 2 earn-out made it less likely Buyer would pay more for the Company, acknowledging that the Company's public stockholders were competing with Developer 2's owners (including Riverstone, PSP, and management) for merger consideration.[284]

Despite this tension, the Special Committee decided to progress with Buyer, authorizing a meeting between Buyer and PSP and instructing Paul Weiss to send Buyer a draft merger agreement.[285] The Special Committee authorized Company management to begin discussing their compensation and post-transaction roles with Buyer "provided that representatives of financial advisors to the Special Committee were in attendance."[286]

As instructed, Paul Weiss sent the draft merger agreement to Buyer's outside counsel.[287] The draft provided that the closing would not be conditioned upon

---

[283] *Id.* ¶ 162.

[284] *Id.* ¶ 163.

[285] *Id.*; Proxy at 45.

[286] Proxy at 45; Compl. ¶ 163.

[287] Proxy at 46.

closing a Developer 2 acquisition; it also included a go-shop provision.[288]  Paul Weiss also brought Riverstone into the fold, contacting Riverstone's outside counsel to discuss a transaction with Buyer, the Company, and Developer 2.[289]  Paul Weiss pressed that any Company-Buyer transaction should not be cross-conditioned with any potential transaction involving Developer 2.[290]  In addition, Company management, Evercore, Goldman and Buyer engaged in "high-level discussions regarding arrangements relating to compensation and post-transaction roles for [Company] management."[291]  Buyer requested exclusivity, but the Special Committee, in consultation with its advisors, declined to grant exclusivity to any party at that time.[292]

In mid- to late-August, the Company's advisors reached out to all interested parties, including Brookfield.[293]  Of those bidders that came forward after the August 12 *Bloomberg* article, one requested to pursue a transaction and negotiate a confidentiality agreement; six others decided to forego a transaction with the Company.[294]

---

[288] *Id.*

[289] *Id.*

[290] *Id.*

[291] *Id.*

[292] *Id.*

[293] *Id.* at 45.

[294] *Id.*

**J.  Brookfield Attempts To Accommodate The Company's Shifting Goals And Riverstone's Demands, But The Special Committee Proceeds With Buyer.**

Brookfield submitted an updated offer letter on August 26.[295]  Brookfield revealed that, on August 20, the Special Committee's advisors had indicated an unwillingness to move forward with Brookfield.  Curiously, the advisors had told Brookfield that (1) the Board no longer supported a transaction that internalized Developer 2, which was inconsistent with their representations to Buyer in the same time period; (2) Riverstone would use the Consent Right to block a TerraForm acquisition; and (3) the Board prioritized deal certainty and price.[296]

Undeterred, Brookfield proposed a Company-on-top transaction in which the Company would acquire TerraForm, "so that no Riverstone consent is required in connection with the transaction," at a ratio of two TerraForm shares for each Company share.[297]  Brookfield's proposal did not include Developer 2 or any side benefits for Riverstone or the Officer Defendants; nor did it require any concessions from Riverstone or amendments to the Company's contractual agreements with Developer 2.[298]  Special Committee meeting minutes provide that Brookfield's

---

[295] Compl. ¶ 164; *see* Weinberger Decl. Ex. 5.

[296] Compl. ¶¶ 164–65, 174, 209.

[297] *Id.* ¶ 166.

[298] *Id.* ¶¶ 166, 168.

updated proposal "was not dependent upon any transaction with [Developer 2.]"[299] But the Proxy stated that Brookfield said it would require concessions from Developer 2.[300]

Brookfield's offer valued the Company at $33.38 per share, representing a 45% premium—far above Buyer's offer and the final Merger price.[301] As Brookfield indicated, this strategic transaction would allow Company stockholders "the opportunity to continue to participate in the upside embedded in the shares of a world class renewable power leader that will have a dividend payout ratio," which "is [a] more compelling opportunity than having their upside capped in a privatization transaction."[302] Brookfield stated its offer would expire if it were not granted exclusivity by August 30.[303]

On August 26, the Special Committee discussed Brookfield's revised proposal.[304] The Special Committee and Browne met again on August 28.[305] The Special Committee noted Brookfield's offer represented a 45% premium,[306] and

---

[299] *Id.* ¶ 168.

[300] Proxy at 46.

[301] Compl. ¶¶ 167, 171.

[302] *Id.* ¶ 167 (emphasis omitted).

[303] Proxy at 46.

[304] *Id.*

[305] Compl. ¶¶ 170–71.

[306] *Id.* ¶ 171.

contemplated potential litigation risks from TerraForm, as well as "the uncertain value of the all-stock consideration offered by [Brookfield] as compared to the all-cash offers received from other bidders."[307] In view of these concerns, the Special Committee determined that it needed to further evaluate Brookfield's offer and that it would be "premature" to grant exclusivity.[308]

On August 29, at the Special Committee's direction, Evercore asked Brookfield to clarify its proposal with respect to Developer 2 and what Brookfield envisioned for the combined company's relationship with Developer 2.[309] In response to those discussions, on August 30, Brookfield submitted an updated offer letter.[310] It recapped the changing messages it had received about Developer 2. Brookfield stated that it had been told early in the process that the Company believed it was desirable for senior management to maintain their positions in the combined company, including their dual positions at Developer 2.[311] The Company had also been telling Brookfield that it prioritized internalizing Developer 2.[312] But by August 20, the Company flipped the script, and Brookfield responded by

---

[307] Proxy at 47.

[308] *Id.*

[309] *Id.*

[310] *Id.*; Compl. ¶¶ 173–74; Kirby Decl. Ex. 27.

[311] Compl. ¶ 174.

[312] *Id.*

restructuring its proposal to make the Company the acquirer and surviving parent company to avoid the Consent Right, and to address the Board's supposed disinterest in internalizing Developer 2.[313] Brookfield emphasized its willingness to move forward, stating that its due diligence was complete so that it could sign final deal documents in September, but stated its offer would expire unless the Company granted exclusivity by September 4.[314] It is reasonable to infer that contrary to its representations to Brookfield, the Special Committee and management (and Riverstone) supported an internalization of Developer 2; they just did not support a deal that cashed out Riverstone.

The Special Committee decided "to progress the transaction" with Buyer, and authorized management to obtain their own legal counsel with respect to the proposed Buyer transactions, including their interest in Developer 2, and to engage in further discussions with Buyer relating to such interests and post-closing management arrangements.[315]

Batkin discussed the competing offers with management and the Company's advisors on September 1.[316] On September 2, Paul Weiss received a revised draft

---

[313] *Id.* ¶¶ 173–74; Proxy at 47; Kirby Decl. Ex. 27 at PEGI-00000982.

[314] Compl. ¶ 175; Proxy at 47.

[315] Proxy at 47.

[316] *Id.*

merger agreement from Buyer.[317] Among other things, the draft removed the go-shop provision and capped damages in the event of termination, but did not condition the proposed merger on involving Developer 2.[318] That same day, Batkin spoke with Brookfield to discuss the possibility of adding downside protection for Company stockholders in the form of a cash option or exchange ratio collar; the implications for Brookfield's proposal if Riverstone did not support the transaction; and Brookfield's request for exclusivity.[319]

On September 3, Paul Weiss sent a draft merger agreement to Brookfield's counsel, by which closing would not be conditioned on a transaction with Developer 2.[320] Batkin suggested that Brookfield arrange a meeting with Company management and Riverstone to discuss Developer 2.[321] Accordingly, the next day, September 4, Brookfield's CEO, Sachin Shah, met with Garland and Riverstone's representative, Hunt.[322] Riverstone insisted that its consent was required for the Company to acquire TerraForm and that it would require amendments to the contracts between the Company and Developer 2 before providing such consent.[323]

---

[317] *Id.*

[318] *Id.*

[319] *Id.*

[320] *Id.* at 47–48.

[321] *Id.* at 48.

[322] *Id.*; Compl. ¶ 176.

[323] Compl. ¶ 177.

Brookfield indicated that it did not intend to proceed with a transaction that Riverstone did not support, and offered to consider Riverstone's proposed amendments.[324] Shah emailed Batkin later that day, noting that "Riverstone needed to consider matters to see if there was a path forward on a potential deal" and that "the ball was in Riverstone's court on the issue, not Brookfield's, as Brookfield still believed in the merits of a transaction."[325]

Batkin followed up with Brookfield and Riverstone.[326] Brookfield flagged that its August 30 offer letter had expired and that Brookfield planned to terminate discussions unless and until it received acceptable proposals regarding the Company's relationship with Developer 2.[327] Batkin and the Special Committee's advisors considered granting Brookfield exclusivity, but declined.[328]

On September 10, Brookfield sent a revised proposal, addressed to the full Board, to Batkin and the Special Committee.[329] Brookfield recognized the complex relationship between the Company, Developer 2, and Riverstone and its bearing on the sales process:

---

[324] Proxy at 48.

[325] Compl. ¶ 178.

[326] Proxy at 48.

[327] *Id.*

[328] *Id.*

[329] *Id.*; Compl. ¶¶ 179–80; Weinberger Decl. Ex. 6.

> Our understanding is that the relationship between the [Company] Board and Riverstone is complex. The Board has a fiduciary duty to shareholders of [Company] but is not free to accept certain types of transactions without prior Riverstone consent or, as we understand, any transaction not supported by Riverstone without attracting Riverstone litigation risk. We also understand that Riverstone is not necessarily economically aligned with [Company] shareholders given that it holds no (or negligible) equity in [Company]. Further, given the interrelated nature of the arrangements between [Company], its management, and Riverstone, there could be potential multiple competing interests. This is a unique and difficult scenario.[330]

Brookfield went on to say that "we do not believe it is in anyone's best interests to engage with Riverstone in a manner that creates animosity or material litigation risk."[331] Brookfield was willing to resume discussions if Riverstone consented to the deal and if the parties agreed to Riverstone's requested amendments to the entities' existing contractual, operational, and structural arrangements.[332] Brookfield was also willing to negotiate with Riverstone and Developer 2 if it was granted exclusivity by both entities.[333]

On September 12, Riverstone and Developer 2 informed Batkin that they were willing to resume talks with Brookfield and present Brookfield with suggested amendments to the documents governing the relationship between the Company and

---

[330] Compl. ¶ 179 (emphasis omitted); Weinberger Decl. Ex. 6 at PEGI-00000881.

[331] Compl. ¶ 180.

[332] *Id.*; Proxy at 48.

[333] Compl. ¶ 180; Proxy at 48.

Developer 2.[334]  Batkin asked Riverstone to send Brookfield a written proposal of preferred terms, which Riverstone did on September 18.[335]

As for Buyer, on September 8, the Special Committee directed Paul Weiss to send a revised draft merger agreement to Buyer's counsel.[336]  Buyer returned a marked-up agreement on September 19; it included a 35-day go-shop period subject to carve-outs for specific parties, including Brookfield.[337]  Thereafter, the parties discussed open issues, including the go-shop provision, developments with Developer 2, and financing.[338]  The Special Committee also continued probing the Company's remaining bidders, advancing discussions, and denying any particular bidder exclusivity.[339]

On September 23, Batkin met with the Special Committee's advisors and Company management to discuss Riverstone's demanded and "fairly expansive" contract amendments.[340]  Brookfield indicated that "there were realistic options to resolve the issues presented in Riverstone's recent proposal, but that [Brookfield] would only continue discussions regarding a transaction if granted exclusivity by

---

[334] Proxy at 48.

[335] *Id.* at 49; Compl. ¶ 180.

[336] Proxy at 48.

[337] *Id.* at 49.

[338] *Id.*

[339] *Id.* at 49–50.

[340] Compl. ¶ 183.

[the Company]."[341]   Batkin denied exclusivity, but offered to pay Brookfield's going-forward expenses "to entice [Brookfield] to advance discussions with Riverstone."[342]

Over the next three days, the Special Committee strategized to keep Brookfield in the running.[343]  Batkin and the Special Committee's advisors sought to arrange a meeting between Brookfield and Riverstone "to ensure that there was a shared understanding of the terms in Riverstone's September 18, 2019 proposal."[344] Batkin contacted Brookfield on September 25, and Brookfield agreed to the meeting.[345]   With Batkin's assistance, Brookfield and Riverstone scheduled a meeting for October 1.[346] But on September 27, Brookfield cancelled the meeting.[347]

On September 29, the Special Committee met to evaluate the remaining bidders:  Brookfield, Buyer, Party B, and Party D.[348]  The Special Committee considered Brookfield's offer and Riverstone's demand, which included a right to

---

[341] Proxy at 49.

[342] *Id.*

[343] *Id.* at 49–50.

[344] *Id.* at 50.

[345] *Id.*

[346] *Id.*

[347] *Id.*

[348] *Id.*

buy back the Company's 29% stake in Developer 2.[349]  Batkin advised the Special

Committee that Brookfield was willing to agree to Riverstone's demanded terms

"as-is."[350]  But Garland warned that a Company-TerraForm merger would alter the

Company's relationship with Developer 2,[351] even if those changes were the result

of Riverstone's demands.  Given Brookfield's potentially higher bid, the Special

Committee noted its duty to "maximize value for shareholders."[352]  It ultimately

determined that it would grant neither Buyer or Brookfield exclusivity, "given the

continued interest in [the Company] expressed by multiple credible parties."[353]

### K. Garland Drives Issuance Of Preferred Stock That Must Vote In Favor Of The Merger.

Also at the Special Committee's September 29 meeting, with all directors in

attendance, Garland pressured the Board to authorize the issuance of a new class of

voting preferred shares, purportedly to fund the purchase of two renewable energy

projects.[354]  In June 2019, while the sales process was underway, the Board had laid

the groundwork for a potential preferred issuance and formed a transaction

---

[349] Compl. ¶ 183.

[350] *Id.* ¶¶ 183–85.

[351] *Id.* ¶ 186.

[352] *Id.* ¶ 188.

[353] Proxy at 50.

[354] Compl. ¶ 187.

committee.[355] Despite having no apparent relationship to the sales process and a specifically-designated committee to carry out any such issuance, Garland told the Board to move quickly, noting his "concern that the Preferred Issuance had already been delayed for months" due to the sales process "and indicated that it had reached a point where it could not be delayed any further without risk of the Company's counterparty walking away from the proposed deal."[356] Garland "reminded the Committee of the importance to the Company of consummating the Preferred Issuance."[357]

On September 30, the transaction committee approved the preferred stock (the "Preferred Issuance").[358] Thereafter, on October 10, the Company sold 10,400,000 preferred shares with a par value of $260 million for $256.1 million, or $24.625 per share, to CBRE Caledon Capital Management Inc. affiliates ("CBRE") in a private placement pursuant to a Securities Purchase and Rights Agreement (the "Purchase Agreement").[359] The CBRE sale closed on October 25, raising

---

[355] *See* D.I. 94, Ex. A ¶ 5 (noting that on June 12, 2019, the Board appointed a transaction committee to authorize and approve a new series of preferred stock).

[356] Compl. ¶ 187.

[357] *Id.*

[358] *Id.* ¶¶ 190, 235.

[359] *Id.* ¶ 235.

roughly $75 million more than Garland claimed the Company needed to fund the cited projects.[360]

The preferred shares entitled CBRE to favorable dividends and distributions in the years following the merger of the two entities.[361] They entitled CBRE to one vote per share, subject to a cap, such that they represented 9.99% of the vote on the Merger, which occurred shortly after the sale closed.[362] Importantly, the Securities Purchase and Rights Agreement required CBRE's preferred shares to be voted in favor of the Merger—which had not yet been guaranteed, finalized, or signed at the time the CBRE sale closed.[363]

### L. The Special Committee Accepts Buyer's Offer And Rejects Brookfield's Premium.

By October, Brookfield and Buyer emerged as the Company's remaining serious bidders.[364] Since late August 2019, Brookfield labored to secure the Special Committee's and Riverstone's approval of its premium bid, continuing to entertain Company management's and Riverstone's demands. In contrast, Buyer's offer

---

[360] *Id.* ¶ 244.

[361] *Id.* ¶ 242.

[362] *Id.* ¶ 236.

[363] *Id.* ¶ 237. The Purchase Agreement required the shares to be voted in accordance with the recommendation of the Board so long as the special meeting took place on or before May 10, 2021.

[364] *See id.* ¶¶ 188–96.

moved forward smoothly with little to no enhancement to its offer price.[365]  Despite

Brookfield's efforts and the 45% premium, and with the preferred stock sale on the

horizon, Batkin and Company management determined that the Brookfield offer

would ultimately be inadequate for Riverstone.[366]

On October 3, Batkin again encouraged Brookfield to engage with

Riverstone.[367]  Brookfield once more demanded exclusivity and stood firm that,

without it, Brookfield "would not be willing to devote time and resources to

discussions with Riverstone."[368]  Batkin told Brookfield that the Company could not

grant exclusivity, as the Special Committee was still in discussions with other

parties, including Buyer and Party D.[369]

Between October 13 and 16, Batkin and the Special Committee's advisors

continued speaking with Brookfield.[370]  They recognized and reiterated that

Brookfield's August 26 proposal was "competitive," but to move forward,

Brookfield had to confirm that either (1) Brookfield's proposal was not conditioned

on Brookfield entering into an agreement with Developer 2 or Riverstone, so that

---

[365] *See id.*; Proxy at 52.

[366] *See* Compl. ¶ 201.

[367] Proxy at 51.

[368] *Id.*

[369] *Id.*; *see also id.* at 50.

[370] *Id.* at 51.

those entities could not hold up a transaction; or (2) Brookfield had negotiated definitive drafts of such agreements.[371] The Special Committee warned Brookfield that "other parties had entered more advanced stages of negotiations" and that the Company "would be seeking definitive offers from all interested parties."[372]

The Special Committee then pushed all remaining bidders.[373] On October 17, Evercore instructed Brookfield, Buyer, and Party D to submit their "best and final" offers by October 28.[374] On October 28, after months of negotiation that led to an small increase of $1.25 per share from its original offer, Buyer submitted a definitive all-cash offer to purchase the outstanding shares of Company Common Stock for $26.75 per share.[375] While still lower than Brookfield's offer, Buyer also agreed to simultaneously acquire Developer 2 and allow Riverstone to retain equity in the combined company; it also offered the benefit of keeping the Company and Developer 2's management in place.[376]

That same day, Brookfield submitted a letter reaffirming its prior stock-exchange proposal, noting that its "proposal has a clear path to execution" and that

---

[371] *Id.*

[372] *Id.*

[373] *Id.*

[374] *Id.*; Compl. ¶ 191.

[375] Compl. ¶ 195; Proxy at 52.

[376] Compl. ¶ 195.

"we have been advised by you and your advisors that our proposal is superior from a value perspective to the others that you have received and that you will receive in this sales process."[377] Brookfield reiterated that it could agree to Riverstone's demands,[378] but acknowledged that "the situation vis-à-vis Riverstone continues to be problematic for the [Company] Board and that Riverstone's interests are likely not aligned with those of the [Company] shareholders," and expressed that it was confident in its ability to grow the post-closing entity in the face of Riverstone's demands and consequent separation.[379] Brookfield explained,

> As requested, we have carefully reviewed Riverstone's list of demands to potentially support a merger of [the Company] with [TerraForm]. Those demands effectively require a separation of the Riverstone business from [the Company]. The list from Riverstone, as you know, requires that all of [the Company]'s development expertise, systems, people and the Pattern name itself revert back to Riverstone, in exchange for their support.
>
> As we have stated, we could agree to these requests. Brookfield has over 3,000 professionals focused on power operations, marketing, investment, development, and finance around the world. Our bench strength in management is deep. We have people and operations globally with the capabilities to manage, operate, grow, fund and deliver value to [the Company]'s shareholders, with a public track record of over 20 years. We also have a demonstrated expertise in carve-out transactions. . . . Therefore, we believe it would be possible to successfully execute such a separation to achieve the proposed merger at the value we have ascribed.

---

[377] *Id.* ¶ 192 (emphasis omitted); *accord* Weinberger Decl. Ex. 7; *see* Proxy at 52.

[378] Compl. ¶ 194; *accord* Weinberger Decl. Ex. 7.

[379] Compl. ¶ 194; *accord* Weinberger Decl. Ex. 7.

Further, we believe executing on certain of the Riverstone demands may leave [the Company] as a far better company in the future than it currently is. If we separate the inter-related management, systems and eliminate the conflicts that Riverstone brings to [the Company] and merge the Company with [TerraForm], we will leave the merged entity with clear alignment between the Board, shareholders, management and its sponsor, Brookfield. All constituents will then have a singular focus on creating value for [the Company]. [380]

The Company determined that Brookfield's October 28 letter did not meet the conditions set by the Special Committee, nor did it include a proposed merger agreement.[381] The Company extended the deadline for submitting definitive transaction documentation to October 30, and requested that Brookfield confirm its willingness to enter into and consummate a merger with the Company at the proposed exchange ratio regardless of any agreement (or lack thereof) between Brookfield and Riverstone.[382]

On October 30, Brookfield submitted a revised draft merger agreement, which included a condition that Brookfield be permitted to engage in discussions with Riverstone prior to executing it.[383] It also conditioned closing on Riverstone's consent to certain amendments to Developer 2's existing contractual relationships

---

[380] Compl. ¶ 194 (emphasis omitted); *accord* Weinberger Decl. Ex. 7.

[381] Proxy at 52.

[382] *Id.*

[383] *Id.*

with the Company.[384]  Brookfield did not submit definitive documentation or terms relating to governance of the combined company or detail any requested arrangements with Developer 2.[385]  The Special Committee extended its definitive offer deadline again to November 2.[386]

On October 30 and 31, the Special Committee met to evaluate Buyer's and Brookfield's final offers; Browne attended.[387]  Evercore presented an analysis indicating that a Company-TerraForm merger would result in a combined company with a stock valued in the range of at least $29.71 to $32.94 per share:  well above Buyer's offer of $26.75 per share.[388]  Nonetheless, Evercore stressed that a TerraForm transaction would undermine the "purpose and commercial viability" of Developer 2.[389]  But management had projected that Developer 2 was on the cusp of being self-funding, and nothing in the Company-TerraForm transaction endangered Developer 2's continued performance of its contractual obligations.[390]

---

[384] *Id.*

[385] *Id.*

[386] *Id.*

[387] *Id.*; Compl. ¶¶ 196–97.

[388] Compl. ¶¶ 198–99.  Plaintiff alleges that even those values for the combined company were depressed because Evercore did not use consistent or updated dividend yields across its analyses, and if corrected, Evercore's analysis would have shown the combined company would trade in the range of $32.69 to $36.15 per share.

[389] *Id.* ¶¶ 201–04.

[390] *Id.* ¶¶ 82, 202–04.

Goldman contributed by describing Riverstone's confidence in the Company-Buyer-Developer 2 proposal.[391]

On November 1, Brookfield told Paul Weiss it could negotiate any necessary amendments with Riverstone within thirty days.[392] Paul Weiss demanded that Brookfield submit definitive documents the next day, which Brookfield could not do without Riverstone's cooperation, which it did not believe it would receive.[393] As a result, Brookfield decided its efforts were futile and withdrew its bid.[394] Buyer was the last bidder standing.

On November 3, the Special Committee voted to recommend that the Board approve the all-cash Merger with Buyer at $26.75 per share, which was $1.05 less than the $27.80 closing trading price of the Company's stock the previous day, but represented a 14.8% premium to the Company's closing price on August 9, the last trading day before rumors of a potential acquisition leaked.[395] Under the Merger agreement with Buyer (the "Merger Agreement"), Buyer's offer of $26.75 per share implied an enterprise value for the Company of $6.1 billion, including debt.[396]

---

[391] *Id.* ¶ 197.

[392] *Id.* ¶ 205; Proxy at 52.

[393] Compl. ¶ 205; Proxy at 52.

[394] Compl. ¶ 205; Proxy at 53.

[395] Compl. ¶¶ 206–07, 222.

[396] *Id.* ¶ 207.

Evercore issued a fairness opinion confirming that the Merger was fair from a financial point of view; Goldman did not issue an opinion.[397] The Board approved the Merger that day.[398]

During the Merger Agreement's go-shop period, the Special Committee's financial advisors contacted sixteen additional potential bidders.[399] The contacted parties either did not respond or declined to pursue a transaction.[400] Plaintiff alleges that the go-shop process was a sham in light of the Merger Agreement's $52.7 million termination fee and the discretionary power of Riverstone, Buyer, and the Company to award to or withhold from Goldman an additional $3 million dollars upon consummation of the Merger.[401] On November 4, the Company officially announced that it had entered into the Merger Agreement with Buyer.[402]

Around this time, Buyer, Riverstone, the Officer Defendants, and Developer 2 entered into a Contribution and Exchange Agreement (the "Contribution Agreement") pursuant to which the Company and Developer 2 would be united under common ownership.[403] The Contribution Agreement valued

---

[397] Proxy at A-24.

[398] Compl. ¶ 206.

[399] Proxy at 54.

[400] *Id.*

[401] Compl. ¶¶ 216, 271.

[402] *See* D.I. 74 at 10 (citing Compl. ¶ 206).

[403] Compl. ¶ 208.

Developer 2 at $1.06 billion.[404] According to its terms, the parties would "make certain contributions contemplated by the Contribution Agreement, including with respect to their interests in [Developer 2] in exchange for equity interests in [the surviving entity]."[405]

Each of Riverstone, the Officer Defendants, PSP, and CBRE continue to hold equity in the new combined company, whereas the Company's public stockholders were cashed out.[406] The Officer Defendants are also eligible to earn up to $51 million in earnout payments and were given new employment agreements with generous compensation for a minimum of three-year terms with automatic one-year renewals.[407]

## M. The Officer Defendants Prepare The Merger Disclosures.

Concurrently with approving the Merger, the Board adopted resolutions that delegated full authority to prepare and disseminate the Proxy to Company management.[408] Management had unbridled discretion to include or omit information as "deemed necessary, appropriate or advisable."[409] The Board did not

---

[404] *Id.*

[405] Proxy at 74.

[406] Compl. ¶¶ 209–11.

[407] *Id.* ¶¶ 209–10, 212–14.

[408] *Id.* ¶¶ 231–32; Weinberger Decl. Ex. 8 at PEGI-00000388.

[409] Compl. ¶ 231; Weinberger Decl. Ex. 8 at PEGI-00000388.

reserve authority to review, alter, or discuss the Proxy's disclosures before filing.[410]

As a result of leaving the Merger disclosures in the hands of the Officer Defendants—particularly Garland—Plaintiff contends that the Proxy omitted or misrepresented numerous categories of material information.[411]

On February 4, 2020, the Company filed the Proxy recommending that Company stockholders vote in favor of the Merger.[412] Including annexes, the Proxy spanned 231 pages and, among other things, disclosed a detailed summary of the Merger process, including details about the bids by and negotiations with competitive bidders;[413] the valuation metrics employed; the Consent Right; the concurrent Developer 2 acquisition and Contribution Agreement and that certain members of Company management stood to benefit under the Contribution Agreement; and that certain directors and officers had potential conflicts of interest, and the Board was aware that these interests existed and considered them, among other matters, when it approved the Merger Agreement.[414] After negative commentary by proxy advisory firms and disclosure suits by stockholders,[415] but

---

[410] Compl. ¶ 232; *see also* Weinberger Decl. Ex. 8 at PEGI-00000388.

[411] Compl. ¶¶ 253–82.

[412] Proxy at 1.

[413] *Id.* at 36–54.

[414] *Id.* at 6–7, 69–79.

[415] *See, e.g.*, Compl. ¶¶ 223–25.

before the stockholder vote, the Company issued further disclosures in a supplemental definitive proxy statement filed on March 4, 2020 (the "Supplemental Proxy").[416]

However, as alleged, the Proxy and Supplemental Proxy failed to disclose, among other things, that Riverstone used the Consent Right to block a more valuable deal with Brookfield and TerraForm; that Garland had unauthorized discussions with potential bidders in violation of the Special Committee's instructions, including an unauthorized in-person meeting with Buyer and representatives of Riverstone in April 2019; that Goldman faced conflicts of interest, including that Goldman owns a substantial stake in Riverstone, had advised Riverstone on a take-private of the Company, and had earned fees totaling over $100 million from Riverstone and Buyer in recent years; that Browne, a representative of Riverstone, attended a majority of the Special Committee's meetings and Executive Sessions; and that the Company's largest stockholder, PSP, held a 22% interest in Developer 2, and therefore was interested in the Merger.[417]

---

[416] *See* Kirby Decl. Ex. 2; D.I. 74 at 12.

[417] *See generally* Compl.

77

### N. The Market Reacts, And Company Stockholders Marginally Vote To Approve The Merger.

Following the Merger announcement, nine sets of plaintiffs filed pre-merger lawsuits alleging that the Proxy made inadequate disclosures.[418] All but one of these lawsuits were voluntarily dismissed shortly after the Company filed the Supplemental Proxy. The remaining lawsuit was filed by Water Island Capital, LLC and its affiliates ("Water Island"), who also launched an aggressive public campaign urging other stockholders to vote against the Merger based on the themes pervading the Complaint.[419]

On February 18, Water Island issued an open letter to Company stockholders, opposing the consideration paid for Company stock in the Merger as "woefully inadequate."[420] Water Island claimed that the Merger "originally offered at best a negligible premium," and, at the time of Water Island's letter, "a significant discount" due to "the recent seismic shift in the value ascribed to renewable energy companies."[421]

---

[418] *See* D.I. 74 at 12.

[419] *See id.*; Compl. ¶¶ 224–25.

[420] *See* D.I. 74 at 12 (quoting *Water Island Capital, LLC Issues Open Letter to Shareholders of PEGI Group, Inc.*, BUSINESSWIRE (Feb. 18, 2020), https://www.businesswire.com/news/home/20200218005403/en/Water-Island-Capital-LLC-Issues-Open-Letter).

[421] *Id.*

On February 19, the Company issued a press release responding to Water Island's claims and reiterating the Board's position that the Merger was the best path forward for the Company and its stockholders.[422] Water Island then issued a second letter on February 24, again urging stockholders to vote against the Merger and detailing the same supposedly "misleading" aspects of the Proxy that Plaintiff challenges in this litigation. Specifically, Water Island claimed that the Merger consideration represented a "low-ball management-led buyout of [the Company]"; that the Board "fail[ed] to restrain a conflicted management team from leveraging a previously undisclosed [Developer] 2 'consent right' in order to block any merger that did not enrich their own self-interests"; and that "the Board's claim of a robust sales process couldn't be further from the truth."[423]

---

[422] *See id.* at 13 (citing *PEGI Board of Directors Reiterates Recommendation that Stockholders Vote "FOR" Proposed Canada Pension Plan Investment Board Transaction* (Feb. 19, 2020), https://patternenergy.com/news/press-releases/pattern-energy-board-directors-reiterates-recommendation).

[423] *See id.* (quoting *Water Island Capital, LLC Issues Open Letter to Shareholders in Response to Misleading Claims Made by Pattern Energy Group, Inc. Board of Directors*, BUSINESSWIRE (Feb. 24, 2020), https://www.businesswire.com/news/home/20200224005340/en/Water-Island-Capital-LLC-Issues-Open-Letter). Water Island further suggested to stockholders that the Company was "hiding the purchase price of [Developer] 2," and that the Proxy did not disclose that the PSP, which held 9.5% of the shares in [the Company], was a "conflicted party who [should be] excluded from the majority-of-the-minority vote." *Id.* PSP's holding in the Company, as well as the investment rights that accompanied it and the potential that PSP might have interests that conflicted with the Company and its stockholders, were all disclosed in the Company's Form 10-K filings for each of 2018, 2019 and 2020. *See* Kirby Decl. Ex. 3; Kirby Decl. Ex. 4; Kirby Decl. Ex. 5.

On February 26, the Company responded, noting that the Company faced significant headwinds, including limited access to low-cost capital and a lack of financial sponsors, which led to it consistently trading at a discount to its peers over the last five years. The Company again reiterated that the Merger represented the best path forward for stockholders.[424]

Following Water Island's public criticism of the Merger, on February 28 and March 2, Institutional Shareholder Services ("ISS") and Glass Lewis, the two largest proxy advisory firms in the United States, both issued reports recommending that stockholders reject the Merger.[425] Glass Lewis expressed concern that the Board and Special Committee did not run a sufficiently independent process and believed the Company was worth more as a standalone entity.[426] While ISS also believed the Merger inadequate, it also acknowledged that some Company stockholders may have preferred a cash offer, as opposed to Brookfield's potential all-stock transaction, because it provided "certainty of value" in the face of "global pandemic fears," and the recent surge in the value

---

[424] *See* D.I. 74 at 14 (citing *Pattern Energy Sets the Record Straight Regarding Water Island's False Assertions and Mischaracterizations* (Feb. 26, 2020), previously available at https://investors.patternenergy.com/news-releases/news-release-details/patternenergy-sets-record-straight-regarding-water-islands).

[425] Compl. ¶ 225; *see also* D.I. 74 at 14–15.

[426] Compl. ¶ 225.

attributed to renewable energy companies may not necessarily be a "resilient long-term trend."[427]

As of the Merger's record date, the Company had 98,218,625 shares of common stock outstanding and 10,400,000 shares of preferred stock outstanding, with each common and preferred share receiving one vote for a total of 108,618,625 potential votes.[428] Ultimately, on March 10, a total of 56,856,604 of the Company's outstanding shares voted in favor of the Merger by a slim majority of 52%.[429] PSP owned 9,341,035 (or approximately 8.6%) of the shares that voted in favor of the Merger; because PSP owns 22% of Developer 2, Plaintiff alleges PSP was interested.[430] An additional 1,210,049 (or 1.1%) shares of those voted in favor were held by members of Company management who received equity and jobs in the post-closing company.[431] CBRE's 10,400,000 preferred shares, which were rolled over into the post-closing company and remain outstanding, were required to be voted in favor of the Merger.[432] If these three blocks of votes were excluded, only 41% of the disinterested shares voted in favor of the Merger.[433]

---

[427] *See* D.I. 74 at 15; Compl. ¶ 225.

[428] Compl. ¶ 247.

[429] *Id.* ¶ 248.

[430] *Id.* ¶ 249.

[431] *Id.* An additional 50,872 shares were held by other Company insiders. *Id.* ¶ 249 n.23.

[432] *Id.* ¶ 249.

[433] *Id.* ¶ 250.

## O. This Litigation Ensues.

The Merger sparked litigation in this Court: two class action complaints challenging the adequacy of the Merger process and its consideration were filed in May 2020.[434] Those actions were consolidated into the present case,[435] and Britt was appointed lead plaintiff.[436] Her class action Complaint asserts six counts.[437]

Count I, for breach of fiduciary duty, asserts the Director Defendants "consciously disregarded their fiduciary duties by, among other things, agreeing to the unfair Merger, which failed to maximize stockholder value, but was the preferred transaction for Riverstone and a conflicted management team";[438] "knowingly and willfully allow[ed] numerous conflicted individuals/entities to participate in its deliberations, including Browne, Garland, Goldman, and other members of management";[439] "knowingly and intentionally failed to disclose all material information to the Company's stockholders"; and "consciously abdicated their

---

[434] Plaintiff's original complaint was filed under a different case number. *See Britt v. Garland, et al.*, C.A. No. 2020-0412-MTZ. The initial complaint under this case number was filed by Gary Broz, Robert Long, Walter James Peters III, and Michael Richardson (the "Broz Plaintiffs"). *See* D.I. 1. After the actions were consolidated under this caption and Britt appointed lead plaintiff, the Broz Plaintiffs voluntarily dismissed. *See* D.I. 64.

[435] D.I. 10.

[436] D.I. 44.

[437] Plaintiff's initial Complaint is identical to the operative consolidated Complaint, which Plaintiff filed on this docket belatedly after the parties completed briefing and argument on the Motions. *See* D.I. 100; D.I. 101; D.I. 102.

[438] Compl. ¶ 292.

[439] *Id.* ¶ 293.

82

duties by granting conflicted management sole authority to exercise its discretion to determine what material information should be included (or excluded) from the Proxy and distribute the Proxy to stockholders without prior Board and/or Special Committee review and approval."[440]

Count II, for breach of fiduciary duty, asserts the Officer Defendants "were interested in the Merger as a result of their employment with and/or substantial equity holdings in [Developer 2] and their continued employment with and equity interests in the post-closing combined entity";[441] and that they "advanc[ed] their own self-interest and the interests of Riverstone to the detriment of [Company] stockholders" by improperly wielding Riverstone's narrow consent right to improperly influence the Special Committee, manipulating their own projections, and knowingly and intentionally disseminating a materially false and misleading Proxy.[442] Count II alleges that Garland in particular breached his duties by disobeying the Special Committee's instructions, meeting with Buyer and Riverstone without the Special Committee's authorization, and concealing that meeting from the Special Committee, which Plaintiff contends "allowed Riverstone's preferred bidder, Buyer, to enter the sales process and propose a

---

[440] *Id.* ¶ 294.

[441] *Id.* ¶ 299.

[442] *Id.* ¶ 300.

transaction that benefited management and Riverstone at the expense of the Company stockholders."[443]

Count III asserts the Entity Defendants aided and abetted Company fiduciaries' breaches by, among other things, having unauthorized meetings with Goldman, Garland, and Buyer; infecting the process with conflicted individuals and entities; wrongfully exploiting the Consent Right in favor of the Merger and Riverstone; and threatening meritless litigation against Brookfield to block a transaction with it.[444] Count IV asserts the Entity Defendants tortiously interfered with the Company stockholders' prospective economic advantage in the superior Brookfield-TerraForm offer.[445] Count V asserts the Entity Defendants, Officer Defendants and Browne conspired to defeat the Brookfield-TerraForm transaction in favor of the unfair Merger and to ensure the Company did not disclose all material information to its stockholders, thereby inducing them to approve the Merger.[446] Count VI collects the Officer Defendants and the Entity Defendants into a group referred to as the "Controller Defendants," and asserts they owed and breached fiduciary duties as controllers.

---

[443] *Id.* ¶ 301.

[444] *Id.* ¶¶ 304–07.

[445] *Id.* ¶¶ 308–13.

[446] *Id.* ¶¶ 314–19.

As recourse for these alleged wrongs, Plaintiff seeks damages, fees, and costs.[447]

On September 11, 2020, the Individual Defendants and Entity Defendants moved to dismiss under Court of Chancery Rule 12(b)(6) (respectively, the "Individual Defendants' Motion" and the "Entity Defendants' Motion," and together, the "Motions").[448] The parties briefed the Motions as of October 26.[449] I held argument on November 5, and requested that the parties submit supplemental briefing.[450] The parties completed supplemental briefing as of December 10, and the matter was taken under advisement.[451]

## II. ANALYSIS

The standards governing a motion to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof."[452]

---

[447] *Id.* ¶¶ (h)–(j).

[448] D.I. 73; D.I. 74.

[449] *See* D.I. 82; D.I. 84; D.I. 85.

[450] *See* D.I. 88; D.I. 93.

[451] *See* D.I. 91; D.I. 92; D.I. 94; D.I. 95; D.I. 96.

[452] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations omitted); *accord In re Baker Hughes Inc. Merger Litig.*, 2020 WL 6281427, at *5 (Del. Ch. Oct. 27, 2020).

Thus, the touchstone "to survive a motion to dismiss is reasonable 'conceivability.'"[453] This standard is "minimal"[454] and plaintiff-friendly.[455] "Indeed, it may, as a factual matter, ultimately prove impossible for the plaintiff to prove his claims at a later stage of a proceeding, but that is not the test to survive a motion to dismiss."[456] Despite this forgiving standard, the Court need not "accept conclusory allegations unsupported by specific facts" or "draw unreasonable inferences in favor of the non-moving party."[457] "Moreover, the court is not required to accept every strained interpretation of the allegations proposed by the plaintiff."[458]

### A. Plaintiff Has Stated A Claim For Breach Of Fiduciary Duty Against The Director Defendants.

The Director Defendants argue that Plaintiff's breach of fiduciary duty claims must be dismissed under *Corwin v. KKR Financial Holdings LLC*[459] because holders

---

[453] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[454] *Id.* at 536 (citing *Savor*, 812 A.2d at 896).

[455] *See, e.g.*, *Clouser v. Doherty*, 175 A.3d 86 (Del. 2017) (TABLE); *In re USG Corp. S'holder Litig.*, 2021 WL 930620, at *3–4 (Del. Ch. Mar. 11, 2021); *In re Trados Inc. S'holder Litig.* (*Trados I*), 2009 WL 2225958, at *8 (Del. Ch. July 24, 2009).

[456] *Cent. Mortg. Co.*, 27 A.3d at 536.

[457] *Price v. E.I. du Pont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[458] *Trados I*, 2009 WL 2225958, at *4 (internal quotation marks omitted) (quoting *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006)).

[459] 125 A.3d 304 (Del. 2015).

of a majority of disinterested shares approved the Merger in a fully informed, uncoerced vote, and, therefore, the business judgment rule unrebuttably applies.[460] Even if *Corwin* is inapplicable, the Director Defendants argue that Plaintiff's duty of care claims against them are barred by the exculpation provision in the Company's Certificate of Incorporation, and that Plaintiff does not plead a nonexculpated duty of loyalty claim.[461]

Plaintiff asserts that she has stated nonexculpated claims against the Director Defendants for violating their duties in bad faith; that *Corwin* does not apply to cleanse the transaction; and that the Court should review it under an entire fairness standard because controllers stood on both sides of the transaction, and/or Garland committed fraud on the Board.[462]

Plaintiff is correct that *Corwin* does not place the Merger under the ambit of the business judgment rule. Because Company stockholders were cashed out, "the merger is presumptively subject to enhanced scrutiny."[463] Through the lens of enhanced scrutiny, Plaintiff's allegations render it reasonably conceivable that the Director Defendants violated their duty of loyalty. Accordingly, the Director

---

[460] *See* D.I. 74 at 2.

[461] *Id.* at 3.

[462] D.I. 82 at 32, 58–60.

[463] *Chester Cty. Empls.' Ret. Fund v. KCG Hldgs., Inc.*, 2019 WL 2564093, at *10 (Del. Ch. June 21, 2019) (citing *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 184 (Del. 1986)).

Defendants' Motion is denied as to Count I.  Moreover, it remains possible that the transaction will be subject to entire fairness because discovery may reveal that a control group, consisting of the Entity and Officer Defendants, stood on both sides of the transaction.

### 1.     *Revlon* Enhanced Scrutiny Applies At The Pleading Stage.

The board of directors has the ultimate responsibility for managing the business and affairs of a corporation.[464]  "In discharging this function, the directors owe fiduciary duties of care and loyalty to the corporation and its shareholders," and "[t]his unremitting obligation extends equally to board conduct in a sale of corporate control."[465]

"When determining whether corporate fiduciaries have breached their duties, Delaware corporate law distinguishes between the standard of conduct and the standard of review."[466]  "The standard of conduct describes what directors are expected to do and is defined by the content of the duties of loyalty and care.  The standard of review is the test that a court applies when evaluating whether directors have met the standard of conduct."[467]

---

[464] 8 *Del. C.* § 141(a).

[465] *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989) (citations omitted).

[466] *Chen v. Howard-Anderson*, 87 A.3d 648, 666 (Del. Ch. 2014) (collecting authorities).

[467] *Id.* (internal quotation marks omitted) (quoting *In re Trados Inc. S'holder Litig.* (*Trados II*), 73 A.3d 17, 35–36 (Del. Ch. 2013)).

"Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness."[468] Which of the three standards applies depends initially on whether the board members

> (i) were disinterested and independent (the business judgment rule), (ii) faced potential conflicts of interest because of the decisional dynamics present in particular recurring and recognizable situations (enhanced scrutiny), or (iii) confronted actual conflicts of interest such that the directors making the decision did not comprise a disinterested and independent board majority (entire fairness). The standard of review may change further depending on whether the directors took steps to address the potential or actual conflict, such as by creating an independent committee, conditioning the transaction on approval by disinterested stockholders, or both.[469]

The business judgment rule, Delaware's default standard of review, presumes board members act "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[470] "[W]here the business judgment presumptions are applicable, the board's decision will be upheld unless it cannot be attributed to any rational purpose."[471]

*Revlon*'s intermediate standard of enhanced scrutiny is applied when board members face "potential conflicts of interest because of situational dynamics present

---

[468] *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011).

[469] *Chen*, 87 A.3d at 666–67 (quoting *Trados II*, 73 A.3d at 36).

[470] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *rev'd on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[471] *In re Walt Disney Co. Deriv. Litig.* (*Disney II*), 906 A.2d 27, 74 (Del. 2006) (internal quotation marks omitted) (quoting *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)).

in particular" transactions.[472]  "*Revlon* enhanced scrutiny applies to 'final stage' transactions, including a 'cash sale, a break-up, or a transaction like a change of control that fundamentally alters ownership rights'"[473] because in these transactions, directors may be more prone to pursue self-interest and engage in selfish action.[474] In cash-out mergers presenting no "long run" for stockholders, "the board's duty to shareholders is inconsistent with acts not designed to maximize present share value, acts which in other circumstances might be accounted for or justified by reference to the long run interest of shareholders."[475]

Here, Buyer cashed out the Company's public stockholders in the transaction, and thus "there [exist] sufficient dangers to merit employing enhanced scrutiny."[476] Because Company stockholders "received cash for their shares, the merger is presumptively subject to enhanced scrutiny."[477]

---

[472] *Trados II*, 73 A.3d at 36.

[473] *Huff Energy Fund, L.P. v. Gershen*, 2016 WL 5462958, at *13 (Del. Ch. Sep. 29, 2016) (quoting *Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1019 (Del. Ch. 2010)).

[474] *Firefighters' Pension Sys. of Kan. City, Mo. Tr. v. Presidio, Inc.*, 2021 WL 298141, at *12 n.13 (Del. Ch. Jan. 29, 2021) (citing *Reis*, 28 A.3d at 458 (explaining that parties may be more willing to cheat where they do not anticipate repeated transactions)).

[475] *TW Servs., Inc. v. SWT Acq. Corp.*, 1989 WL 20290 (Del. Ch. Mar. 2, 1989).

[476] *Lonergan*, 5 A.3d at 1019.

[477] *KCG Hldgs.*, 2019 WL 2564093, at *10 (citing *Revlon*, 506 A.2d at 184); *accord In re Mindbody, Inc.*, 2020 WL 5870084, at *13 (Del. Ch. Oct. 2, 2020) ("The cash-for-stock Merger was a final-stage transaction presumptively subject to enhanced scrutiny under *Revlon*.").

Plaintiff asks this Court to further elevate the standard of review to entire fairness.[478] Entire fairness, Delaware's most stringent standard, applies to board action where there exists "actual conflicts of interest."[479] Under the entire fairness standard, the defendants must show that the transaction in question was "objectively fair, independent of the board's beliefs."[480] Entire fairness applies in certain discrete circumstances, including (1) when a plaintiff pleads facts that "call[] into question the disinterestedness and independence of a sufficient number of directors;"[481] (2) when the transaction was effectuated "by a controlling or dominating shareholder,"[482] and (3) when a plaintiff pleads a fraud-on-the-board theory and the attendant "illicit manipulation of a board's deliberative processes by self-interested corporate fiduciaries."[483]

Plaintiff has not pled facts sufficient to indicate that the Special Committee was interested and lacked independence such that its members would be presumably

---

[478] D.I. 82 at 32.

[479] *Trados II*, 73 A.3d at 36.

[480] *Presidio*, 2021 WL 298141, at *17 (internal quotation marks omitted) (quoting *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006)).

[481] *Chen*, 87 A.3d at 672.

[482] *Kahn v. Lynch Comms. Sys., Inc.*, 638 A.2d 1110, 1117 (Del. 1994).

[483] *Macmillan*, 559 A.2d at 1279; *see Mindbody*, 2020 WL 5870084, at *25 n.229 ("[T]he presumptive standard of review in *Macmillan* was *Revlon* . . . . Yet . . . the court elevated the standard of review to entire fairness in view of the fraud-on-the-board theories advanced by the plaintiffs.").

incapable of exercising their objective judgment in considering the merits of the transaction. At the time of the Merger, the Board consisted of seven directors. Only two, Garland and Browne, were allegedly conflicted with respect to the transaction; that is why they were not appointed to the Special Committee.[484] The remaining five directors, Batkin, Goodman, Hall, Newson, and Sutphen, were disinterested and independent with respect to the Merger, and were therefore appointed to the Special Committee.[485]

Further, Plaintiff has not pled facts sufficient to support a fraud-on-the-board theory. Still, this cash-out Merger may warrant entire fairness review under a controller theory; time and discovery will tell. At a minimum, it warrants enhanced scrutiny.

### a. Plaintiff Has Failed To Plead Fraud On The Board.

Plaintiff principally contends entire fairness is warranted under a fraud-on-the-board theory. Plaintiff invokes *Mills Acquisition Co. v. Macmillan, Inc.*,[486] in which the Delaware Supreme Court elevated the standard of review to entire fairness based on the conclusion that insider officers committed fraud on the board out of

---

[484] *See, e.g.*, Compl. ¶¶ 24, 26, 101. The allegations of Garland and Browne's interestedness and lack of independence are discussed further *infra*.

[485] *See id.* ¶ 100.

[486] 559 A.2d 1261, 1279 (Del. 1989).

self-interest. Macmillan's officers "failed to disclose that they tipped off their favored bidder in a way that tainted and manipulated the Board's deliberative process."[487] Here, Plaintiff theorizes:

> [T]he Complaint alleges that Garland—in plain violation of the Special Committee's prohibition on members of [Company] management engaging with any potential parties to a strategic transaction without the express consent of the Special Committee—commenced unauthorized sale discussions with Riverstone and [Buyer] in April 2019. Garland never informed the Committee of the actual substance or circumstances of his improper outreach, which was part of Garland's and the other Officer Defendants' disloyal effort to steer the Merger process in favor of [Developer 2] and Riverstone. As a result of Garland's misconduct, Riverstone inserted [Buyer] into the Merger process and ultimately blocked a more valuable transaction with Brookfield. As a matter of Delaware law, Garland's self-interested and illicit manipulation of a board's deliberative process requires the Merger be subjected to rigorous judicial scrutiny under the exacting standards of entire fairness.[488]

Plaintiff offers fraud on the board only in pursuit of entire fairness, while offering a theory of director breach that tracks the paradigmatic *Revlon* narrative of an overweening CEO and supine board.[489] I question whether I should entertain fraud

---

[487] *City of Fort Myers Gen. Empls.' Pension Fund v. Haley*, 235 A.3d 702, 717 n.49 (Del. 2020) (citing *Macmillan*, 559 A.2d at 1279–81).

[488] D.I. 82 at 32–33 (alteration, citations, footnote, and internal quotation marks omitted) (citing Compl. ¶ 124, and then quoting *Macmillan*, 559 A.2d at 1279).

[489] *See infra* Section II.A.2.a; *see also Mindbody*, 2020 WL 5870084, at *1 ("[T]he paradigmatic claim under *Revlon, Inc. v MacAndrews & Forbes Holdings, Inc.* arises when a supine board under the sway of an overweening CEO bent on a certain direction tilts the sales process for reasons inimical to the stockholders' desire for the best price." (alteration, footnote, and internal quotation marks omitted) (quoting *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1002 (Del. Ch. 2005))).

on the board solely to set the standard of review, as the theory of breach should drive the standard of review inquiry. Plaintiff's theory of breach is not that Garland deceived the Special Committee into favoring Buyer. Her theory is that the Special Committee knowingly favored Buyer because they favored Riverstone and Developer 2 over Company stockholders. For the sake of completeness, I consider whether Plaintiff's allegations can stretch to allege fraud on the board and conclude they cannot.

In *Mills*, the board and special committee failed to engage in "planning and oversight to insulate the self-interested management" in connection with a sale of corporate control.[490] Rather, the board placed "the entire process in the hands of [a manager]" who chose the Committee's financial advisors, and acted without board oversight as the board looked on "with a blind eye."[491] "[T]he Macmillan board completely relied on" interested management's false portrayal of a potential bidder that "served more to propagandize the board than to enlighten it."[492] Management worked intensely and furtively with Macmillan's Special Committee's financial advisor on restructuring proposals that would eventually reach the Special Committee that largely benefitted management.[493] Throughout negotiations and

---

[490] *Macmillan*, 559 A.2d at 1282.

[491] *Id.* at 1280.

[492] *Id.* at 1267 (citation and internal quotation marks omitted).

[493] *Id.* at 1268.

restructuring, "the Board and the Special Committee followed [management] in lockstep. Neither took reasonable efforts to uncover the facts."[494] Because of the deception in the change-of-control process, and because the board's oversight failure "afforded management the opportunity to indulge in the misconduct which occurred," entire fairness review was warranted.[495]

In recent years, Delaware courts have honed the pleading-stage distinctions between a paradigmatic *Revlon* claim and a *Mills* theory warranting entire fairness review.[496] First, the rogue fiduciary must be materially interested, as by seeking control or benefit from the company post-merger.[497] Second, the board must be "inattentive or ineffective" and permit the fiduciary's manipulation.[498] Third, so

---

[494] *Id.* at 1269 (emphasis omitted).

[495] *Id.* at 1279.

[496] Of course, fraud on the board can also be perpetuated by an advisor. *See, e.g.*, *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816 (Del. 2015). My discussion here focuses on the line between an overweening officer and a fraudster.

[497] *See Haley*, 235 A.3d at 717, 719; *City of Miami Gen. Empls.' v. Comstock*, 2016 WL 4464156, at *19 (Del. Ch. Aug. 24, 2016) (noting "plaintiff must allege that [the fiduciary] was acting out of self-interest and that he deceived the rest of the board into approving the transaction," and declining to apply entire fairness because the fiduciary was not self-interested), *aff'd*, 158 A.3d 885 (Del. 2017); *City of Warren Gen. Empls.' Ret. Sys. v. Roche*, 2020 WL 7023896, at *10 (Del. Ch. Nov. 30, 2020) (concluding the plaintiff failed to plead that the defendant fiduciaries were tainted by self-interest with respect to the buyout).

[498] *Roche*, 2020 WL 7023896, at *15; *see also Macmillan,* 559 A.2d at 1279 (noting the board's lack of oversight afforded the opportunity for mismanagement); *Mindbody*, 2020 WL 5870084 at *25 (considering whether "the Board was the passive victim of a rogue fiduciary" due to an informal, ill-equipped, and tardily-formed transaction committee); *Kahn v. Stern*, 183 A.3d 715, n.4 (Del. 2018) (TABLE) (noting that a variant of *Macmillan* claim exists where "impartial board members did not oversee conflicted members

enabled, the fiduciary must commit deception or manipulation, as by "deceiving an independent board of directors into favoring a bidder"[499] or "fail[ing] to disclose his 'interest in the transaction to the board.'"[500] Fourth, that deception must be material.[501] "[A]n omission is 'material' to a board if the undisclosed fact is relevant and of a magnitude to be important to directors in carrying out their fiduciary duty of care in decisionmaking."[502] Finally, the "key issue" is whether it is reasonably conceivable that the deception "tainted the decisionmaking of [the] concededly independent and disinterested directors[.]"[503] The fiduciary's allegedly deceptive or

---

sufficiently"); *In re Xura, Inc. S'holder Litig.*, 2018 WL 6498677, at *4 (Del. Ch. Dec. 10, 2018) (discussing allegations of an inert special committee formed to evaluate and negotiate a transaction with a bidder, including an allegation that one of its members "did not even realize that the Special Committee existed or that he was a member of the committee until he learned about it at his deposition").

[499] *Roche*, 2020 WL 7023896, at *17 (citing *Macmillan*, 559 A.2d at 127, and also citing *Stern*, 183 A.3d at n.4, and also citing *Comstock*, 2016 WL 4464156, at *19); *accord Comstock*, 2016 WL 4464156, at *20.

[500] *Haley*, 235 A.3d at 717 (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1168 (Del. 1995)); *accord Mindbody*, 2020 WL 5870084, at *23–24.

[501] *Mindbody*, 2020 WL 5870084, at *23–25.

[502] *Id.* at *23 (internal quotation marks omitted) (quoting *Haley*, 235 A.3d at 718). "[T]he term 'material,' when used in the context of a director's obligation to be candid with the other members of the Board, is distinct from the use of the term 'material' in the quite different context of disclosure to stockholders in which an omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Haley*, 235 A.3d at 719 (alteration and internal quotation marks omitted) (quoting *Brehm*, 746 A.2d at 259 n.49).

[503] *Roche*, 2020 WL 7023896, at *15 (quoting *Baker Hughes*, 2020 WL 6281427, at *19).

manipulative conduct must cause the board to take action or inaction that was outcome-determinative.

Thus, to elevate the standard of review for a paradigmatic *Revlon* claim, an interested officer must be more than overweening; he must be fraudulent or outright manipulative. The board must be more than supine; it must be deceived and permit that deception. And the deception must affect the outcome. To raise the standard of review on any less risks swallowing enhanced scrutiny in every paradigmatic *Revlon* case.[504]

Garland was materially interested, and the Special Committee failed to vigorously enforce its instructions or effectively manage conflicts. Garland misled the Special Committee, failing to disclose that he met with Riverstone and Buyer together, and saying instead that meetings with Buyer and Riverstone would occur in the coming weeks, and that Buyer's "approach the company…had come about indirectly."[505] But the Special Committee's deficiencies did not facilitate Garland's deception. The Special Committee oversaw and engaged in the sale process, and

---

[504] *See Macmillan*, 559 A.2d at 1279 ("[J]udicial reluctance to assess the merits of a business decision ends in the face of illicit manipulation of a board's deliberative processes by self-interested corporate fiduciaries. Here, not only was there such deception, but the board's own lack of oversight in structuring and directing the auction afforded management the opportunity to indulge in the misconduct which occurred. In such a context, the challenged transaction must withstand rigorous judicial scrutiny under the exacting standards of entire fairness.").

[505] Compl. ¶ 140.

took measures to oversee Garland, including issuing repeated instructions on how conflicted fiduciaries should behave and issuing a corrective memorandum after learning of Garland's April 15 Meeting.[506] Importantly, Plaintiff's argument seeking entire fairness review depends on the allegation that "Garland breached the Committee protocols."[507] Batkin told the Special Committee Garland had discussions with Riverstone and Buyer concerning a potential acquisition, albeit tardily and without the detail that Garland had met with them together.

The undisclosed fact that Garland had met with Riverstone and Buyer together "is relevant and of a magnitude to be important to directors in carrying out their fiduciary duty of care in decisionmaking."[508] The April 15 Meeting's materiality is evidenced by the Batkin Memo, which is the only memo sent during the process. On May 15, the Batkin Memo informed the Special Committee that Garland had discussions with Riverstone and Buyer concerning Buyer's potential acquisition of the Company. The Batkin Memo indicated that Buyer was interested in a transaction and was willing to enter into a confidentiality agreement to engage in discussions. But the Batkin Memo did not fully disclose that Garland met with Riverstone and

---

[506] *Id.* ¶ 128.

[507] D.I. 82 at 34.

[508] *Mindbody*, 2020 WL 5870084, at *23 (internal quotation marks omitted) (quoting *Haley*, 235 A.3d at 718).

98

Buyer together and the impetus for, circumstances surrounding, and substance of that meeting.

As for the Proxy, it discloses the fact of the meeting but is silent regarding its timing, substance, and context. It inaccurately suggests that Garland disclosed the April 15 Meeting immediately after it occurred—if Garland had so disclosed shortly after the April 15 Meeting as the Proxy suggests, there would have been no occasion to circulate the Batkin Memo weeks later. The Proxy also states that on May 2, Garland "informed the Special Committee of his recent meeting with Riverstone Representatives and [Buyer]."[509] But the May 2 meeting minutes do not mention Buyer, and state that Garland disclosed Riverstone had suggested taking the Company private in conjunction with an unidentified third-party institutional investor, but had "dropped the suggestion following consideration of conflicts and certain contractual obligations of [Riverstone]."[510] The May 2 meeting minutes were therefore also misleading, as Garland had already identified and held a meeting with Buyer.

To be sure, Garland's tardy half-truths pale in comparison to the undisclosed conflicts in *Haley* and *Mindbody*.[511] They more resemble the immaterial early

---

[509] Proxy at 40.

[510] Compl. ¶ 127.

[511] *See Haley*, 235 A.3d at 719 ("Plaintiffs have adequately alleged that the Board would have found it material that its lead negotiator had been presented with a compensation proposal having a potential upside of nearly five times his compensation at Towers, and

99

undisclosed management employment discussion in *Comstock*, as the Special Committee would become fully aware of Riverstone and Buyer's partnership, just as the *Comstock* board would become aware of the undisclosed discussion.[512] But the Batkin Memo supports the inference that the Company's fiduciaries considered the April 15 Meeting material.

While the full story about the April 15 Meeting is material, its concealment did not impact the Special Committee's decisionmaking as Plaintiff suggests. Garland's belated half-truths about the meeting appear to have had no effect on the process. The omitted fact that he actually spoke with Riverstone and Buyer together, and the belated disclosure in the Batkin Memo, does not amount to "illicit manipulation of the board's deliberative process."[513] As in *Comstock*, Plaintiff does

---

that he was presented with this Proposal during an atmosphere of deal uncertainty and before they authorized him to renegotiate the merger consideration."); *Mindbody*, 2020 WL 5870084, at *24 (offering a "catalogue[]" of "undisclosed conflicts").

[512] *Comstock*, 2016 WL 4464156, at *21 ("Plaintiff also alleges that Comstock deceived the board by failing to inform it of various steps he took while negotiating the transaction. For instance, plaintiff alleges that Comstock did not disclose an early discussion with Petrello regarding C&J management's potential future contracts with New C&J, or Comstock's motives for negotiating the transaction, as plaintiff interprets them. Significantly, however, plaintiff does not allege that management's eventual future roles were never disclosed to the board, or that the critical deal terms Comstock negotiated, such as the EBITDA multiple, were hidden from the board." (footnote omitted)).

[513] *Id.* at *19 (quoting *Macmillan*, 559 A.2d at 1279).

not allege that Riverstone's partnership with Buyer was never disclosed to the Board, or that any terms Garland may have negotiated in those discussions were hidden.[514]

While Plaintiff contends the April 15 Meeting gave Riverstone and Buyer entry to the sales process, the Board had already included Riverstone in the process. Riverstone's representative, Hunt, attended the first Board meeting and substantive discussions of potential strategic alternatives.[515] "The Board then solicited the views of Riverstone" who it believed "may be interested in participating in a potential transaction."[516]

Plaintiff has not alleged how the meeting, the delayed and incomplete disclosures, or the Special Committee's lukewarm response harmed Brookfield, caused the Board or Special Committee to disadvantage Brookfield, or enabled Garland to continue any meaningful unprincipled conduct. The Special Committee, with Batkin in the driver's seat, engaged with Brookfield and afforded it the opportunity to conduct extensive due diligence. Nor did Garland mislead the Special Committee as to Brookfield's bid; the Special Committee and its advisors acknowledged the superior aspects of Brookfield's bid, including its superior value. Plaintiff does not allege that Garland "deceived the rest of the board into approving

---

[514] *Compare id.* at *21, *with Macmillan*, 559 A.2d at 1279.

[515] Compl. ¶¶ 92–94.

[516] *Id.* ¶ 97 (emphasis omitted).

the transaction" or into rejecting Brookfield.[517]  Plaintiff does not plead facts to support outcome-determinative deception.[518]

I end where I began, by noting that Plaintiff's paradigmatic *Revlon* theory of breach is incompatible with her fraud-on-the-board theory for entire fairness.  Under Plaintiff's own breach theory, in which the Special Committee favored Riverstone's interest over that of company stockholders, the sales process outcome would have been the same whether or not the Special Committee immediately learned the full truth of Garland's April 15 Meeting with Riverstone and Buyer.

**b.**  **Whether The Officer And Entity Defendants Form A Control Group Must Be Determined With The Benefit Of A Factual Record.**

Plaintiff alleges the Officer Defendants stood on both sides of the transaction; that Riverstone and the Officer Defendants, as Developer 2 stakeholders, competed with the Company's public stockholders for consideration; and that Riverstone and the Officer Defendants retained equity in the post-Merger entity while public stockholders were cashed out.  Plaintiff contends the Entity and Officer Defendants (together, the "Controller Defendants") aggregated their sources of power and

---

[517] *See Comstock*, 2016 WL 4464156, at *19.

[518] *Roche*, 2020 WL 7023896, at *14–15; *see also Comstock*, 2016 WL 4464156, at *21 (describing the type of deceitful conduct necessary to trigger entire fairness).

influence to control the Company. Accordingly, entire fairness review may be warranted if the Entity and Officer Defendants acted as a control group.[519]

"Delaware law imposes fiduciary duties on those who effectively control a corporation."[520] The premise for contending that a controller owes fiduciary duties "is that the controller exerts its will over the enterprise in the manner of the board itself."[521] The controller analysis "must take into account whether the stockholder, as a practical matter, possesses a combination of stock voting power and managerial authority that enables him to control the corporation, if he so wishes."[522] If a controller or control group is present, entire fairness review arises "when the board labors under actual conflicts of interest" stemming from the controller standing on both sides of a challenged transaction or competing with the minority for consideration.[523] "The question whether a shareholder is a controlling one is highly

[519] Despite Plaintiff's deficient presentation of this theory for purposes of the standard of review, limited to a footnote in her answering brief, I consider whether she has pled a control group because she also asserts the Controller Defendants owe fiduciary duties and are liable for breaching them, and has briefed that those claims should survive Defendants' motion under Rule 12(b)(6). *See* D.I. 82 at 34 n.66.

[520] *Voigt v. Metcalf*, 2020 WL 614999, at *11 (Del. Ch. Feb. 10, 2020) (quoting *Quadrant Structured Prods. Co. Ltd. v. Vertin*, 102 A.3d 155, 183–84 (Del. Ch. 2014)).

[521] *Abraham v. Emerson Radio Corp.*, 901 A.2d 751, 759 (Del. Ch. 2006).

[522] *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 553 (Del. Ch. 2003).

[523] *FrontFour Cap. Gp. LLC v. Taube*, 2019 WL 1313408, at *20 (Del. Ch. Mar. 11, 2019) (quoting *Reis*, 28 A.3d at 457, and citing *Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997), and *Kahn*, 638 A.2d at 1115, and *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983), and *In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *12 (Del. Ch. Oct. 2, 2009), and *In re Delphi Fin. Gp. S'holder Litig.*, 2012 WL 729232, at *12

contextualized and is difficult to resolve based solely on the complaint."[524]  "[T]here

is no magic formula to find control; rather, it is a highly fact specific inquiry."[525]

Delaware cases have traditionally evaluated whether stockholders wielded

control over the corporation.[526]  This is unsurprising, as control manifests in whether

an individual or entity has the power to displace the will of the board,[527] and stock

n.57 (Del. Ch. Mar. 6, 2012), and also citing *In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 487 (Del. Ch. 2013)).

[524] *Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *6 (Del. Ch. June 5, 2006); *accord In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *13 (Del. Ch. Mar. 28, 2018) ("Whether a large blockholder is so powerful as to have obtained the status of a 'controlling stockholder' is intensely factual and it is a difficult question to resolve on the pleadings." (alterations and internal quotation marks omitted)); *Cysive*, 836 A.2d at 550–51 (same); *see In re Zhongpin Inc. S'holders Litig.*, 2014 WL 6735457, at *9 n.33 (Del. Ch. Nov. 26, 2014) ("Whether or not a particular CEO and sizeable stockholder holds more practical power than is typical should not be decided at the motion to dismiss stage if a plaintiff pleads facts sufficient to raise the inference of control.  To ignore real-world indicia of a stockholder's actual power would depart from this Court's precedent."), *rev'd on other grounds sub nom. In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173 (Del. 2015).

[525] *Calesa Assocs., L.P. v. Am. Cap., Ltd.*, 2016 WL 770251, at *11 (Del. Ch. Feb. 29, 2016) (citing *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *10 (Del. Ch. Oct. 24, 2014)); *see Zhongpin*, 2014 WL 6735457, at *6–7 (noting the inquiry of "whether or not a stockholder's voting power and managerial authority, when combined, enable him to control the corporation . . . is not a formulaic endeavor and depends on the particular circumstances of a given case" (footnote and internal quotation marks omitted) (quoting *Cysive*, 836 A.2d at 553)).

[526] *E.g.*, *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 983 (Del. Ch. 2014) ("This action involves the novel claim that a holder of less than one percent of the stock of a Delaware corporation was a controlling stockholder and thus owed fiduciary obligations to the other stockholders of the corporation."), *aff'd sub nom. Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015).

[527] *Superior Vision Servs., Inc. v. Reliastar Life Ins. Co.*, 2006 WL 2521426, at *4 (Del. Ch. Aug. 25, 2006) (considering "whether the actual control must be over the Board or whether separately negotiated contract rights can supply the requisite degree of control,"

ownership is the original vehicle for such displacement. A majority stockholder's control flows principally from its voting power, which translates into the power to "alter materially the nature of the corporation and the public stockholders' interests."[528]

For a minority stockholder or an aggregate control group of minority stockholders, fiduciary duties flow from aggregated sources of influence, including voting power and softer sources of power.[529] "It is impossible to identify or foresee all of the possible sources of influence that could contribute to a finding of actual

---

and noting that, in evaluating whether a stockholder is a controller, "Delaware case law has focused on control of the board").

[528] *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 43 (Del. 1994); *see also Voigt*, 2020 WL 614999, at \*11 ("One method of pleading control sufficient to impose fiduciary duties is to allege that a defendant has the ability to exercise a majority of the corporation's voting power.").

[529] *See Corwin*, 125 A.3d at 307 (noting the Delaware Supreme Court's "instructions" to "look[] for a combination of potent voting power and management control such that the stockholder could be deemed to have effective control of the board without actually owning a majority of stock" (footnote omitted)); *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1221 n.8 (Del. 1999) (noting that minority stockholdings with "some additional allegation of domination through actual control of corporate conduct" may give rise to controller status); *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at \*9 (Del. Ch. Aug. 18, 2006) (considering "stockholders who, although lacking a clear majority, have such formidable voting and managerial power that they, as a practical matter, are no differently situated than if they had majority voting control"); *see also* 8 *Del. C.* § 203(c)(4) (defining "[c]ontrol" as "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting stock, by contract or otherwise"); 17 C.F.R. § 230.405 (defining "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise").

control."[530]  The many sources of influence and of control that could contribute to a finding of actual control include:

> (i) relationships with particular directors, (ii) relationships with key managers or advisors, (iii) the exercise of contractual rights to channel the corporation into a particular outcome, and (iv) the existence of commercial relationships that provide the defendant with leverage over the corporation, such as status as a key customer or supplier.[531]

"Broader indicia of effective control also play a role,"[532] and include, but are not limited to, ownership of a significant equity stake; the right to designate directors; contractual augmentation of the power of a minority stockholder or board-level position; and the ability to exercise outsized influence in the board room or on committees, as through roles like CEO, Chairman, or founder.[533]

Here, Plaintiff's control group theory aggregates the Officer Defendants' stock holdings and management roles with the Entity Defendants' contractual, operational, and structural pull, even though the Entity Defendants are not stockholders.  Plaintiff pegs the Entity Defendants as the group's primary source of power, pointing to the Company's formation to serve Riverstone, the importance of Developer 2's commercial relationship with the Company, Riverstone's ability to

---

[530] *Voigt*, 2020 WL 614999, at *12 (citing *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *26 (Del. Ch. July 6, 2018), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019) (TABLE)).

[531] *Id.* (citing *Basho*, 2018 WL 3326693, at *26).

[532] *Id.* (citing *Basho*, 2018 WL 3326693, at *27).

[533] *Id.* (citing *Basho*, 2018 WL 3326693, at *27).

install insiders as officers and directors at both the Company and Developer 2, and the Consent Right. Accordingly, this case presents an interesting wrinkle. It is an open question under Delaware law whether the Entity Defendants' soft power alone, anchored in historical and commercial ties and the contractual Consent Right, can support including the Entity Defendants in a control group and imposing fiduciary duties.

This Court has dismissed fiduciary duty claims against a group of alleged controllers where some or all of the members held no stock in the company.[534] For example, *Klein v. H.I.G. Capital, L.C.C.* considered a "novel" control group theory in which the group's purported members were not alleged to have owned any company stock at the time of the transaction in question.[535] Relying on the accurate observation that Delaware law looks to substance rather than form when considering who wields control sufficient to impose fiduciary duties, the plaintiff argued that the group's members "were effectively controlling stockholders of the Company."[536] The Court rejected this position: "[i]t [wa]s not alleged that [the defendant] owned *any* stock of [the company] until the Transactions closed and thus, by definition, [the

---

[534] *See, e.g., Skye Min. Invs., LLC v. DXS Cap. (U.S.) Ltd.*, 2020 WL 881544, at *24–29 (Del. Ch. Feb. 24, 2020); *Klein v. H.I.G. Cap., L.L.C.*, 2018 WL 6719717, at *13 (Del. Ch. Dec. 19, 2018); *Forsythe v. ESC Fund Mgmt. Co. (U.S.)*, 2007 WL 2982247, at *12–13 (Del. Ch. Oct. 9, 2007).

[535] 2018 WL 6719717, at *13.

[536] *Id.*

defendant] could not have been part of a 'group' of Company stockholders when the Transactions were negotiated."[537]

But after remarking on the hurdle of stock ownership, the Court went on to make the "more general[]" observation that the complaint was "devoid of any allegations that [the defendant] was a party to any agreement or arrangement that controlled the votes of any shares of the Company's stock," or that it "otherwise took any action to exercise control over the directors of [the company] before the parties entered into the Transactions."[538] Rather, the most that could be reasonably inferred from alleged sources of power other than stock ownership was that the purported controller "had the potential to *later* exercise control over the Company," which "is not enough to impose fiduciary obligations."[539]

And *Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited* considered claims against an alleged control group of six, only two members of which held any

---

[537] *Id.*

[538] *Id.*

[539] *Id.* (emphasis added) (citing *In re Sea-Land Corp. S'holders Litig.*, 1987 WL 11283, at *5 (Del. Ch. May 22, 1987) (reasoning that the "potential ability to exercise control is not equivalent to the actual exercise of that ability," and only actual control over the board's decision-making process suffices to impose fiduciary duties (emphasis omitted)), and also citing *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1056 (Del. Ch. 1984) ("Plaintiffs' contention that Burlington occupied a fiduciary role because of its potential for control is subject to the same infirmity as its contract argument. . . . State law claims of breach of contract and breach of fiduciary relationship must subsist on the actuality of a specific legal relationship, not in its potential."), *aff'd*, 575 A.3d 1131 (Del. 1990)).

company stock.[540] Because the alleged group owned less than 50% of the outstanding stock, the Court observed that plaintiff was required to plead facts "allow[ing] a reasonable inference that the Alleged Controllers exercised such formidable voting and managerial power that, as a practical matter, they were no differently situated than if they had majority voting control."[541] As to the four alleged nonstockholder control group members, the Court concluded it was "not reasonably conceivable they exercised actual control over the company because they "owned *no* [company] units, appointed *none* of [the company]'s Board members and held *no* contractual blocking rights."[542]

But as to the two minority stockholders, the Court found it reasonably conceivable that they exercised control, aggregating their stock with their contractual blocking rights.[543] The Court emphasized that "the focal point" of the control analysis was the stockholders' blocking rights and how they used them.[544]

---

[540] *Skye Min. Invs.*, 2020 WL 881544, at *24–29.

[541] *Id.* at *26 (alterations and internal quotation marks omitted) (quoting *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 665 (Del. Ch. 2013)).

[542] *Id.* at *27 (emphasis in original).

[543] *Id.* at *26.

[544] *Id.* (citing *Basho*, 2018 WL 3326693, at *25 ("If a defendant wields control over a corporation" either "generally or with regard to a particular transaction," then "the defendant takes on fiduciary duties, even if the defendant is a stockholder who otherwise would not owe duties in that capacity."), & *26 (noting that a plaintiff can show a minority blockholder's domination and control in various ways including personal relationships with board members, contractual rights, commercial relationships, *de facto* ability to

Relying on *Basho Technologies v. Georgetown Basho Investors*,[545] the defendants argued that "a mere blocking right standing alone is highly unlikely to support either a finding or a reasonable inference of control."[546] The Court agreed with that statement, but held the plaintiff had alleged more.[547] As alleged, the blocking rights "amounted to a self-destruct button" that allowed the stockholders to "wield control by driving [the company] into the ground if it suited their interests."[548] With this "on/off switch for [the company] that could be, and allegedly was, manipulated by [the stockholders] to serve their interests at the expense of [the company],"[549] the stockholders "exercised their leverage with the Blocking Rights to steer [the company's operating subsidiary] off the cliff into the bankruptcy ravine below," by allowing the stockholders "to block *all* of [the company]'s efforts to finance *any* of its ongoing operations."[550] As the Court observed, "[w]hen blocking rights empower a minority investor to channel the corporation into a particular outcome, they

---

remove directors or the company's own characterizations of the minority blockholder's influence)).

[545] 2018 WL 3326693 (Del. Ch. July 6, 2018).

[546] *Skye Min. Invs.*, 2020 WL 881544, at *27 (internal quotation marks omitted) (referring to *Basho*, 2018 WL 3326693, at *26 n.315).

[547] *Id.*

[548] *Id.* at *26 (internal quotation marks omitted).

[549] *Id.*

[550] *Id.* at *27 (emphasis in original).

contribute to an inference of control."[551]   The *Skye* plaintiffs "ma[d]e an even stronger case as the Blocking Rights did more than channel [the company] to a particular outcome," as "the Blocking Rights gave [the stockholders] the unilateral power to shut [the company] down—full stop."[552]  In the end, the Court declined to impute the stockholders' blocking right to the nonstockholders, who otherwise brought no power to the table, and so declined to find a control group.[553]

   *Klein* and *Skye Mineral Investors* concluded that the members of a purported control group that did not own stock were not part of the group.  But both looked beyond the bounds of stock ownership to other sources of soft power and left open the possibility that, if a plaintiff pleads sufficient sources of influence, controller status and its attendant fiduciary duties may extend to a nonstockholder.[554]  These fact-specific evaluations of nonstockholder members of alleged control groups followed this Court's consideration of the possibility that fiduciary duties would extend to a nonstockholder in *In re EZCORP Inc. Consulting Agreement Derivative Litigation*.[555]   That consideration built on the United States Supreme Court's

---

[551] *Id.* (internal quotation marks omitted) (quoting *Basho*, 2018 WL 3326693, at *29).

[552] *Id.* (internal quotation marks omitted) (quoting *Basho*, 2018 WL 3326693, at *29).

[553] *See id.* at *27–29.

[554] *See id.*; *Klein*, 2018 WL 6719717, at *13.

[555] 2016 WL 301245, at *8–10 (Del. Ch. Jan. 25, 2016).

decision in *Southern Pacific Co. v. Bogert*,[556] which observed that the "the doctrine under which majority stockholders exercising control are deemed trustees for the minority" was not avoided simply because the defendant "did not itself own directly any stock" in the company, but exerted its control through its subsidiary that held the majority of the company's stock.[557] The Supreme Court stated,

> [T]he doctrine by which the holders of a majority of the stock of a corporation who dominate its affairs are held to act as trustee for the minority does not rest upon such technical distinctions. It is the fact of control of the common property held and exercised, not the particular means by which or manner in which the control is exercised, that creates the fiduciary obligation.[558]

Chancellor Wolcott similarly held in the seminal decision in *Eshleman v. Keenan*;[559] affirming that decision, the Delaware Supreme Court ruled that "the formal corporate vehicle" behind a transaction does not necessarily matter, as "[t]he conception of corporate entity is not a thing so opaque that it cannot be seen through."[560] Drawing on *Southern Pacific* and *Eshleman*, *EZCORP* held that fiduciary duties extended to an individual defendant that was the company's

---

[556] 250 U.S. 483 (1919).

[557] *Id.* at 491–92.

[558] *Id.* at 492.

[559] 187 A. 25 (Del. Ch. 1936), *aff'd*, 2 A.2d 904 (Del. 1938).

[560] *EZCORP*, 2016 WL 301245, at *9 (quoting *Eshleman*, 2 A.2d at 908).

"ultimate controller," even though he exercised control only indirectly and did not himself own stock.[561]

Fiduciary duties arise from the separation of ownership and control.[562] The essential quality of a fiduciary is that she controls something she does not own. A trustee need not (and does not) own the assets held in trust; directors need not own stock. Even a third party lender that influences extraordinary influence over a company may be liable for acting negligently or in bad faith.[563] If a stockholder, as one co-owner, can owe fiduciary duties to fellow co-owners because the stockholder controls the thing collectively owned, surely an "outsider[]" that controls something it does not own owes duties to the owner.[564] "[I]t is a maxim of equity that 'equity regards substance rather than form,'"[565] and "the application of equitable principles

---

[561] *Id.* at *10.

[562] *See S. Pac. Co.*, 250 U.S. at 492.

[563] *Basho*, 2018 WL 3326693, at *26 (citing *NVent, LLC v. Hortonworks, Inc.*, 2017 WL 449585 at *9–10 (Del. Super. Feb. 1, 2017) (applying California law)).

[564] *EZCORP*, 2016 WL 301245, at *9 (citing *S. Pac. Co.*, 250 U.S. at 488, and *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 109–10 (Del. 1952)).

[565] *Id.* (quoting *Monroe Park v. Metro. Life Ins. Co.*, 457 A.2d 734, 737 (Del. 1983), and citing *Gatz v. Ponsoldt*, 925 A.2d 1265, 1280 (Del. 2007)).

Not every member of a control group needs to be similarly situated in that they each own stock. Envision a particular task that requires a truck, tools, and know-how. A first person owns a truck, a second owns the tools, and the third has the know-how. The three individuals can come together and complete the task, and are responsible for the quality of its completion. Their contributions need not be in identical ratios; that they do not each possess one truck part, one tool, and one skill is no reason to absolve them of their responsibility for the final work product. Similarly, holders of voting and soft power can work together to exert control without being similarly situated. The Officer Defendants

113

depends on the substance of control rather than the form[;] it does not matter whether the control is exercised directly or indirectly."[566] "[T]he level of stock ownership is not the predominant factor, and an inability to exert influence through voting power does not foreclose a finding of control."[567] Thus, "Delaware corporate decisions consistently have looked to who wields control in substance and have imposed the risk of fiduciary liability on that person,"[568] and "[l]iability for breach of fiduciary duty *therefore extends to outsiders* who effectively controlled the corporation."[569]

With this foundation, and considering evolving market realities and corporate structures affording effective control, Delaware law may countenance extending

---

contributed stock ownership and executive leadership positions; Developer 2 had its commercial relationship with the Company; and Riverstone had the Consent Right, the Officer Defendants, and Developer 2. When aggregated, those sources of influence enabled the Controller Defendants to complete the task: exercising control over the Company to cause a merger with Buyer. The fact that the different actors held different sources of disaggregated power does not dilute their combined effectiveness, and I can see no reason why it should absolve the actors of the consequences of their control.

[566] *EZCORP*, 2016 WL 301245, at *9–10.

[567] *FrontFour*, 2019 WL 1313408, at *21; *see also Crimson Expl.*, 2014 WL 5449419, at *10 (collecting cases and noting that "the cases do not reveal any sort of linear, sliding-scale approach whereby a larger share percentage makes it substantially more likely that the court will find the stockholder was a controlling stockholder," but "[i]nstead, the scatter-plot nature of the holdings highlights the importance and fact-intensive nature of the actual control factor"); *Calesa Assocs.*, 2016 WL 770251, at *11 (discussing *Crimson Exploration* and noting that it "found no correlation between the percentage of equity owned and the determination of control status").

[568] *EZCORP*, 2016 WL 301245, at *9.

[569] *Id.* (emphasis added) (citing *S. Pac. Co.*, 250 U.S. at 488, and also citing *Sterling*, 93 A.2d at 109–10).

114

controller status and fiduciary duties to a nonstockholder that holds and exercises soft power that displaces the will of the board with respect to a particular decision or transaction.

Here, in the context of the Company's end-stage transaction, Plaintiff asks the Court to consider Riverstone's Consent Right, its commercial power through Developer 2, and role as the Company's creator, together with the Officer Defendants' managerial power and some stockholdings. And so, with the door left open by *EZCORP*, *Skye Mineral Investors*, and *Klein*, I proceed with the well-established control group analysis to consider whether the Controller Defendants collectively owed duties with respect to the Merger.

To plead a control group, the plaintiff must first plead the connection among those in the purported control group was "legally significant" to subject the members to fiduciary duties.[570] Plaintiff must then allege that the control group exercised *de facto* control by actual domination or control of the board generally, or actual domination or control of the corporation, its board, or the deciding committee with respect to the challenged transaction.[571]

I first consider whether Plaintiff has alleged that the Controller Defendants were bound in a legally significant way. The Delaware Supreme Court recently

---

[570] *Sheldon v. Pinto Tech. Ventures, L.P.*, 220 A.3d 245, 252 (Del. 2019).

[571] *See FrontFour*, 2019 WL 1313408, at *22.

addressed the requirements for pleading a control group in *Sheldon v. Pinto Technology Ventures, L.P.*, adopting the "legally significant connection" standard applied by multiple decisions of this Court:

> To demonstrate that a group of stockholders exercises control collectively, the [plaintiff] must establish that they are connected in some legally significant way—such as by contract, common ownership, agreement, or other arrangement—to work together toward a shared goal. To show a legally significant connection, the [plaintiff] must allege that there was more than a mere concurrence of self-interest among certain stockholders. Rather, there must be some indication of an actual agreement, although it need not be formal or written.[572]

Both historical ties and transaction-specific ties may support an inference of an actual agreement.[573]

Plaintiff has alleged facts giving rise to the reasonable inference that the alleged group had an "actual agreement" to work together in connection with the sales process.[574] Plaintiff identifies relevant historical and transactional ties, reflected in the Company's inception and its capital structures and management, and the Consent Right. Plaintiff relates Riverstone's long history with the Officer Defendants and the Company, alleging that "[t]he extent and significance of the

---

[572] 220 A.3d at 251–52 (footnotes and internal quotation marks omitted) (quoting *Crimson Expl.*, 2014 WL 5449419, at *15, and also quoting *Carr v. New Enter. Assocs. Inc.*, 2018 WL 1472336, at *10 (Del. Ch. Mar. 26, 2018)).

[573] *See Garfield v. BlackRock Mortg. Ventures, LLC*, 2019 WL 7168004, at *8–9 (Del. Ch. Dec. 20, 2019) (applying the principles in *Sheldon*, as well as those in *In re Hansen Med. S'holders Litig.*, 2018 WL 3025525 (Del. Ch. June 18, 2018)).

[574] *See id.* at *9–10.

relationship between the Officer Defendants and Riverstone cannot be overstated" as "Riverstone has been their co-investor, partner, employer, sponsor, and financial patron" for over a decade.[575]  In 2009, Riverstone and the Officer Defendants together established Developer 1, "free[ing]" the Officer Defendants of their prior employer which the Officer Defendants touted as "a great thing."[576]  The Officer Defendants believed they "found the perfect partner in Riverstone," as Riverstone was similarly "interested in investing in renewables," "valued [the Officer Defendants'] team," and acted as a "new backer."[577]

Riverstone delivered, and its relationship with the Officer Defendants reverberated through the Company and its upstream developers.  Riverstone appointed the Officer Defendants to a team of fiduciaries that simultaneously served the Company and Developer 1, and then Developer 2.  The Officer Defendants also invested in Developer 1, the Company, and Developer 2, and retained equity in the post-Merger entity.

The connection ran deeper than overlapping appointments and investments.  Riverstone, via Developer 1, and the Officer Defendants created and molded the Company to serve Riverstone's needs and purchase and operate Developer 1's

---

[575] Compl. ¶ 45.

[576] *Id.*

[577] *Id.*

projects. Riverstone and Developer 1 used the Company's spinoff and IPO to further their shifting needs, meet and profit off increased demand in the energy sector, and grow Developer 2 via Pattern Vision 2020. After the IPO, Riverstone retained control over the Company, as Developer 2's continued symbiotic relationship with the Company was critical to achieving Pattern Vision 2020's growth targets. Via Developer 1, Riverstone controlled approximately 67.9% of the Company's stock and a majority of the Board, and retained the Consent Right over the Company's major transactions.[578]

Riverstone then tweaked its relationship with the Company. To retain veto power over a change of control at the Company after selling all its equity, Riverstone retained the Consent Right and loyal Riverstone personnel on the Board and in the Company's C-suite. The Company and Developer 2 agreed that Developer 2 had contractual control over the Company in their Purchase Rights Agreement.[579]

As transaction-specific ties, Plaintiff alleges that the Company's fiduciaries with longtime Riverstone ties, including the Officer Defendants, tipped the scales to secure a transaction with the Entity Defendants' preferred bidder.[580] Plaintiff has

---

[578] *See id.* ¶¶ 47, 49, 50.

[579] *Id.* ¶ 66.

[580] The allegations against the Officer Defendants and their potential liability are discussed further *infra*. Although this discussion refers to the Officer Defendants generally and collectively, as will be discussed, Plaintiff has failed to state claims against Armistead and Pedersen.

alleged that Browne and the Officer Defendants facilitated Riverstone's influence over the sales process. And sometime in early 2018, with access to the Company's confidential information, Riverstone and Goldman explored a Company take-private, but abandoned that effort; Riverstone's insiders at the Company picked up where it left off. The Officer Defendants began considering a sales process without the Board's knowledge, even retaining an advisor to prepare an analysis. With Garland taking the lead, the Officer Defendants initiated the sales process at a time when the Company was independently viable and achieving Pattern Vision 2020's milestones as planned and when there was no exigent or apparent need to sell. They did so at a Board meeting that a Riverstone representative attended, and solicited Riverstone's opinion and identified it as a potential acquirer.

During the process and without the Special Committee's authorization, Garland met secretly with Riverstone and Riverstone's preferred bidder, Buyer. The Officer Defendants introduced Riverstone-friendly Goldman into the process. Browne attended numerous Special Committee meetings, including executive sessions. Garland and Elkort pressed the Consent Right, asserting that "the need for [Riverstone's] support for any potential . . . transaction should not be underestimated because [Riverstone's] rights to consent that would likely be implicated by the proposed transaction appeared to be very broad."[581] And the Officer Defendants

---

[581] Compl. ¶ 117.

pushed the Entity Defendants' agenda, as reflected in the bidders' perception that the Company was tightly bound to Riverstone and Developer 2.[582]

Having alleged a legally significant connection, Plaintiff must also allege that the control group exercised *de facto* control by actual domination or control of the board generally, or actual domination or control of the corporation, its board, or the deciding committee with respect to the challenged transaction.[583] This need not be a "pervasive" showing.[584]

"Invariably, the facts and circumstances surrounding the particular transaction will loom large."[585] "Rarely (if ever) will any one source of influence or indication of control, standing alone, be sufficient to make the necessary showing. A reasonable inference of control at the pleading stage typically results when a confluence of multiple sources combines in a fact-specific manner to produce a particular result."[586] Therefore, the Court must holistically evaluate sources of influence and authority, as "[d]ifferent sources of influence that would not support

[582] *See id.* ¶¶ 151, 180–81.

[583] *See FrontFour*, 2019 WL 1313408, at *22.

[584] *See Superior Vision Servs.*, 2006 WL 2521426, at *4 ("[P]ervasive control over the corporation's actions is not required.").

[585] *Voigt*, 2020 WL 614999, at *13 (citing *Basho*, 2018 WL 3326693, at *28) ("A plaintiff may allege facts indicating that a defendant insisted on a particular course of action even though other fiduciaries or advisors resisted or had second thoughts. Or a plaintiff may allege that the defendant engaged in pressure tactics that went beyond ordinary advocacy to encompass aggressive, threatening, disruptive, or punitive behavior.").

[586] *Id.* (alterations omitted) (quoting *Basho*, 2018 WL 3326693, at *28).

an inference of control if held in isolation may, in the aggregate, support an inference of control."[587] If that authority takes the form of a contractual right, that right must give the nonstockholder power akin to "'operating the decision-making machinery of the corporation' (a 'classic fiduciary')," rather than "'an individual who owns a contractual right, and who exploits that right,' forcing a corporation to 'react' (which does not support a fiduciary status)."[588] The contractual right must confer control over the board.[589] Transaction-specific context is important: for example, a consent right to a change of control carries more transactional influence in the context of an end-stage transaction than it would in others.[590] Whether such a right translates to

---

[587] *Id.*

[588] *Skye Min. Invs.*, 2020 WL 881544, at *27 n.330 (alterations omitted) (quoting *Thermopylae Cap. P'rs, L.P. v. Simbol, Inc.*, 2016 WL 368170, at *14 (Del. Ch. Jan. 29, 2016)).

[589] *See KKR*, 101 A.3d at 994 (contemplating a contractual right "to veto any action of the board"); *Superior Vision Servs.*, 2006 WL 2521426, at *4 (noting a contractual right must afford control over the corporate decision-making process); *Cox Commc'ns*, 2006 WL 1586375, at *5 (finding control in a low stockholder stake and "the ability to shut down the effective operation of the At Home board of directors by vetoing board actions"); *Acp Master, Ltd. v. Sprint Corp.*, 2016 WL 3566363, at *2 (Del. Ch. June 30, 2016) (finding control supported by "veto power over almost all important business actions at [the Company] under the company's governing documents").

[590] *See Cox Commc'ns*, 2006 WL 1586375, at *5 (noting "[t]here is no case law in Delaware, nor in any other jurisdiction that this Court is aware of, holding that board veto power *in and of itself* gives rise to a shareholder's controlling status" where such veto power was never actually wielded, but considering such veto power as "significant" to "coercive leverage" because the veto right conferred "the ability to shut down the effective operation of the . . . board", and when combined with other soft power, might also confer the power to tilt a transaction (emphasis in original)); *see KKR*, 101 A.3d at 994 (considering "coercive power that stockholder could wield over the board's ability to independently decide whether or not to approve the merger" as distinct from constraint of

control also depends on what other sources of soft power may be aggregated with it.[591]

Plaintiff has not established that the Controller Defendants had the ability to exercise a majority of the corporation's voting power via stock ownership: not even close. At the time of the Merger, the owners of Developer 2, including the Officer Defendants, slightly more than 10% of the Company's common stock; Riverstone and Developer 2 held no stock in the Company.[592] Accordingly, Plaintiff's control theory principally relies on the Controller Defendants' soft sources of power.

The Entity Defendants had three sources of soft power. First, as explained, the long history between Riverstone, Browne, and the Officer Defendants, amplified by the officers' significant Company roles as founders, CEO, executive vice presidents, COO, chief compliance officer, and general counsel supports the reasonable inference that Riverstone and Developer 2, via the Officer Defendants, had "the ability to exercise outsized influence in the board room or on

---

the "business or strategic options available to the corporation"); *Basho*, 2018 WL 3326693, at *29 (considering contractual rights to limit financing wielded "to cut off the Company's access to *other sources* of financing" when the company was in a "position of maximum financial distress" (emphasis added)).

[591] *See Cox Commc'ns*, 2006 WL 1586375, at *4–5.

[592] *See* Compl. ¶ 249 (identifying the stockholdings of PSP and Company management, which equaled roughly 10.7% of the Company's outstanding stock and 9.7% of shares voted in favor of the Merger).

committees."[593]    Second, and relatedly, Riverstone controlled Developer 2, an essential part of the Company's upstream supply chain, supporting the inference of even more Riverstone "leverage over" the outcome of the sales process.[594]  With these two sources of soft power, Riverstone pervaded the Company's C-suite, boardroom, and supply chain.

The third source of soft power, the Consent Right, is contractual, and is the Entity Defendants' direct source of control over the Company's fate.  "[V]eto power is significant for analysis of the control issue."[595]  In the context of a sales process, Riverstone's power to veto a transaction replicated the veto power of a majority stockholder's vote, even after Developer 1 sold off its interest in the Company.  And Riverstone used it to that effect, flexing the Consent Right before the Special Committee and bidders to "channel the corporation into a particular outcome,"[596] specifically cashing out public stockholders and internalizing Developer 2.

---

[593] *Voigt*, 2020 WL 614999, at *12.

[594] *Id.*; *see also Cox Commc'ns*, 2006 WL 1586375, at *5 (noting the Company's operational dependence on the defendants offered leverage and contributed to control); *Acp Master, Ltd.*, 2016 WL 3566363, at *2 (noting a stockholder that is a company's "only significant customer" may "exert control" and "have significant leverage" (alterations omitted) (quoting *Cox Commc'ns*, 2006 WL 1586375, at *5)).  As reflected by the Company's many third-party bidders, its structure did not appear to "limit [the Company's] value-maximizing options," and is not the source of "Plaintiff['s] real grievance" as in *KKR*. *See KKR*, 101 A.3d at 994; *see also Corwin*, 125 A.3d at 307–08 (quoting, analyzing, and affirming the Court of Chancery's decision in *KKR*).

[595] *Cox Commc'ns*, 2006 WL 1586375, at *5.

[596] *Voigt*, 2020 WL 614999, at *12.

123

The Consent Right's effect was outsized due to Riverstone's other sources of soft power. Even though advisors and Brookfield saw the Consent Right was readily circumvented, all understood Riverstone's approval was required, conditioned on acquisition of Developer 2, no matter the transaction's structure. The Company's advisors acknowledged early in the process that a transaction with Brookfield could be structured to avoid the Consent Right, stating that the parties would "need to structure the transaction as a merger of [TerraForm] into a subsidiary of [the Company] due to" and that doing so would "not affect the economic terms of the transaction."[597] But from the start, Garland insisted to the Special Committee that any transaction with Brookfield would trigger the Consent Right.[598] And Garland and Elkort suggested to the Special Committee that Riverstone had "broad" consent rights such that Riverstone would have to approve of any merger transaction involving the Company.[599]

The Consent Right loomed large in negotiations with Brookfield. When Brookfield submitted an offer that would exclude Developer 2, Evercore and Goldman told Brookfield that "Riverstone has a consent right with respect to a merger of [the Company], and Riverstone will not provide such consent to a

[597] Compl. ¶ 121; *see also id.* ¶ 139.

[598] *See, e.g., id.* ¶ 8.

[599] *Id.* ¶¶ 117, 130.

transaction in which [TerraForm] becomes the parent company of [the Company]."[600]  At first, Brookfield proposed the Company acquire TerraForm in a transaction that excluded Developer 2 "so that no Riverstone consent is required in connection with the transaction."[601]  Brookfield explained:

> We had previously been notified by your advisors that Riverstone has a consent right with respect to a merger of [the Company], and Riverstone will not provide such consent to a transaction in which [TerraForm] becomes the parent company of [the Company].  As you are aware, we, at your request, restructured the proposed transaction with [the Company] as the surviving parent company so that no Riverstone consent is required in connection with this proposed transaction.[602]

Even with the Consent Right so circumvented, the Special Committee worried Riverstone would sue to block a transaction that did not involve Developer 2.[603]

Riverstone expressed it would not consent to any transaction with Brookfield and

---

[600] *Id.* ¶ 164.

[601] *Id.* ¶ 166.

[602] *Id.* ¶ 173 (emphasis omitted).

[603] *Id.* ¶ 171.  Plaintiff contends that the Entity Defendants "threaten[ed] meritless litigation in the event a merger agreement was entered with Brookfield and TerraForm that did not satisfy Riverstone's demands."  D.I. 82 at 5; *see* Compl. ¶¶ 15, 171, 177, 180, 260, 306, 311(d), 317.  As support for this theory, Plaintiff points to Shah's September 10 letter to the Board that acknowledged the Board was not "free to accept certain types of transactions without prior Riverstone consent or, as we understand, any transaction not supported by Riverstone without attracting Riverstone litigation risk."  Compl. ¶¶ 179–80.  While the Complaint and the documents integral to it suggest that Riverstone was willing to take necessary steps to enforce the Consent Right in the event of a breach, they do not support Plaintiff's sweeping allegations of overt and explicit threats.  Those allegations must be developed through discovery.

TerraForm and would be displeased with the Company if it entered a deal that circumvented the Consent Right.[604] By September 2019, Brookfield understood the state of play, as reflected in its letter to the Special Committee after meeting with Riverstone:

> Our understanding is that the relationship between the [] Board and Riverstone is complex. The Board has a fiduciary duty to shareholders of [the Company] but is not free to accept certain types of transactions without prior Riverstone consent or, as we understand, any transaction not supported by Riverstone without attracting Riverstone litigation risk.[605]

After meeting with Riverstone, Brookfield was unwilling to proceed with a transaction structure that avoided the Consent Right, placing the Consent Right back in play. Brookfield remained willing to move forward if Riverstone consented to the deal and the parties agreed to Riverstone's requested amendments of existing contractual arrangements.[606]

Riverstone's outsized role is reflected in the process itself. Riverstone had the ability to meet with bidders, review and assess their offers, and weigh in, many times before the Special Committee had considered the proposal. Bidders believed that Riverstone's satisfaction was essential to closing any deal, and accurately perceived Developer 2 and the Company as a bundled buy-one-get-one package. Specifically,

---

[604] Compl. ¶ 15.

[605] *Id.* ¶ 179 (emphasis omitted).

[606] *Id.* ¶ 180.

Party D acknowledged that Riverstone was one of "the three legs of the stool that are critical to accomplishing our objective of acquiring and combining [the Company] and [Developer] 2."[607] Brookfield stated that "the *Board and management* wish to also internalize [Developer 2] as part of this transaction."[608] Brookfield acknowledged that it was not "in anyone's best interests to engage with Riverstone in a manner that creates animosity or material litigation," and believed that "no deal could be completed without the consent of Riverstone even though it had no legal right to block a properly structured transaction."[609]

Thus, having determined that the Controller Defendants are connected in a legally significant way, it may be that their aggregate sources of power are sufficient to establish a control group, as they allowed the Controller Defendants to drive the outcome of the sales process and favor Buyer. But because this inquiry is highly fact intensive, I decline to make a definitive determination that the Controller Defendants operated as a control group owing fiduciary duties with respect to the transaction and that entire fairness therefore applies.[610] The Controller Defendants' duties and resultant standard of review can only be known after the record is

---

[607] *Id.* ¶ 181.

[608] *Id.* ¶ 151 (emphasis added).

[609] *Id.* ¶ 180.

[610] *See, e.g.*, *In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *5–6 (Del. Ch. May 22, 2000) (determining the controlling stockholder issue at summary judgment); *Cysive*, 836 A.2d at 552 (determining the controlling stockholder issue post-trial).

developed through discovery.[611]  I also decline to rule on the Motions to dismiss Count VI until a later stage in these proceedings.[612]

* * * * *

While discovery may shed light on facts that support increasing the standard of review, at this stage, Plaintiff's *Revlon* theory will be considered through the lens of enhanced scrutiny because Company stockholders received cash for their shares. This is so unless Defendants can demonstrate they should be afforded unrebuttable protection under the business judgment rule via a *Corwin* cleansing vote.[613]  I turn

---

[611] *See In re Tesla Motors, Inc.*, 2018 WL 2006678, at *3 (Del. Ch. Apr. 27, 2018) (explaining the Court's intention to merely hold plaintiffs had met their pleading-stage burden, but left the standard of review to be determined).

[612] *See* Ct. Ch. R. 12(d) ("The defenses specifically enumerated (1)-(7) in paragraph (b) of this rule, whether made in a pleading or by motion, and the motion for judgment mentioned in paragraph (c) of this rule, shall be heard and determined before trial on application of any party, unless the Court orders that the hearing and determination thereof be deferred until the trial."); *see also Spencer v. Malik*, 2021 WL 719862, at *5 (Del. Ch. Feb. 23, 2021) ("A party does not have a right to a pleading-stage ruling.  Rule 12(d) states that pleading-stage motions brought under Rule 12 shall be heard and determined before trial on application of any party, unless the Court orders that the hearing and determination thereof be deferred until the trial.  Not all disputes can or should be resolved at the pleading stage. Given the importance of the issue presented, the limited briefing provided by the parties, and the early stage of the case, the question . . . is deferred until after trial.  The motion for judgment on the pleadings on this issue is denied on that basis." (internal quotation marks omitted)); *Slingshot Techs., LLC v. Acacia Rsch. Corp.*, 2021 WL 1224828, at *3 (Del. Ch. March 30, 2021) ("Under Rule 12(a)(1), a court may postpone the disposition of a pleading stage motion until a later stage of the case, including until the trial on the merits.  Rule 12(d) reiterates this point, noting that a court should address a Rule 12(b)(6) motion in a preliminary hearing unless the court orders that the hearing and determination thereof be deferred until the trial." (alterations and internal quotation marks omitted)).

[613] *See KCG Hldgs.*, 2019 WL 2564093, at *10.

next to whether Plaintiff has stated a nonexculpated claim in view of *Revlon*, and then turn to whether cleansing has occurred under *Corwin*.

### 2. Plaintiff Has Stated A Nonexculpated Claim For Breach Against The Director Defendants.

The duties of care and loyalty "are the traditional hallmarks of a fiduciary who endeavors to act in the service of a corporation and its stockholders" and "[e]ach of these duties is of equal and independent significance."[614] The duty of care requires the directors of a company to act on an informed basis.[615] It also "requires a director to take an active and direct role in the context of a sale of a company from beginning to end."[616] "A breach of the duty of care exists where the fiduciary acted with gross negligence."[617]

"[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[618] Corporate fiduciaries "are not permitted to use their position of trust and confidence

---

[614] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 367 (Del. 1993).

[615] *See id.* at 368.

[616] *Id.* (citing *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 66 (Del. 1989), and also citing *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985)).

[617] *Mindbody*, 2020 WL 5870084, at *32 (citing *Morrison v. Berry* (*Morrison I*), 2019 WL 7369431, at *22 (Del. Ch. Dec. 31, 2019)).

[618] *Cede & Co.*, 634 A.2d at 361 (citing *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984), and also citing *Aronson*, 473 A.2d at 812).

to further their private interests."[619]  Under Delaware law, for a director to act loyally to advance the best interests of the corporation, she "must seek to promote the value of the corporation for the benefit of its stockholders."[620]  "Delaware case law is clear that the board of directors of a for-profit corporation must, within the limits of its legal discretion, treat stockholder welfare as the only end, considering other interests only to the extent that doing so is rationally related to stockholder welfare."[621]

There is "no dilution of the duty of loyalty when a director holds dual or multiple fiduciary obligations," and there is "no safe harbor for such divided loyalties in Delaware."[622]  "If the interests of the beneficiaries to whom the dual fiduciary owes duties diverge, the fiduciary faces an inherent conflict of interest. But if the interests of the beneficiaries are aligned, then there is no conflict."[623]

Claims arising out of the cash-out Merger, "a final-stage transaction presumptively subject to enhanced scrutiny under *Revlon*,"[624] "do not admit of easy

---

[619] *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939).

[620] *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *17 (Del. Ch. Apr. 14, 2017) (internal quotation marks omitted) (quoting *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 34 (Del. Ch. 2010)).

[621] *Id.* (alteration and internal quotation marks omitted) (quoting Leo E. Strine, Jr., *A Job is Not a Hobby:  The Judicial Revival of Corporate Paternalism and its Problematic Implications*, 41 J. Corp. L. 71, 107 (2015)).

[622] *Chen*, 87 A.3d at 670 (internal quotation marks omitted) (quoting *Weinberger*, 457 A.2d at 710).

[623] *Id.* (footnote omitted) (citing *Van de Walle v. Unimation, Inc.*, 1991 WL 29303, at *11 (Del. Ch. Mar. 7, 1991)).

[624] *Mindbody*, 2020 WL 5870084, at *13.

categorization as duties of care or loyalty."[625]  Situations that warrant enhanced scrutiny "involv[e] potential conflicts of interest where the realities of the decisionmaking context can subtly undermine the decisions of even independent and disinterested directors."[626]  "[T]he predicate question of what the board's true motivation was comes into play, and the court must take a nuanced and realistic look at the possibility that personal interests short of pure self-dealing have influenced the board."[627]

To address this pervasive concern in final-stage transactions, Delaware law expects directors to hold a single goal:  "get the highest value reasonably attainable for the shareholders."[628]  "At a minimum, *Revlon* requires that there be the most scrupulous adherence to ordinary principles of fairness in the sense that stockholder interests are enhanced, rather than diminished, in the conduct of an auction for the sale of corporate control."[629]  "The sole responsibility of the directors in such a sale

---

[625] *Chen*, 87 A.3d at 677 (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 67 (Del. 1995)).

[626] *Id.* (quoting *Trados II*, 73 A.3d at 43).

[627] *Id.* at 678 (alterations and internal quotation marks omitted) (quoting *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010)).  In these game-ending situations, "there is a basis for concern that directors without a pure self-dealing motive might be influenced by considerations other than the best interests of the corporation and other stockholders." *Dollar Thrifty*, 14 A.3d at 599 n.181.

[628] *Macmillan*, 559 A.2d at 1285.

[629] *Id.*; *see also id.* at 1264 ("When conducting an auction for the sale of corporate control, this concept of fairness must be viewed solely from the standpoint of advancing general, rather than individual, shareholder interests.").

is for the shareholders' benefit," and "[t]he board may not allow any impermissible influence, inconsistent with the best interests of the shareholders, to alter the strict fulfillment of th[is obligation]."[630]

"A corporate board's failure to obtain the best value for its stockholders may be the result of illicit motivation (bad faith), personal interest divergent from shareholder interest (disloyalty) or a lack of due care."[631] In evaluating alleged breaches of the duties of care and loyalty through the lens of enhanced scrutiny, "the focus is on whether the directors' decision was, on balance, within a range of reasonableness."[632]

In order to maximize stockholder value, "[d]irectors are not required by Delaware law to conduct an auction according to some standard formula, only that they observe the significant requirement of fairness for the purpose of enhancing general shareholder interests."[633] Accordingly, Delaware law does not *per se*

---

[630] *Id.* at 1285 (citing *Revlon*, 506 A.2d at 182).

[631] *Rudd v. Brown*, 2020 WL 5494526, at *6 (Del. Ch. Sept. 11, 2020) (quoting *Lukens*, 757 A.2d at 731).

[632] *Baker Hughes*, 2020 WL 6281427, at *7 (internal quotation marks omitted) (quoting *Paramount*, 637 A.2d at 45).

[633] *Macmillan*, 559 A.2d at 1286; *see also id.* at 1287 ("We do not intend to limit the broad negotiating authority of the directors to achieve the best price available to the stockholders."); *KCG Hldgs.*, 2019 WL 2564093, at *16 ("Under *Revlon*, directors are generally free to select the path to value maximization, so long as they choose a reasonable route to get there." (internal quotation marks omitted) (quoting *In re Answers Corp. S'holders Litig.*, 2011 WL 1366780, at *3 (Del. Ch. Apr. 11, 2011))).

"preclude differing treatment of bidders when necessary to advance those interests," as "[v]ariables may occur which necessitate such treatment."[634] "A board of directors may favor a bidder if in good faith and advisedly it believes shareholder interests would be thereby advanced,"[635] and "[a] board may tilt the playing field if, but only if, it is in the shareholders' interest to do so."[636] But "the board's primary objective, and essential purpose, must remain the enhancement of the bidding process for the benefit of the stockholders."[637]

"[T]he paradigmatic claim under *Revlon* [] arises when a supine board under the sway of an overweening CEO bent on a certain direction tilts the sales process for reasons inimical to the stockholders' desire for the best price."[638] A plaintiff may state a claim for liability under *Revlon* by pleading a claim as to only one board

---

[634] *Macmillan*, 559 A.2d at 1286–87.

[635] *Chen*, 87 A.3d at 674 (internal quotation marks omitted) (quoting *In re Fort Howard Corp. S'holders Litig.*, 1988 WL 83147, at *14 (Del. Ch. Aug. 8, 1988) (Allen, C.)).

[636] *Id.* (internal quotation marks omitted) (quoting *In re J.P. Stevens & Co. S'holders Litig.*, 542 A.2d 770, 782 (Del. Ch. 1988)).

[637] *Macmillan*, 559 A.2d at 1287 (noting that "there must be a rational basis for the action such that the interests of the stockholders are manifestly the board's paramount objective"); *see also Chen*, 87 A.3d at 674 ("A board may not favor one bidder over another for selfish or inappropriate reasons. Any favoritism directors display toward particular bidders must be justified solely by reference to the objective of maximizing the price the stockholders receive for their shares." (alterations and citation omitted) (quoting *Golden Cycle, LLC v. Allan*, 1998 WL 892631, at *14 (Del. Ch. Dec. 10, 1998), and then quoting *In re Topps Co. S'holders Litig.*, 926 A.2d 58, 64 (Del. Ch. 2007))).

[638] *Mindbody*, 2020 WL 5870084, at *1 (alteration, footnote, and internal quotation marks omitted) (quoting *Toys "R" Us*, 877 A.2d at 1002).

member—"[t]he sins of just one fiduciary can support a viable *Revlon* claim."[639] Plaintiff's allegations are modeled after that paradigmatic theory: she asserts Riverstone, through or alongside Garland, overrode a supine Special Committee which, while disinterested and independent, breached its duty of loyalty to Company stockholders by acting in bad faith.

Under this rubric, Plaintiff's ability to state a claim against each of the Director Defendants is further restricted by the exculpation provision in the Company's charter pursuant to 8 *Del. C* § 102(b)(7).[640] Even under *Revlon* scrutiny, allegations of a violation of duty of care alone do not state a claim against the Director Defendants; Plaintiff must state a claim for breach of the duty of loyalty.[641] In order to survive a motion to dismiss under a breach of the duty of loyalty theory, Plaintiff must plead that the Director Defendants "were interested in the transaction, lacked independence, or acted in bad faith."[642] If a plaintiff alleges "well pleaded

---

[639] *Id.* at *14.

[640] *See* Kirby Decl. Ex. 8 ("To the fullest extent permitted by the DGCL, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty owed to the Corporation or its stockholders.").

[641] *See Cornerstone*, 115 A.3d at 1179; *Malpiede v. Townson*, 780 A.2d 1075, 1094–95 (Del. 2001); *Rudd*, 2020 WL 5494526, at *7; *KCG Hldgs.*, 2019 WL 2564093, at *16.

[642] *Baker Hughes*, 2020 WL 6281427, at *15 (quoting *Morrison I*, 2019 WL 7369431, at *13).

facts that track the paradigmatic *Revlon* theory," they will generally be sufficient to support a nonexculpated claim at the motion to dismiss phase.[643]

A finding of bad faith in the fiduciary context is rare.[644] "In the context of a sale of corporate control, bad faith is qualitatively different from an inadequate or flawed effort to obtain the highest value reasonably available for a corporation."[645] "[C]riticizing the price at which a board agrees to sell a company, without more, does not a bad a faith claim make."[646] Delaware law explicitly recognizes several forms of bad faith: (i) subjective bad faith, in conduct motivated by an intent to do harm; (ii) intentional dereliction of duty or conscious disregard of duty; and (iii) "allow[ing] interests other than obtaining the best value reasonably available for [the company's] stockholders to influence [director] decisions during the sale process, given that they made decisions falling outside of the range of reasonableness."[647] "Absent direct evidence of an improper intent, a plaintiff must point to a decision

---

[643] *Mindbody*, 2020 WL 5870084, at *13.

[644] *See In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *20 (Del. Ch. Mar. 31, 2017) (citing *In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, 2016 WL 3044721, at *1 (Del. Ch. May 20, 2016)).

[645] *In re Essendant, Inc. S'holder Litig.*, 2019 WL 7290944, at *13 (Del. Ch. Dec. 30, 2019) (internal quotations marks omitted) (quoting *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009)).

[646] *Id.* at *14 (collecting cases).

[647] *Chen*, 87 A.3d at 677–78; *see also Disney II*, 906 A.2d at 63–66.

that lacked any rationally conceivable basis associated with maximizing stockholder value to survive a motion to dismiss."[648]

Plaintiff asserts the Director Defendants' bad faith takes the forms of conscious disregard of their obligation to seek the highest value reasonably available for Company shareholders, and conduct that "lacked any rationally conceivable basis associated with maximizing stockholder value."[649] In support, Plaintiff contends that the Director Defendants "knew the Merger did not maximize stockholder value but approved it anyway,"[650] and "knowingly fail[ed] to manage conflicts at virtually every level of the Merger process" and "protect stockholders"[651] by "d[oing] nothing to exclude Garland or Riverstone from the sale process after learning of their misconduct" and "retain[ing] Goldman."[652]  "In the transactional context, an extreme set of facts is required to sustain a disloyalty claim premised on

[648] *Essendant*, 2019 WL 7290944, at \*13, \*14 (alteration and internal quotation marks omitted) (quoting *Chen*, 87 A.3d at 684); *see also Chelsea Therapeutics*, 2016 WL 3044721, at \*1 (stating that in cases where "there is no indication of conflicted interests or lack of independence on the part of the directors," a finding of bad faith should be reserved for situations where "the nature of [the directors'] action can in no way be understood as in the corporate interest:  *res ipsa loquitur*").

[649] D.I. 82 at 59 (alteration omitted) (quoting *In re USG Corp. S'holder Litig.*, 2020 WL 5126671, at \*29 (Del. Ch. Aug. 31, 2020)).

[650] *Id.*

[651] *Id.* at 62.

[652] *Id.* at 64 (emphasis omitted).

the notion that disinterested directors were intentionally disregarding their duties."[653] Plaintiff's allegations do not support an inference of conscious disregard, or that the transaction lacked any rationally conceivable basis.

The Special Committee took a great number of reasonable actions to fulfill their duties, as pled in the Complaint and disclosed in the Proxy. The Board immediately formed the disinterested and independent Special Committee when it decided to put the Company up for sale, and tasked it with managing the sales process. The Special Committee hired Evercore as an independent financial advisor and Paul Weiss as counsel, and met regularly with those advisors. The Special Committee's meeting minutes reflect that it discussed with its advisors how Riverstone might wield the Consent Right. The Special Committee was aware Goldman, Garland, and Browne had conflicts and those conflicts were later disclosed in part to Company stockholders. To manage fiduciary conflicts, the Special Committee twice implemented protocols requiring its authorization before Garland, Browne, or the Officer Defendants contacted bidders. Those protocols specifically prohibited management from discussing compensation relating to any potential transaction.

---

[653] *Lyondell*, 970 A.2d at 243 (alterations and internal quotation marks omitted) (quoting *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 654 (Del. Ch. 2008)).

Further, for over one year, the Special Committee actively engaged in sale discussions with roughly a dozen bidders, and kept at least four bidders in the running until late October 2019. It weighed the risks and merits of transactions with each potential bidder; executed confidentiality agreements with serious bidders in an effort to further due diligence; encouraged those bidders to connect with Riverstone in view of the Consent Right to increase the likelihood of a deal; arranged meetings between Company representatives and each bidder; and exchanged draft merger agreements with more than one interested party. The Special Committee resisted calls for exclusivity, pursued go-shop provisions, and interfaced with numerous bidders during the go-shop in its agreement with Buyer.[654]

Specifically as to Brookfield, Batkin and the Special Committee worked to extract value and to facilitate Brookfield's cooperation with Riverstone on multiple occasions. When Brookfield threatened to walk away, Batkin and the Special Committee worked to keep Brookfield seated. It offered to cover Brookfield's going-forward expenses, accommodated requests in due diligence, and gave numerous extensions for document submissions. These actions with respect to Brookfield yielded a return: by November 2019, Brookfield was offering a 45% premium, was willing to satisfy Riverstone and Developer 2's demands, and decided to forego a Company-on-top merger.

---

[654] *See* Compl. ¶ 216; Proxy at 47–49, 54.

Thus, the Special Committee took an "active and direct role in the sale process" from beginning to end,[655] was "reasonably informed about the alternatives available to the company," and acted "reasonably to learn about actual and potential conflicts faced by directors, management, and their advisors."[656] "At first glance, it is difficult to discern bad faith from this narrative."[657] It is impossible to conceive of conscious disregard or the absence of any rationally conceivable basis for the Director Defendants' action.

But with each reasonable and measured step forward, the Complaint alleges the Director Defendants took two steps back. At this procedural stage and in view of the Court's obligation to view end-game transactions with inherent skepticism,[658] "the predicate question of what the board's true motivation was comes into play, and *the court* must take a nuanced and realistic look at the possibility that personal interests short of pure self-dealing have influenced the board."[659] While this does not give the Court free rein to rewrite the story or impose on fiduciaries *post hoc*

---

[655] *Citron*, 569 A.2d at 66.

[656] *KCG Hldgs.*, 2019 WL 2564093, at *16 (quoting *In re Rural Metro Corp. S'holders Litig.*, 88 A.3d 54, 89–90 (Del. Ch. 2014)).

[657] *Saba Software*, 2017 WL 1201108, at *20.

[658] *See Chen*, 87 A.3d at 677–78.

[659] *Id.* at 678 (alterations and internal quotation marks omitted) (emphasis added) (quoting *Dollar Thrifty*, 14 A.3d at 598).

obligations to have taken certain steps,[660] the Court must seek to "assure itself that the board acted reasonably, in the sense of taking a logical and reasoned approach for the purpose of advancing a proper objective and to thereby smoke out mere pretextual justifications for improperly motivated decisions."[661] This mandates that I assess the facts as pled and determine whether Plaintiff has stated a claim for bad faith on the part of the Director Defendants. Rather than conscious disregard, "[t]he loyalty issue in this case is whether the directors allowed interests other than obtaining the best value reasonably available for [the Company's] stockholders to influence their decisions during the sale process, given that they made decisions falling outside of the range of reasonableness."[662]

Plaintiff's allegations make it reasonably conceivable that the Director Defendants placed the interests of Riverstone, Developer 2, and the Officer Defendants above the interest of Company stockholders and their obligation to maximize stockholder value, and therefore acted in bad faith.[663]

---

[660] *See Baker Hughes*, 2020 WL 6281427, at *7; *see also Lyondell*, 970 A.2d at 243 ("The trial court decided that the *Revlon* sale process must follow one of three courses, and that the Lyondell directors did not discharge that known set of *Revlon* 'duties.' But, as noted, there are no legally prescribed steps that directors must follow to satisfy their *Revlon* duties. . . . More importantly, there is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties." (alteration, internal quotation marks, and citation omitted)).

[661] *Baker Hughes*, 2020 WL 6281427, at *7 (quoting *Dollar Thrifty*, 14 A.3d at 598).

[662] *Chen*, 87 A.3d at 677.

[663] *See, e.g., KCG Hldgs.*, 2019 WL 2564093, at *17.

**a.** **The Complaint Pleads That The Director Defendants Allowed Interests Other Than Obtaining The Best Value For Company Stockholders To Influence Their Decisions During The Sales Process.**

The Complaint alleges that the Director Defendants elevated the long-term welfare of Riverstone and Developer 2 over seeking the best value reasonably available for Company stockholders by (1) infecting the process with interested fiduciaries and conflicted advisors; (2) preferring Buyer throughout the process and at the moment of decision over Brookfield's premium bid; and (3) misusing the Consent Right to dissuade Brookfield. Plaintiff's concerns outweigh the Special Committee's few reasonable steps and demonstrate that, on balance, the Director Defendants' choices in conducting the sales process were unreasonable and in bad faith.

**i.** ***The Special Committee's Work Was Infected By Conflicted Directors, Management, And Advisors.***

First, Plaintiff contends the Director Defendants allowed conflicted individuals and entities to participate in deliberations (including Browne, Garland, and Goldman) and failed to manage those conflicts. The facts alleged demonstrate that the decision to involve these conflicted parties in the sales process depressed Company stockholders' value for Riverstone and Developer 2's benefit.

141

The Board immediately identified Riverstone and Developer 2 as the source of potential and actual conflicts with respect to the sales process. Nonetheless, the Board gave Riverstone a seat at the table on day one and every day thereafter. Before the June 5, 2018, annual meeting, and presumably without the knowledge of the Board or stockholders, conflicted management—including Garland—retained Evercore and secured a presentation that "included preliminary potential valuations for various strategic options."[664] At the meeting, Garland first proposed that the Board consider a potential sale, despite repeated and numerous representations to Company investors (both before and after the meeting) that Pattern Vision 2020 was proceeding as planned and that the Company had ample liquidity and was not planning on raising common equity capital. Hunt (Developer 2's director and Riverstone's partner, but not a Company fiduciary) attended that meeting, knowing that Riverstone had already explored a potential take-private of the Company, with access to the Company's confidential information and with Goldman as an advisor.[665] The Board solicited Riverstone's views on a potential transaction while simultaneously identifying Riverstone as a prospective acquirer.[666] From these facts, it is reasonably conceivable that the June 5 suggestion that the Board "consider a

[664] Compl. ¶ 95 (emphasis omitted).

[665] *See id.* ¶¶ 93, 98.

[666] *Id.* ¶ 97.

potential sale of the business" was from the start driven by, or for the benefit of, Riverstone.[667]

Thereafter, the Board formed the Special Committee. The Board was aware of Garland and Browne's open and apparent ties to Riverstone.[668] Because the interests of Developer 2 and Riverstone diverged from those of the Company stockholders, Browne and Garland "face[d] an inherent conflict of interest."[669] In view of these conflicts, the Board did not appoint Browne or Garland to the Special Committee, and the Special Committee twice implemented conflict-safety protocols. Nonetheless, despite the risk that Browne would share information with Riverstone, the Special Committee allowed Browne to attend the majority of Special Committee meetings in his capacity as Riverstone's representative and to attend executive sessions where the Special Committee specifically excluded conflicted Company management.[670]

The Special Committee also allowed Garland substantial involvement in its process, delegating to him primary responsibility for engaging with the Company's

---

[667] *Id.* ¶ 94.

[668] *Id.* ¶ 101.

[669] *Chen*, 87 A.3d at 670.

[670] Compl. ¶¶ 101–04. The Proxy does not disclose Browne's attendance at any Special Committee meeting. *Id.* ¶ 104.

potential suitors.[671]  As the Director Defendants accurately point out, "[t]here is nothing inherently wrong with a Board delegating to a conflicted CEO the task of negotiating a transaction."[672]  "But the conflict must be adequately disclosed to the Board, and the Board must properly oversee and manage the conflict."[673]  Garland was afforded the opportunity to tip the scales in Riverstone's favor and did so.

Plaintiff points to Garland's unauthorized April 15 Meeting with Riverstone and Buyer.  The context is important.  At this point, the Special Committee was actively shopping the Company, taking into consideration Riverstone and Developer 2's interest in and potential satisfaction from the outcome, and working to find a Riverstone-friendly financial acquirer, beginning with PSP.[674]  But

[671] *Id.* ¶¶ 102–03, 105.

[672] *Haley*, 235 A.3d at 721 n.69.

[673] *Id.*; *see also In re OPENLANE, Inc. S'holders Litig.*, 2011 WL 4599662, *5 (Del. Ch. Sept. 30, 2011) (finding that, as the Board was aware of the CEO's possible employment after consummation of the transaction "and was fully committed to the process," and that even though the CEO, who led the negotiations, was conflicted, "his efforts in negotiating the Merger Agreement and dealing with other potential acquirers d[id] not taint the process")); *RBC*, 129 A.3d at 850–57 (affirming trial court's findings that the Board failed to oversee the Special Committee, failed to become informed about strategic alternatives and about potential conflicts faced by advisors, and approved the merger without adequate information); *id.* at 855 (holding that, "[t]he record indicates that Rural's Board was unaware of the implications of the dual-track structure of the bidding process and that the design was driven by RBC's motivation to obtain financing fees in another transaction with Rural's competitor," and that, "[t]he Board, as a result, took no steps to address or mitigate RBC's conflicts"); *id.* ("While a board may be free to consent to certain conflicts, . . . directors need to be active and reasonably informed when overseeing the sale process, including identifying and responding to actual or potential conflicts of interest.").

[674] *See* Compl. ¶¶ 109–11, 116–17; Proxy at 3.

Brookfield had emerged as a disinterested strategic bidder, proposing a transaction that might not benefit Riverstone and leave Developer 2 behind.[675] In late February, Garland and Elkort allegedly met Brookfield's interest with resistance, raising the Consent Right to cast doubt on the viability of a Brookfield transaction.[676] At a March 11, 2019 Special Committee meeting, Brookfield submitted a term sheet reflecting a Company-TerraForm transaction structured to circumvent the Consent Right.[677] The Special Committee did not meet again until May.[678]

During this period of quiet, after Brookfield sharpened its offer to avoid the Consent Right, Garland arranged and held the unauthorized April 15 Meeting with Riverstone and Buyer. That meeting presented Riverstone the opportunity to offer up a preferred and familiar face as a third-party bidder: Buyer, which previously invested over $700 million in Riverstone investment funds and whose representative Garland "knew."[679] While Riverstone had been in the room since the first Board meeting on June 5, 2018, and while the Special Committee had kept Riverstone and Developer 2 in mind since the early stages of the sales process, Garland's meeting

---

[675] *See* Compl. ¶¶ 111–15.

[676] *See id.* ¶¶ 116–19.

[677] *Id.* ¶ 121.

[678] *Id.* ¶ 122.

[679] *Id.* ¶ 128.

after Brookfield's offer spurred Buyer to action.[680]  It is reasonably conceivable (in view of loose information sharing in the past, including through Hunt and Browne) that Riverstone and Garland communicated the Company's confidential information to Buyer at the meeting.

If sunlight is the best disinfectant, the April 15 Meeting remained infectious. Weeks later, on May 2, Garland disclosed that Riverstone had suggested taking the Company private in conjunction with an unidentified third-party institutional investor, but had "dropped the suggestion following consideration of conflicts and certain contractual obligations of [Riverstone]."[681]  This was misleading, as evidenced by the Batkin Memo and Proxy, which themselves fall short of full and adequate disclosure.[682]  This series of inconsistent and incomplete disclosures gives rise to the reasonable inference that Garland was less than candid with the Special Committee—and later, Company stockholders—about his early dealings with Riverstone and Buyer.

Nonetheless, after the April 15 Meeting, the Special Committee allowed Garland to continue to front the sale process, even after learning that the risks associated with his conflicts had materialized when he violated the Special

---

[680] *See id.* ¶ 132; Proxy at 37.

[681] Compl. ¶ 127.

[682] *See supra* Section II.A.1.a.

Committee's express conduct guidelines. The April 15 Meeting serves as one of the structural components of the sales process that renders it reasonably conceivable that Garland perceptibly tilted the sales process in favor of Riverstone, the Special Committee was lackluster in its response, and this classic *Revlon* combination ultimately gave Riverstone, via Buyer, the advantage.

In addition to conflicted management, the Special Committee's work was tainted by a conflicted advisor. The decision to hire Goldman illustrates the Special Committee's passivity in the face of Garland's requests. When the Special Committee first met on July 13, 2018, Garland (and the Officer Defendants) recommended that the Special Committee retain Goldman, despite Evercore having prepared management's presentation for the June 5, 2018 meeting. As alleged, conflicted management's push for Goldman is unsurprising, as Goldman had longstanding, deep, and financial ties to Riverstone and, more significantly, had recently advised Riverstone with respect to a potential take-private of the Company.[683]

Conceivably perceiving the risks associated with Goldman's conflict, the Special Committee decided to retain only Evercore and to revisit the possibility of retaining Goldman at a later time, but did not determine that Goldman's participation

---

[683] *See* Compl. ¶¶ 12, 98; *see Cinerama*, 663 A.2d at 1169 (holding a "stake in" a "firm that deals with the corporation" is "self-dealing") (citing 8 *Del. C.* § 144(a)).

would run afoul of the stockholder's best interests.[684]  The Special Committee left the door open, and Goldman would eventually join the fray and advocate for Riverstone and Buyer, who each enjoyed a "substantial business relationship" with Goldman.[685]  Goldman entered the sales process (1) in "early April 2019," on the heels of Brookfield's third-party, independent bid and Paul Weiss' suggestion that a Company-TerraForm transaction could be structured to circumvent the Consent Right and exclude Riverstone; and (2) on the eve of Riverstone and Garland offering up a third-party bidder of their own, Buyer, with whom Goldman and Riverstone were affiliated.  Unlike the decision to retain Evercore, the Special Committee's decision to retain Goldman is not recorded in meeting minutes.[686]  Plaintiff and the Director Defendants agree that "each and every one of these alleged conflicts was disclosed to the Special Committee prior to the Special Committee's decision to retain Goldman Sachs."[687]  At the end of the day, Goldman did not issue an opinion.[688]  Rather, in the final days of the sales process, "Goldman advocated for Riverstone, describing Riverstone's communications with the conflicted investment

---

[684] Compl. ¶ 108.

[685] *Id.*

[686] *See id.* ¶¶ 134–35.

[687] *See* D.I. 74 at 23–24.

[688] *See* Proxy at A-24.

bank that expressed confidence in the proposed transaction among the Company, Buyer, and [Developer 2]."[689]

A secondary financial advisor may be "conflict-cleansing."[690]  Here, as alleged, Goldman further contaminated the process, despite the Special Committee's awareness of that risk.  There was no apparent need for the Special Committee to retain a second advisor; the Complaint and the Proxy indicate that Evercore was sufficiently advising on the financial aspects of the process.[691]  And Goldman benefitted from the Merger, as Goldman's engagement letter entitled it to $2 million upon the announcement of the Merger; an additional $4 million upon consummation of the Merger; and a discretionary payment of up to $3 million upon or promptly following the consummation of the Merger.[692]

Thus, Buyer, Riverstone, and conflicted management—who maintained post-close positions with the company—had the ability to pay or withhold nearly a third of Goldman's total fee.  Further, the Company granted Goldman a right of first offer to act as joint book-runner or agent in the case of any offering of securities and a right of first offer as a joint arranger and book-runner for any bank or bridge loan

[689] Compl. ¶ 197; *see also id.* ¶¶ 153–58.

[690] *RBC*, 129 A.3d at 864.

[691] *See* Compl. ¶ 108.

[692] *Id.* ¶ 271.

149

related to the Merger.[693] As alleged, this further incentivized Goldman to push the Special Committee toward Buyer's offer and away from Brookfield's, which was structured such that the Company would not be required to raise capital through debt or a security offering.[694]

> ### ii. The Director Defendants Prioritized Riverstone and Developer 2 Over Maximizing Value.

In addition to mismanaging the foregoing conflicts, the Special Committee, and eventually the entire Board, approved Riverstone's preferred transaction with Buyer despite acknowledging that Brookfield offered the superior bid. Plaintiff has pled facts making it reasonably conceivable that the Director Defendants did not believe "in good faith and advisedly" that Buyer's bid would advance the stockholders' interest,[695] and that the Director Defendants had no "rational basis" for shunning Brookfield's premium that was "justified solely by reference to the objective of maximizing the price the stockholders receive for their shares."[696]

As alleged, Riverstone's desire for a Company take-private and Developer 2 internalization was the impetus for the sales process, the Special Committee's focus

---

[693] *Id.* ¶ 272.

[694] *Id.*

[695] *Chen*, 87 A.3d at 674 (quoting *Fort Howard*, 1988 WL 83147, at *14).

[696] *Id.* (quoting *Topps*, 926 A.2d at 64).

during deliberations, and the reason for its final selection of Buyer over Brookfield. The Special Committee held various meetings that addressed Developer 2 and its interests; ways to structure transactions to include Developer 2; and the importance of Riverstone's ability to exercise the Consent Right, even though it was readily circumvented. And the Special Committee explicitly told bidders that internalizing Developer 2 was the preferred course of conduct and pressed bidders to structure offers toward that end, despite knowing that it would require the Company's stockholders to compete for transaction consideration. Thus, while the Special Committee engaged with numerous bidders and pressed them for value, they repeatedly revealed their focus on satisfying Riverstone and meeting its desire to internalize Developer 2.

When the sales process began, with Riverstone in the room, the Special Committee first looked to Riverstone as an acquirer. The Special Committee next considered PSP, which had strong ties to Riverstone. When a transaction directly involving Riverstone or Riverstone-friendly PSP did not pan out, Riverstone's role evolved from preferred bidder to co-negotiator alongside the Company's fiduciaries, attending meetings with Garland, Brookfield and other bidders to discuss Developer 2. The Special Committee encouraged bidders to meet with Riverstone and agree to confidentiality, and Riverstone had those meetings.

While the Special Committee properly responded to Brookfield's initial October 2018 offer by pressing for a premium, it also communicated Riverstone's concerns about internalizing Developer 2. By May 31, 2019, Brookfield submitted a revised term sheet that reflected an all-stock acquisition of the Company by TerraForm at a 15% premium and also contemplated a concurrent acquisition of Developer 2, which would cash Riverstone out of the Company and Developer 2 for a cash price to be negotiated by the Company and Riverstone.[697] The Special Committee authorized Garland to "notify" Developer 2 and Riverstone about the Company's discussions with Brookfield.[698]

Brookfield's offer inspired Garland and Riverstone to introduce Buyer into the process. Even in the absence of an offer, the Special Committee devoted time and resources to Buyer.[699] Buyer did not submit a proposal to acquire the Company until June 28, 2019. It proposed an all-cash transaction at a 14% premium, less than Brookfield's offer.[700] Buyer's offer specifically assumed that it would reach a separate agreement with Riverstone with respect to Developer 2, and separate agreements with senior management, without the Special Committee's

---

[697] Compl. ¶ 142.

[698] *Id.* ¶ 119.

[699] *See id.* ¶ 145.

[700] *Id.* ¶¶ 145–47.

involvement.[701]  As the sales process progressed, Buyer solidified its offer for Developer 2, stating it would purchase Developer 2 at a price equal to 1.8x of Riverstone's invested capital subject to a contingent earnout provision that could increase the total purchase price to up to 2.25x Riverstone's invested capital.  The Special Committee would later deem this earnout "acceptable to Riverstone."[702]

Brookfield volleyed on July 1, reiterating its offer for the Company and pricing Developer 2 for cash at a 1.75x multiple of invested capital, still cashing Riverstone out of the combined company.  Unlike Buyer, Brookfield intended to reach an agreement with the Company, not just Riverstone, regarding Developer 2's valuation.  Despite the higher premium and acquisition of Developer 2, the Special Committee did not favor Brookfield, allegedly because Brookfield's proposal did not contemplate negotiating for Developer 2 free of the Special Committee.

On July 23, Brookfield submitted a new offer, noting the Special Committee's desire to "internalize [Developer 2] as part of this transaction."[703]  Brookfield offered to do so for cash at a 15% premium to Company stockholders.  But Brookfield also offered a 20% premium for a deal without Developer 2.[704]

---

[701] *Id.* ¶¶ 147–48.

[702] *Id.* ¶ 163.

[703] *Id.* ¶ 151.

[704] *Id.*

The Special Committee worried over Riverstone and Developer 2, even though a deal with Brookfield offered the greatest value to Company stockholders.[705] At July 31 and August 1 meetings, the Special Committee discussed that Brookfield's and Buyer's offers internalizing Developer 2 provided similar value to Company stockholders; but in a key difference, Brookfield would cash out Riverstone, while Buyer would allow Riverstone to continue to own an equity interest.[706] The Special Committee also considered that Buyer's offer favored Riverstone over the Company's stockholders: its offer for Developer 2 with an earnout was higher than Brookfield's, which made it less likely Buyer would increase its offer for the Company.[707] Thus, the Special Committee explicitly acknowledged that the Company's public stockholders were competing with Developer 2's owners for merger consideration.[708]

With Riverstone and Developer 2's satisfaction driving the Special Committee's deliberations, Buyer emerged from those Special Committee meetings as the frontrunner.[709] Evercore observed that Buyer was already in "advanced stages of negotiation" with Riverstone, and that combining the Company and Developer 2

---

[705] *See id.* ¶ 158.

[706] *Id.* ¶ 154.

[707] *Id.* ¶ 163.

[708] *See id.*

[709] *See id.* ¶¶ 156–57.

was "in line with management's vision."[710] The Special Committee recognized the need to "determine whether [Buyer] would increase its offer,"[711] but also insisted that "it would need to convey to Brookfield the importance of reaching an agreement with Riverstone about a deal that included [Developer 2] if it wanted to have a chance to acquire [the Company]."[712]

On August 16, Buyer submitted an updated offer for both the Company and Developer 2, valuing the Company less than Brookfield's 15% premium bundled with Developer 2, and certainly less than Brookfield's 20% standalone premium.

The Company's messaging to Brookfield from this point was inconsistent at best and sabotage at worst. At an August 20 meeting, Evercore and Goldman told Brookfield that the "Board of Directors of [the Company] is no longer supportive of any transaction which includes the internalization of the 71% [of Developer 2] that [the Company] does not currently own."[713] Goldman and Evercore also pressed the Consent Right, stating that "Riverstone will not provide such consent to a transaction in which TerraForm becomes the parent company of [the Company]."[714]

---

[710] *Id.* ¶ 157.

[711] *Id.* ¶ 156.

[712] *Id.* ¶ 157.

[713] *Id.* ¶ 164.

[714] *Id.* (alteration omitted).

On August 28, 2019, the Special Committee discussed how Brookfield's offer was worth $34 per share, a 45% premium based on the then-current trading price, and the risk that Riverstone would sue to block a transaction that did not involve Developer 2 even though the Brookfield proposal was structured to avoid the Consent Right. The Special Committee determined it was best "to progress the transaction" with Buyer.[715]

By late August, Brookfield submitted an updated offer valuing the Company at $33.38 per share.[716] Brookfield restructured the proposed transaction as a Company acquisition of TerraForm to avoid the Consent Right; addressed the Board's supposed disinterest in internalizing Developer 2; and stated that it had been told early in the process, when internalizing Developer 2 was a priority, that the Company believed it was desirable for senior management to maintain their positions in the combined company, including their dual positions at Developer 2.[717] Meanwhile, Buyer's offer had remained afloat with little to no enhancement.

The Special Committee met on September 29, 2019. The meeting minutes show the Special Committee explicitly recognized its duty to "maximize value for shareholders"[718] and had even acknowledged to Brookfield "that [its] proposal [wa]s

---

[715] *Id.* ¶ 172.

[716] *Id.* ¶ 167.

[717] *See id.* ¶¶ 166, 168, 173–75.

[718] *Id.* ¶ 188.

superior from a value perspective to the others that [the Company] ha[d] received and that [the Company] will receive in this sales process."[719]

But at that meeting, focused on Developer 2, Garland warned that a Company-TerraForm merger would alter the Company's relationship with Developer 2.[720] In addition, pushing to lock up a transaction with Buyer, Garland pressured the Board to issue preferred stock that was bound to vote in favor of a Board-recommended merger with Buyer. Garland brought this idea to the Special Committee as Brookfield continued to press forward in the face of Riverstone's many demands.[721] A separate and independent committee was responsible for handling the stock issuance, so there is no reasonably conceivable explanation as to why Garland would have brought the "importance" of consummating the Preferred Issuance to the Special Committee's attention.[722] And Garland had been touting the Company's padded wallet and exceptional performance; representing that the Company had no need for liquidity; and assuring investors that the Company could easily manage any maturing obligations without raising additional funds. But he told the Special Committee that the issuance was required to fund two new projects.

---

[719] *Id.* ¶ 192.

[720] *Id.* ¶ 186.

[721] *See id.* ¶¶ 183–90.

[722] *Id.* ¶ 187.

The next day, September 30, the Board's transaction committee approved the Preferred Issuance. Plaintiff alleges Defendants issued the preferred shares to tilt the stockholder vote on the Merger with Buyer in their favor.[723] In support, Plaintiff points out that "[t]he issuance of the preferred shares made no commercial sense" because "[the Company] had more than sufficient borrowing capacity under its credit agreements to purchase the projects in question, and the interest rate on such debt would have been lower than the interest rate it agreed to pay on the preferred shares."[724] Those shares would become pivotal in approving the Merger. It is reasonably conceivable that the preferred stock issuance, backed by Garland and passively observed by the Special Committee, was in furtherance of jamming though the Board-approved Merger, which was not the best deal for stockholders.

Brookfield soldiered on. In late October, Evercore presented an analysis that indicated that a TerraForm merger would result in a combined company with a stock valued well above Buyer's latest offer.[725] But Evercore also asserted that a TerraForm transaction would undermine the "purpose and commercial viability" of

---

[723] *See id.* ¶¶ 236–38.

[724] D.I. 82 at 26; Compl. ¶¶ 238–44.

[725] Compl. ¶ 199. Plaintiff alleges that even those values for the combined company were depressed because Evercore did not use consistent or updated dividend yields across its analyses, and if corrected, Evercore's analysis would have shown the combined company would trade in the range of $32.69 to $36.15 per share.

Developer 2.[726] Goldman expressed its confidence in the Company-Buyer-Developer 2 proposal.[727]

On November 1, Brookfield told the Special Committee it believed it could negotiate any necessary terms with Riverstone within thirty days. This was met with an unanticipated change of pace.[728] The Special Committee's advisors demanded that Brookfield submit definitive documents the next day, which Brookfield could not do without Riverstone's cooperation.[729] From the facts alleged, Riverstone had its sights set on a take-private with a friendly acquirer, and so it would not finalize a deal with Brookfield on that short deadline. Considering that the sales process had lasted over a year and a half, that there was no exigent need to sell, and that the Company had been amenable to extensions in the past, it is reasonably conceivable that this was the final effort to elevate Buyer as the best and last bidder standing. It worked: Brookfield withdrew its bid.[730] And on November 3, the Special Committee voted to recommend that the Board approve

---

[726] *Id.* ¶ 201.

[727] *Id.* ¶ 197.

[728] *See id.* ¶ 205; Proxy at 52.

[729] Compl. ¶ 205; Proxy at 52.

[730] Compl. ¶ 205; Proxy at 53.

159

the all-cash Merger with Buyer at $26.75 per share, which was $1.05 less than the $27.80 closing trading price of the Company's stock the previous day.[731]

The Director Defendants have argued they favored Buyer's all-cash proposal based in part on the complexities of Brookfield's more burdensome stock-for-stock deal. But in the *Revlon* context, it is dispositive that Buyer's offer took Merger consideration away from the Company's public stockholders in protecting Developer 2 and Riverstone. The Special Committee was bound to obtain the best possible transaction for Company Stockholders.[732] Where other forces preclude a transaction at a higher price, "[t]he only leverage that a special committee may have . . . is the power to say no."[733] As this Court has recognized,

> The power to say no is a significant power. It is the duty of directors serving on such a committee to approve only a transaction that is in the best interests of the public shareholders, to say no to any transaction that is not fair to those shareholders and is not the best transaction available.[734]

Here, the Special Committee failed to use its voice. It is reasonably conceivable that the Special Committee favored Riverstone's long-term play over stockholders' final-moment value, and did so due to Riverstone's influence and a concern for Developer 2: "inappropriate" reasons that undermined the interests of

---

[731] Compl. ¶¶ 206–07, 222.

[732] *See In re First Bos., Inc. S'holders Litig.*, 1990 WL 78836, at *7 (Del. Ch. June 7, 1990).

[733] *Id.*

[734] *Id.*

160

the stockholders.[735] And even in the shadow of the Company's contractual obligation under the Consent Right, the Special Committee remained bound by fiduciary duty to maximize stockholder value when considering that obligation and any alternatives, such as Brookfield's offer structured around the Consent Right.[736]

Accordingly, Plaintiff has stated a nonexculpated claim against the Director Defendants collectively.[737] "Whether Plaintiff can develop proof to sustain these

---

[735] *Chen*, 87 A.3d at 674.

[736] *See Frederick Hsu*, 2017 WL 1437308, at *23–24.

[737] Indeed, "[t]he liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director." *In re Dole Food Co., Inc. S'holder*, 2015 WL 5052214, at *39 (Del. Ch. Aug. 27, 2015); *see also In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331, at *20 (Del. Ch. Mar. 19, 2018). Consequently, "[a] plaintiff must well-plead a loyalty breach against each individual director; so-called 'group pleading' will not suffice." *Reith v. Lichtenstein*, 2019 WL 2714065, at *18 (Del. Ch. June 28, 2019) (internal quotation marks omitted) (quoting *In re Tangoe, Inc. S'holders Litig.*, 2018 WL 6074435, at *12 (Del. Ch. Nov. 20, 2018)). That is, even if a plaintiff could "state a duty of loyalty claim against the interested fiduciaries," that "does not relieve the plaintiff of the responsibility to plead a non-exculpated claim against each [other] director who moves for dismissal." *Cornerstone*, 115 A.3d at 1180.

Here, Plaintiff has pled specific facts against Garland and Browne supporting the reasonable inference that they acted in bad faith such that they breached the duty of loyalty. While the allegations against Batkin, Goodman, Hall, Newson, and Sutphen collectively group them as the Special Committee, Plaintiff pleads an adequate basis "to infer that these defendants acted disloyally or in bad faith" by virtue of the Special Committee's involvement in the sales process. *Voigt*, 2020 WL 614999, at *25–26; *see also In re WeWork Litig.*, 2020 WL 7343021, at *11 (Del. Ch. Dec. 14, 2020) ("Although group pleading is generally disfavored, the Complaint's use of the term 'SoftBank' to capture both SBG and Vision Fund was justified here given the close relationship between these entities plead in the Complaint."); *Chen*, 87 A.3d at 676–77 ("Depending on the facts of the case, the standard of review, and the procedural stage of the litigation, a court may be able to determine that a plaintiff's claims only involve breaches of the duty of care such that the court can apply an exculpatory provision to enter judgment in favor of the defendant directors before making a post-trial finding of a breach of fiduciary duty and

161

allegations remains to be seen, but for now, the Complaint alleges facts from which it is reasonably conceivable that the Board's conduct with regard to the sales process and approval of the Merger can in no way be understood as in the corporate interest."[738] The Individual Defendants' motion to dismiss Count I is denied.[739]

### b. The Complaint Pleads That The Director Defendants Abdicated Their Duty Of Disclosure.

After resolving to sell the Company to Buyer in a combination with Developer 2, the Board issued a resolution giving the Officer Defendants the power to "prepare and execute" the Merger Proxy "containing such information deemed necessary, appropriate or advisable" by only the Officer Defendants, and then to file the Proxy with the SEC without the Board's review.[740] Plaintiff contends that the Director Defendants acted in bad faith by "abdicating their strict and unyielding duty

---

determining the nature of the breach. If a court cannot make the requisite determination as a matter of law on a pre-trial record, then it becomes necessary to hold a trial and evaluate each director s potential liability individually. The liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director." (footnote omitted) (quoting *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *38 (Del. Ch. June 4, 2002), and citing *Venhill Ltd. P'ship ex rel. Stallkamp v. Hillman*, 2008 WL 2270488, at *23 (Del. Ch. June 3, 2008))).

[738] *Saba Software*, 2017 WL 1201108, at *20 (internal quotation marks omitted) (quoting *Chelsea Therapeutics*, 2016 WL 3044721, at *1).

[739] *See, e.g.*, *KCG Hldgs.*, 2019 WL 2564093, at *17; *Saba Software*, 2017 WL 1201108, at *20; *Chen*, 87 A.3d at 677–78.

[740] Compl. ¶ 231; *see id.* ¶¶ 232–33.

of disclosure,"[741] and relatedly, by "knowingly fail[ing] to correct a proxy statement that they knew was materially incomplete and misleading."[742]

Directors' "fiduciary duties of care and loyalty apply when directors communicate with stockholders," and their "specific disclosure obligations are defined by the context in which the director communicates."[743] When directors request discretionary stockholder action, such as the approval of corporate transactions like mergers, "they must disclose fully and fairly all material facts within their control bearing on the request."[744] "This application of the fiduciary duties of care and loyalty is referred to as the 'fiduciary duty of disclosure.'"[745] The Delaware Supreme Court has described the parameters of this duty as "strict and unyielding."[746]

"A fundamental precept of Delaware corporation law is that it is the board of directors, and neither shareholders nor managers, that has ultimate responsibility for

---

[741] D.I. 82 at 66 (alterations and internal quotation marks omitted) (quoting *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985)).

[742] *Id.* at 68.

[743] *Dohmen v. Goodman*, 234 A.3d 1161, 1168 (Del. 2020).

[744] *Id.*; *see also Baker Hughes*, 2020 WL 6281427, at *12 ("Under Delaware law, when directors solicit stockholder action, they must disclose fully and fairly all material information within the board's control." (quoting *In re Solera Hldgs., Inc. S'holder Litig.*, 2017 WL 57839, at *9 (Del. Ch. Jan. 5, 2017))).

[745] *Id.*

[746] *Rosenblatt*, 493 A.2d at 944 (discussing whether the defendant fiduciaries had satisfied their "duty of complete candor" and "whether the proxy statement satisfied the strict and unyielding disclosure requirements of Delaware law").

the management of the enterprise."[747]  But "[t]he realities of modern corporate life are such that directors cannot be expected to manage the day-to-day activities of a company."[748]  "Thus Section 141(a) of DGCL expressly permits a board of directors to delegate managerial duties to officers of the corporation, except to the extent that the corporation's certificate of incorporation or bylaws may limit or prohibit such a delegation."[749]  While the board "may delegate such powers to the officers of the company as in the board's good faith, informed judgment are appropriate," "this power is not without limit."[750]  "The board may not either formally or effectively abdicate its statutory power and its fiduciary duty to manage or direct the management of the business and affairs of this corporation."[751]  "Thus it is well established that while a board may delegate powers subject to possible review, it

[747] *Grimes v. Donald*, 1995 WL 54441, at *8 (Del. Ch. Jan. 11, 1995), *aff'd*, 673 A.2d 1207 (Del. 1996).

[748] *Rosenblatt*, 493 A.2d at 943; *accord Grimes*, 1995 WL 54441, at *8 ("Of course, given the large, complex organizations through which modern, multi-function business corporations often operate, the law recognizes that corporate boards, comprised as they traditionally have been of persons dedicating less than all of their attention to that role, cannot themselves manage the operations of the firm, but may satisfy their obligations by thoughtfully appointing officers, establishing or approving goals and plans and monitoring performance.").

[749] *Grimes*, 1995 WL 54441, at *8.

[750] *Id.* at *9.

[751] *Id.*

may not abdicate them."[752]  "The board must retain the ultimate freedom to direct the strategy and affairs of the Company for the delegation decision to be upheld."[753]

Abdication of directorial duty evidences disloyalty.[754]  "Allegations that [the company's] directors abdicated all responsibility to consider appropriately an action of material importance to the corporation puts directly in question whether the board's decision-making processes were employed in a good faith effort to advance corporate interests."[755]  "Whether or not a delegation of a particular responsibility constitutes an abdication of directorial duty is necessarily a fact specific question."[756] The Court must consider "why the delegation was made, and what task was actually delegated," as well as whether the board acted independently in delegating the task.[757]

---

[752] *Id.*

[753] *In re Bally's Grand Deriv. Litig.*, 1997 WL 305803, at *4 (Del. Ch. June 4, 1997) (internal quotation marks omitted) (quoting *Grimes v. Donald*, 673 A.2d 1207, 1215 (Del. 1996), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)).

[754] *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1178 (Del. Ch. 1999) (citing *Cede & Co.*, 634 A.2d at 363), *aff'd*, 766 A.2d 437 (Del. 2000).

[755] *In re Walt Disney Co. Deriv. Litig.* (*Disney I*), 825 A.2d 275, 278 (Del. Ch. 2003); *see also Cysive*, 836 A.2d at 550 n.26 ("Unless the plaintiffs can show that the independent board majority was duped by the interested block holder, abdicated its responsibilities so as to have acted in subjective bad faith, or acted so irrationally so as to have committed a violation of their duty of care, the business judgment standard of review would condemn their claims.").

[756] *Bally's Grand*, 1997 WL 305803, at *4.

[757] *Rosenblatt*, 493 A.2d at 943; *see also id.* at 944.

Here, Plaintiff has alleged that the Director Defendants delegated to conflicted management total and complete authority to prepare and file the Proxy and that the Director Defendants did not review the Proxy before it was filed. The Director Defendants contend that "[o]f course" Plaintiff's allegations are "not true."[758] They argue that while Plaintiff is entitled to all reasonable inferences in her favor, she "is not entitled to ask the Court to presume a board of directors somehow waives its right to review a Proxy, acts in bad faith and breaches its fiduciary duty whenever it fails to reserve its right to review subsequent drafts of a proposed disclosure in a standard board resolution."[759]

But the Director Defendants have not asserted any reason to reject Plaintiff's allegations as untrue at this stage, particularly where those allegations are consistent with the delegating Board resolution. For example, there are no meeting minutes demonstrating that the Director Defendants oversaw the Proxy's preparation or that they reviewed the Proxy before the Officer Defendants filed it with the SEC.[760] So, as is nearly always the case, the Court must accept Plaintiff's allegations as true for the purpose of the Motions.[761] Plaintiff has alleged facts making it reasonably

---

[758] D.I. 74 at 39.

[759] D.I. 85 at 28.

[760] *See* D.I. 74 at 39–40; D.I. 85 at 28.

[761] *See KCG Hldgs.*, 2019 WL 2564093, at *17 ("Defendants attack these allegations as factually inaccurate, but the Court must accept them as true for the purpose of this motion." (footnote omitted)).

166

conceivable that the Director Defendants delegated full authority to prepare and disseminate the Proxy to the allegedly conflicted Officer Defendants, and did so in bad faith.[762] Bad faith is reflected in the choice of agent and the complete scope of delegation.

I first consider the Board's chosen agents in determining whether a delegation constitutes abdication.[763] The Board delegated drafting the Proxy to the Officer Defendants, known conflicted individuals who had been ostensibly walled off from the sale process but still assisted in tilting the playing field toward Buyer for the benefit of Riverstone and Developer 2. Delegating to Garland was particularly problematic, especially after he had been less than forthright with the Special Committee about his April 15 Meeting with Riverstone after Brookfield's first offer.

Second, the scope of the delegation goes too far. The Board's resolution granted the Officer Defendants full power and discretion to prepare the Proxy with information they thought it needed to contain, and then to file the Proxy with the

---

[762] *See* Compl. ¶¶ 231–32; Weinberger Decl. Ex. 8.

[763] *Cf. Rosenblatt*, 493 A.2d at 942–43 (upholding the board's delegation of authority as a valid exercise of business judgment where there was "no proof that D & M lacked independence or was in any way beholden to either party," and "[t]he record fully support[ed] a conclusion that D & M had the requisite reputation and experience to assist Getty and Skelly").

SEC without the Board's review.[764]  The Board authorized interested parties to unilaterally describe the process to the stockholders with finality, thereby infecting the stockholder vote as well.

And from the alleged misrepresentations in the Proxy, it appears that the Officer Defendants—specifically, Garland—capitalized on the opportunity to selectively disclose the Individual Defendants' self-interested involvement.[765]  As alleged, the Proxy and Supplemental Proxy failed to disclose, among other things, that Riverstone leveraged its relationship with Developer 2 and the Company to block a more valuable deal with Brookfield and TerraForm; that Garland had unauthorized discussions with potential bidders in violation of the Special Committee's instructions, including an unauthorized in-person April 15 Meeting with Buyer and Riverstone in April 2019; that Goldman faced conflicts of interest, including that Goldman owns a substantial stake in Riverstone, had advised Riverstone on a take-private of the Company, and had earned fees totaling over $100 million from Riverstone and Buyer in recent years; that Browne, a representative of Riverstone, attended a majority of the Special Committee's

---

[764] *See* Compl. ¶¶ 231–33.

[765] The Officer Defendants' involvement in drafting and disseminating the Proxy, as well as the Proxy's deficiencies, are discussed in Section II.B.2 *infra*.

meetings and Executive Sessions; and that the Company's largest stockholder, PSP, held a 22% interest in Developer 2.

Finally, Plaintiff has adequately alleged that the Director Defendants failed to correct a Proxy they knew to be false and misleading. The Complaint's allegations indicate that the Director Defendants knew the truth (except for the whole truth about Garland's April 15 Meeting) so if the Director Defendants had reviewed the Proxy, even if only after it was issued, they would have known it was false or misleading. Because the Company issued further disclosures before the stockholder vote in the Supplemental Proxy, the Director Defendants conceivably had the opportunity to correct any alleged misstatements but failed to do so.[766]

As alleged, the Director Defendants' decisions to delegate the Proxy to the Conflicted Officer Defendants and forego reviewing it before filing, as well as their failure to correct the Proxy's alleged false and misleading statements, are actionable as bad faith.[767]

---

[766] *See* Kirby Decl. Ex. 2.

[767] *See, e.g.*, *Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66 A.3d 963, 979 (Del. Ch. 2013) (holding that complaint stated a claim that board had abdicated its responsibilities by failing to conduct meaningful investigation and allowing management to make decisions without oversight); *Disney I*, 825 A.2d at 278 (holding that complaint stated a claim for breach of duty of loyalty and action not in good faith where it alleged that board failed to act on executive's compensation and abdicated decision-making responsibility to the company's CEO); *Nagy v. Bistricer*, 770 A.2d 43, 61–62, 64 (Del. Ch. 2000) (holding that a board abdicated its statutory duty under Section 251(b) when it delegated the determination of the merger consideration to an investment bank selected by the acquirer); *Grimes*, 1995 WL 54441, at *11 (finding that complaint stated a claim that board had

169

### 3. The Merger Was Not Cleansed Under *Corwin*.

Having determined that Plaintiff has stated a claim against the Director Defendants for breach of the duty of loyalty, I turn to the Director Defendants' argument that any such breach was cleansed by a stockholder vote and that therefore dismissal is appropriate under *Corwin*.[768] *Corwin* gives rise to the irrebuttable presumption of the business judgment rule when a transaction "is approved by a fully informed, uncoerced vote of the disinterested stockholders."[769] To obtain the protection of that presumption, the Director Defendants must "demonstrate that the [cash-out] merger has been approved by a fully informed, uncoerced majority of the disinterested stockholders."[770] Otherwise, for the reasons discussed *supra*, *Revlon*

---

improperly delegated its authority under Section 141(a) to the CEO, where the board agreed not to engage in "unreasonable interference, in the good faith judgment of the Executive, by the Board . . . in the Executive's carrying out of his duties and responsibilities"); *Jackson v. Turnbull*, 1994 WL 174668, at *4–5 (Del. Ch. Feb. 8, 1994) (holding board impermissibly abdicated statutory obligation to set merger consideration by delegating task to its investment bankers), *aff'd,* 653 A.2d 306 (Del. 1994) (TABLE); *Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.*, 532 A.2d 1324, 1338 (Del. Ch. 1987) (holding that board "could not abdicate its obligation to make an informed decision on the fairness of the merger by simply deferring to the judgment of the controlling stockholder").

[768] 125 A.3d at 308 (holding that an "uncoerced, informed stockholder vote is outcome-determinative, even if *Revlon* applied to the merger").

[769] *Id.* at 309.

[770] *KCG Hldgs.*, 2019 WL 2564093, at *10 (internal quotation marks omitted) (quoting *Corwin*, 125 A.3d at 306).

enhanced scrutiny or entire fairness will apply and Plaintiff's claims against the Director Defendants will survive the Motions.

As of the close of business on the Merger's record date, the Company had 98,218,625 shares of common stock and 10,400,000 shares of preferred stock outstanding.[771] The common and preferred shares voted together on the Merger as a single class, with each common and preferred share receiving one vote for a total of 108,618,625 potential votes.[772] CBRE's 10,400,000 preferred shares represented roughly 10.4% of the outstanding shares. PSP, which also held a substantial stake in Developer 2, held 9,341,025 shares.[773] And management, who received post-close equity and jobs, held 1,210,049 shares.[774] Overall, 56,856,604 of these shares or 52%, including CBRE, PSP, and management, voted in favor of the Merger.[775]

Plaintiff contends that *Corwin* does not apply because the vote was uninformed and because a significant block of votes was not disinterested.[776]

---

[771] Compl. ¶ 247.

[772] *Id.*

[773] *Id.* ¶ 249.

[774] *Id.*

[775] *Id.* ¶ 248. The Proxy informed stockholders if "you abstain from voting or fail to cast your vote, in person or by proxy, it will have the same effect as a vote 'AGAINST' the proposal to adopt the Merger Agreement and approve the Merger." Proxy at 5 (emphasis omitted).

[776] *See* D.I. 82 at 84–85.

Plaintiff argues PSP was not disinterested because "it held a stake in the buyer,"[777] meaning Riverstone's Developer 2. Plaintiff argues CBRE was neither disinterested nor uncoerced, as it was contractually obligated to vote its preferred shares in accordance with the Board's recommendation regardless of its own economic interest, and that further, its "preferred shares rolled over into the combined company with an increased dividend rate."[778] The parties submitted supplemental briefing on whether CBRE's preferred shares should count toward the uncoerced, disinterested, and fully-informed vote. Removing shares held by PSP, CBRE, and conflicted management from the vote total, 35,905,530—or only 41%—of the remaining 87,667,551 disinterested shares were voted in favor of the Merger.[779] Removing only CBRE's preferred shares leaves 46,456,604 or 47.3% of the overall outstanding 98,218,625 shares in favor of the Merger.[780]

In light of CBRE's contractual obligation to vote in favor of the merger, which CBRE agreed to without being informed of the merger's terms, the Director Defendants cannot invoke *Corwin*'s protections. CBRE was neither fully informed nor disinterested, and its votes were compelled by contractual duty. Because

---

[777] *Id.* at 84.

[778] *Id.*

[779] Compl. ¶ 250.

[780] *Id.* ¶ 252.

removing CBRE's preferred stock strips the Director Defendants of *Corwin*'s protections, I need not reach PSP and management's votes.

CBRE's vote in favor of the Merger was not informed. Under Delaware law, determining whether a vote was fully informed at the pleading stage requires the Court to consider whether the "complaint, when fairly read, supports a rational inference that material facts were not disclosed or that the disclosed information was otherwise materially misleading."[781] For shareholders to be "fully informed," they must possess "all material information" as to a particular transaction.[782]

CBRE acquired its stock on October 10 when it executed the Purchase Agreement.[783] CBRE agreed that in the event of "*any proposed* merger," it would "vote its Preferred Shares in a manner consistent with the recommendation of the Board."[784] CBRE agreed to this term 13 days before bidders submitted definitive

---

[781] *Mindbody*, 2020 WL 5870084, at *26.

[782] *van der Fluit v. Yates*, 2017 WL 5953514, at *7 (Del. Ch. Nov. 30, 2017) (quoting *Solomon v. Armstrong*, 747 A.2d 1098, 1127–28 (Del. Ch. 1999)).

[783] *See* Compl. ¶¶ 181–206, 235; D.I. 92, Ex. A.

[784] D.I. 92, Ex. A. § 6.09(g) (emphasis added); Compl. ¶ 237. CBRE also expressly waived any right to recover damages from the Company beyond the purchase price of the preferred stock, absent fraud. D.I. 92, Ex. A § 8.04. The preferred stock issuance and voting provision were disclosed in the Proxy. *See, e.g.*, Proxy at 15 ("[T]he holders of Company Preferred Stock and Pattern have agreed that the holders of Company Preferred Stock shall vote their 10,400,000 shares of Company Preferred Stock in a manner consistent with the recommendations of the Board . . . ."); *id.* at 129 ("Pursuant to the Company Preferred Stock Purchase Agreement, we issued and sold 10,400,000 shares of Company Preferred Stock on October 25, 2019 to entities affiliated with CBRE . . . .").

173

documentation and 18 days before bidders submitted best and final offers; 24 days before the Special Committee and Board voted to approve the Merger; 117 days before the Company issued the Proxy; and 152 days before the stockholder vote. As of the date of the Purchase Agreement, the Special Committee was fielding offers from at least four bidders, including Brookfield and Buyer, and it was rejecting exclusivity requests. No transaction was definitive, and any terms were tentative at best. CBRE effectively cast its vote in favor of the Merger before the Special Committee and Board had the opportunity to finalize its terms, consider its merits, approve it as furthering the best interests of the Company and its stockholders, or disclose its terms for stockholder consideration. When CBRE agreed to vote in favor of the Merger, it did not know that the transaction would close, the price at which it might close and whether that price would be paid in cash or stock, or who the counterparty might be. Contrary to the Director Defendants' assertion,[785] CBRE's lack of information was not cured *ex post facto* by the allegedly deficient Proxy, issued after CBRE agreed to vote in favor of the Merger. CBRE's uninformed assent to the Merger precludes its votes from contributing to any cleansing under *Corwin*.

---

[785] *See* D.I. 96 at 2 ("Plaintiff asks the Court to simply assume that CBRE must have disregarded the Proxy and the terms of the Merger itself in casting its votes because it had agreed to vote in favor of whatever transaction the [Company] board recommended. . . . CBRE, as a holder of preferred stock, had access to the same information set forth in the Proxy as every other stockholder. Plaintiff does not allege otherwise, and she offers no reason to assume that CBRE ignored the Proxy." (footnote omitted)).

174

Second, CBRE was interested with respect to the Merger. A stockholder is interested if it may derive pecuniary interest from one particular result or is otherwise unable to be fair-minded, unbiased, and impartial.[786] "That is, only the votes of those stockholders with no economic incentive to approve a [challenged] transaction count."[787] CBRE's contractual obligation to vote in favor of the Merger carried with

---

[786] *See Scott v. Arden Farms Co.*, 28 A.2d 81, 85 (Del. Ch. 1942) ("The word 'disinterested' as so used, plainly means something more than not having a pecuniary interest in the controversy; it connotes fair-mindedness, including freedom from actual or probable bias, prejudice or partiality with relation to the questions to be determined.").

[787] *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 900 (Del. Ch. 1999) (emphasis omitted); *cf. Corwin*, 125 A.3d at 313–14 ("There are sound reasons for this policy. When the real parties in interest—the disinterested equity owners—can easily protect themselves at the ballot box by simply voting no, the utility of a litigation-intrusive standard of review promises more costs to stockholders in the form of litigation rents and inhibitions on risk-taking than it promises in terms of benefits to them. The reason for that is tied to the core rationale of the business judgment rule, which is that judges are poorly positioned to evaluate the wisdom of business decisions and there is little utility to having them second-guess the determination of impartial decision-makers with more information (in the case of directors) or an actual economic stake in the outcome (in the case of informed, disinterested stockholders). In circumstances, therefore, where the stockholders have had the voluntary choice to accept or reject a transaction, the business judgment rule standard of review is the presumptively correct one and best facilitates wealth creation through the corporate form." (footnote omitted)); *see In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 426 (Del. Ch. 2002) (stating that "it is clear that the Put Agreements can create materially different incentives for the holders than if they were simply holders of Pure common stock," and therefore discounting holders of those shares in majority of minority calculation); *In re CNX Gas Corp. S'holders Litig.*, 4 A.3d 397, 416 (Del. Ch. 2010) (explaining that "[e]conomic incentives matter, particularly for the effectiveness of a legitimizing mechanism like a . . . stockholder vote"); *Morton's Rest. Gp.*, 74 A.3d at 663 n.34 ("[O]nly disinterested stockholder approval is a strong assurance of fairness."); *In re Zale Corp. S'holders Litig.*, 2015 WL 5853693, at *9 (Del. Ch. Oct. 29, 2015) (ruling plaintiff had not adequately alleged a stockholder was interested where the stockholder's alternate economic interest, unique to that stockholder, was not material); Brandon Mordue, *The* Revlon *Divergence: Evolution of Judicial Review of Merger Litigation*, 12 Va. L. Bus. R. 531, 567 (2018) (explaining, in light of *Corwin*'s economic purposes,

it financial consequences for breach and financial incentives for performance. CBRE bargained for the right to rollover its preferred stock at a premium into the post-closing company and keep its shares after a merger.[788] And after a change in control, the annual dividend rate on CBRE's preferred stock would increase by as much as seventy-five basis points, and the holders would receive an accelerated payment on certain otherwise contingent dividends.[789] CBRE's Merger benefits were not shared with the Company's public common stockholders, who were to be cashed out.[790] Accordingly, CBRE was interested by virtue of the Purchase Agreement, as it stood to receive benefits from the Merger that were not shared with the cashed-out majority.[791] CBRE was also economically incentivized to perform

---

"*Corwin* thus suggests that an 'interested' stockholder would be one voting in favor of a transaction for reasons other than the economic merits of the transaction itself").

[788] Compl. ¶ 249.

[789] D.I. 94, Ex. A § 2(a)–(c).

[790] *See PNB*, 2006 WL 2403999, at *8, *14, *15 (holding that for the purposes of ratification, the only votes that counted were those of the shareholders who would be cashed out; a *majority* of those shareholders had to vote in favor of the transaction for the interested transaction to be ratified; and that the shareholders who stood to keep their shares in the merger were considered interested); *cf. Stewart v. BF Bolthouse Holdco, LLC*, 2013 WL 5210220, at *10 (Del. Ch. Aug. 30, 2013) (stating that "allegations that the directors stood on both sides of the transaction or derived a benefit that was not shared *pro rata* among the other shareholders" may implicate duty of loyalty as an "interested transaction").

[791] *Cf. Larkin v. Shah*, 2016 WL 4485447, at *20 (Del. Ch. Aug. 25, 2016) (noting that "[n]ot all stockholder approvals of a transaction have a cleansing effect," and observing that "[a]mong that 'yes'-block were stockholders owning 27.4% of Auspex's shares who contractually agreed to tender under the Tender and Support Agreement," and "[e]xcluding

176

under the Purchase Agreement and avoid the consequences of breach. CBRE's votes cannot contribute to cleansing under *Corwin*.

Finally, and fundamentally, Defendants have failed to demonstrate that CBRE's vote was voluntary. The business judgment rule standard of review applies only if disinterested and informed stockholders have had the voluntary choice to accept or reject a transaction.[792] "[T]he term 'ratification' applies only to a voluntary stockholder vote."[793] The Court declines to second-guess the board when the stockholders, as a second set of decisionmakers, have approved the economic merits of a transaction for themselves.[794] To be a meaningful ratifying vote, the stockholder must be voting on the transaction of her own accord and on the transaction's merits. A stockholder voting in favor of a specific transaction because it had previously contracted to vote in favor of *any* transaction in exchange for consideration is not

---

them, stockholders owning roughly 70% of the outstanding shares not contractually bound to tender agreed to the merger").

[792] *Corwin*, 125 A.3d at 306, 310, 312–13; *Frank v. Wilson & Co.*, 32 A.2d 277, 305 (Del. 1943) ("Ratification . . . implies a voluntary and positive act . . . .").

[793] *KKR*, 101 A.3d at 1003. The vote itself may be statutorily required; the point is that the stockholder's "yes" is voluntary. *See Corwin*, 125 A.3d at 312–14; *In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 740–45 (Del. Ch. 2016).

[794] *See Lavin v. West Corp.*, 2017 WL 6728702, at *8 (Del. Ch. Dec. 29, 2017) (citing *Corwin*, 125 A.3d at 313); J. Travis Laster, *The Effect of Stockholder Approval on Enhanced Scrutiny*, 40 Wm. Mitchell L. Rev. 1443, 1457 (2014) (commenting that "a compromised board can substitute the stockholders as the necessary qualified decision maker and, thereby, restore the protections of the business judgment rule" and that it is appropriate that "a court should take into account and defer to an uncoerced endorsement from fully informed, disinterested stockholders").

offering the second review that supports application of the business judgment rule.[795]

Indeed, this Court has excluded from a *Corwin* calculus votes by stockholders who contractually agreed to vote their shares in favor of a transaction.[796]

CBRE's vote was not a ratification of the Merger. Rather, it was a dutiful performance under the Purchase Agreement. CBRE lacked the ability to vote no at the ballot box in light of its contractual obligation to vote for the Merger. CBRE could either perform its contractual obligation to vote in favor of the Merger, or breach the Purchase Agreement and face the consequences. Including CBRE in the cleansing vote count would run afoul of *Corwin*'s logical underpinnings.

In an effort to count CBRE's votes as cleansing votes, the Director Defendants point out that the Special Committee put Buyer and Brookfield on level footing before CBRE. According to the September 29 meeting minutes, the purchaser of the preferred shares would have a premium redemption right in the event the Company's acquirer did not meet certain requirements, but both Brookfield and

---

[795] *See In re Invs. Bancorp, Inc. S'holder Litig.*, 177 A.3d 1208, 1220–21 (Del. 2017) (noting "mere approval by stockholders of a request by directors for the authority to take action within broad parameters does not insulate all future action by the directors within those parameters from attack," and explaining that only where "stockholders approve a specific corporate action, [will] the doctrine of ratification, in most situations, preclude[] claims for breach of fiduciary duty attacking that action" (quoting *Sample v. Morgan*, 914 A.2d 647, 663–64 (Del. Ch. 2007))); *Gantler v. Stephens*, 965 A.2d 695, 713 (Del. 2009) ("[T]he only director action or conduct that can be ratified is that which the shareholders are specifically asked to approve.").

[796] *See Larkin*, 2016 WL 4485447, at *20 (excluding shareholders who had contractual obligation to tender shares and vote yes if necessary).

178

Buyer were carved out from that redemption right.[797]  But this does not change the fact that CBRE was required to vote in favor of the Merger regardless of the identity of the acquirer.

The Director Defendants also contend Plaintiff cannot "explain how it was coercive for CBRE to agree to vote in a manner consistent with the board's recommendation, where the Board itself was bound to vote the way of a fully independent Special Committee, and a majority of the Board and all of the Special Committee members are concededly independent."[798]  This misses the point of ratification and why the vote must be voluntary:  the stockholders must consider and approve the transaction with their own voice, wholly independently from the board. CBRE agreed to vote in favor of the Merger—or any merger—without evaluating the transaction's merits or the Board's fiduciary performance.  CBRE agreed to substitute or forego its own independent judgment and support the Board's recommendation for any merger within the identified timeframe.[799]  Plaintiff's argument, connecting CBRE's vote through a daisy chain of substituted judgment to the very Special Committee whose conduct the vote is to ratify, demonstrates the fundamental reason why CBRE's vote cannot be a cleansing vote.  A stockholder

---

[797] Kirby Decl. Ex. 20 at PEGI-00001291.

[798] D.I. 92 at 5.

[799] *See Invs. Bancorp*, 177 A.3d at 1222.

who must vote the same way as the board is echoing, not ratifying, the board's conduct, even if the board were comprised of entirely careful and loyal directors.

Without CBRE's vote, the Director Defendants do not have the majority necessary for *Corwin* to cleanse the Merger. The Individual Defendants' Motion is denied as to Count I, and Plaintiff's nonexculpated claims against the Director Defendants shall proceed.

### B. Plaintiff Has Stated A Claim For Breach Of Fiduciary Duty Against Certain Officer Defendants.

Because Section 102(b)(7) does not exculpate a corporate officer's breach of fiduciary duty, Plaintiff's claims against the Officer Defendants face a different standard.[800] Plaintiffs need only plead facts supporting a reasonable inference that the Officer Defendants breached their fiduciary duty of care in their official

---

[800] *See, e.g.*, *Baker Hughes*, 2020 WL 6281427, at *15–16; *Essendant*, 2019 WL 7290944, at *15.

capacities.[801]  Plaintiff may recover damages from the Officer Defendants in their roles as officers for breach of either the duty of loyalty or the duty of care.[802]

"Corporate officers owe fiduciary duties that are identical to those owed by corporate directors."[803]  As stated, "the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders

[801] *See, e.g.*, *Baker Hughes*, 2020 WL 6281427, at \*15.  As this Court noted recently, "[i]t is an open issue of Delaware law as to whether *Revlon* applies to an officer's actions." *Mindbody*, 2020 WL 5870084, at \*32 n.287.  For purposes of this decision, I assume a breach of an officer's duties of care and loyalty should be reviewed under the traditional standards of bad faith and gross negligence, respectively, because the directors—not the officers—are responsible for the types of decisions that warrant *Revlon* enhanced scrutiny review.  *See id.* (applying gross negligence even though *Revlon* applied to the underlying transaction because "*Revlon* neither creates a new type of fiduciary duty in the sale-of-control context nor alters the nature of the fiduciary duties that generally apply" (quoting *Malpiede*, 780 A.2d at 1083)); *Morrison I*, 2019 WL 7369431, at \*22 (applying gross negligence standard to officer conduct, even though *Revlon* applied to the underlying company sale process).

[802] *See, e.g.*, *Baker Hughes*, 2020 WL 6281427, at \*15.

[803] *Frederick Hsu*, 2017 WL 1437308, at \*39 (citation, footnote, and internal quotation marks omitted) (quoting *Gantler*, 965 A.2d at 708, and then quoting *Hampshire Gp. Ltd. v. Kuttner*, 2010 WL 2739995, at \*12 (Del. Ch. July 12, 2010)).

generally."[804]  Corporate officers "are not permitted to use their position of trust and confidence to further their private interests."[805]

"To plead a claim for breach of the duty of loyalty that will overcome a motion to dismiss, a plaintiff must plead sufficient facts to support a rational inference that the corporate fiduciary acted out of material self-interest that diverged from the interests of the shareholders."[806]  To make such a showing, the plaintiff may plead that the officer was interested or lacked independence with respect to the challenged transaction.[807]  To plead interestedness, a plaintiff can plead the fiduciary received

---

[804] *Cede & Co.*, 634 A.2d at 361; *see also Gantler*, 965 A.2d at 709 ("[T]he fiduciary duties of officers are the same as those of directors."); *Guth*, 5 A.2d at 510 ("While technically not trustees, [corporate officers and directors] stand in a fiduciary relation to the corporation and its stockholders.  A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers.  The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest.  The occasions for the determination of honesty, good faith and loyal conduct are many and varied, and no hard and fast rule can be formulated.  The standard of loyalty is measured by no fixed scale.").

[805] *Guth*, 5 A.2d at 510.

[806] *Saba Software*, 2017 WL 1201108, at *21.

[807] *See, e.g.*, *Cede & Co.*, 634 A.2d at 362 ("Classic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally.  We have generally defined a director as being independent only when the director's decision is based entirely on the corporate merits of the transaction and is not influenced by personal or extraneous considerations.  By contrast, a director who receives

182

"a personal financial benefit from a transaction that is not equally shared by the stockholders," or "was a dual fiduciary and owed a competing duty of loyalty to an entity that itself stood on the other side of the transaction or received a unique benefit not shared with the stockholders."[808] To plead a lack of independence, a plaintiff can plead the fiduciary is "sufficiently loyal to, beholden to, or otherwise influenced by an interested party" to undermine the fiduciary's ability to judge the matter on its merits.[809]

Further, "[l]ike directors, officers breach the duty of loyalty if they act in bad faith for a purpose other than advancing the best interests of the corporation."[810] A claim for breach of the duty of loyalty against officers will proceed where the complaint alleges that they manipulated the sales process to sabotage the alternatives they did not personally favor and acted with favoritism toward a particular bidder.[811]

---

a substantial benefit from supporting a transaction cannot be objectively viewed as disinterested or independent. This principle necessarily constrains our review of the Court of Chancery's duty of loyalty formulation." (citations omitted)).

[808] *Frederick Hsu*, 2017 WL 1437308, at *26 (quoting *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993)).

[809] *Id.*

[810] *Id.* at *39 (alteration and internal quotation marks omitted) (quoting *Kuttner*, 2010 WL 2739995, at *12).

[811] *See Chen*, 87 A.3d at 686–87 (quoting and discussing *Gantler*, 965 A.2d at 709).

An officer's compliance with the duty of care is evaluated for gross negligence.[812] "Gross negligence involves more than simple carelessness. To plead gross negligence, a plaintiff must allege conduct that constitutes reckless indifference or actions that are without the bounds of reason."[813] "While the inquiry of whether the claims amount to gross negligence is necessarily fact-specific, the burden to plead gross negligence is a difficult one."[814]

Plaintiff's Complaint places many wrongs at the many feet of the Officer Defendants or "conflicted management," and Garland appears in nearly every scene of Plaintiff's narrative. But the Complaint pleads few facts addressing the other Officer Defendants' individual involvement in the sales process. As a result, Plaintiff has failed to plead breaches by each Officer Defendant. Plaintiff has alleged facts from which it is reasonably conceivable that Garland, Elkort, and Lyon—but not Armistead and Pedersen—breached their duty of loyalty by titling the sales process toward Buyer in pursuit of their own interests and Riverstone and Developer 2's interests. Plaintiff has stated a claim against Garland for breaching his duties as an officer in preparing the allegedly false and misleading Proxy—but

[812] *Baker Hughes*, 2020 WL 6281427, at *15.

[813] *Id.* (internal quotation marks omitted) (quoting *Morrison I*, 2019 WL 7369431, at *22).

[814] *Id.* (quoting *Zucker v. Hassell*, 2016 WL 7011351, at *7 (Del. Ch. Nov. 30, 2016), *aff'd*, 165 A.3d 288 (Del. 2017)).

not Armistead, Elkort, Lyon, or Pedersen. The Individual Defendants' Motion on Count II is granted and denied in part.

### 1. It Is Reasonably Conceivable That Only Garland, Elkort, And Lyon Tilted The Sales Process In Buyer's Favor; It Is Not Reasonably Conceivable That Armistead And Pedersen Did The Same.

Plaintiff claims the Officer Defendants breached both their duty of loyalty and duty of care by "tilt[ing] the sale process" in Riverstone's and Buyer's "favor due to [their] conflicts of interest."[815] The Complaint supports a reasonable inference that Garland, Elkort, Lyon, and Pederson favored Riverstone and Developer 2's interests over the Company's public stockholders because they were not independent of Riverstone and Developer 2.[816]

As an initial matter, Plaintiff has alleged that each Officer Defendant was conflicted with respect to Riverstone.[817] Each held substantial roles with Riverstone's subsidiaries and the favored entity in the sales process, Developer 2 as preceded by Developer 1. Garland, the Company's CEO since its founding in October 2012, also served as the President and a director of both Developer 1 and

---

[815] D.I. 82 at 35 (quoting *Mindbody*, 2020 WL 5870084, at *1).

[816] *See Frederick Hsu*, 2017 WL 1437308, at *39.

[817] Compl. ¶¶ 32–36.

Developer 2.[818] Armistead, the Company's Executive Vice President of Business Development since August 2013, served as Developer 1's Executive Director since June 2009 and as Developer 2's President since April 2019.[819] Elkort, the Company's Executive Vice President and Chief Legal Officer since May 2018, also served as Developer 1's Director of Legal Services and Co-Head of Finance since June 2009 and as a Developer 2 officer.[820] Lyon, the Company's President since April 2019, also previously served as Developer 1's Head of Structured Finance.[821] And Pedersen, the Company's CFO since April 2019, also served as Developer 2's CFO since May 2018 and Developer 1's Co-Head of Finance since June 2009.[822] Thus, the Officer Defendants were dual fiduciaries at the time of the Merger.[823] Because Riverstone's and Developer 2's interests diverged from those of the

---

[818] *Id.* ¶ 24. Before the Merger, Garland also held a substantial equity interest in Developer 2. Therefore, his interests also diverged from those of the Company's public stockholders to the extent an internalization of Developer 2 required the companies' stockholders to compete for consideration.

[819] *Id.* ¶ 32.

[820] *Id.* ¶ 33. Before the Merger, Elkort also held a substantial equity interest in Developer 2. Therefore, his interests also diverged from those of the Company's public stockholders to the extent an internalization of Developer 2 required the companies' stockholders to compete for consideration.

[821] *Id.* ¶ 34.

[822] *Id.* ¶ 35.

[823] *See, e.g.*, *Chen*, 87 A.3d at 670.

Company's stockholders, those Officer Defendants faced an inherent conflict of interest.[824]

Plaintiff has also alleged that those Officer Defendants were interested in the Merger and incentivized to favor Buyer and the associated internalization of Developer 2 to secure for themselves equity and continued employment.[825] Post-closing, Garland continues to run the combined entity, and Armistead, Elkort, Lyon, and Pedersen continue to serve as its executives.[826] During the sales process, the Company communicated to bidders that it was desirable for the Officer Defendants "to maintain their positions in the combined company,"[827] and the Officer Defendants were, after a blackout period, permitted to negotiate these roles without the Special Committee's involvement.[828] Each was therefore conceivably beholden to Riverstone and Developer 2 for their continued employment, calling into question their independence. Armistead, Garland, Elkort, Lyon, and Pederson also had the opportunity to retain equity in the post-closing company, while the Company's

---

[824] *Id.*

[825] *See, e.g., Frederick Hsu*, 2017 WL 1437308, at *26.

[826] Compl. ¶¶ 24, 32–36.

[827] *Id.* ¶ 174.

[828] *See id.* ¶¶ 147, 174, 163.

public stockholders were cashed out. As disclosed in the Proxy, each received substantial equity in the post-closing company.[829]

While Plaintiff has alleged that each of the Officer Defendants faced conflicts of interest with respect to the Merger, the key question is whether Plaintiff has plead facts making it reasonably conceivable that each Officer Defendant acted during the sales process due to those conflicts. Plaintiff has not. The Complaint pleads facts supporting a reasonable inference that only Garland, Elkort, and Lyon acted disloyally to favor Riverstone and Developer 2's interests, consistent with their incentives. The Complaint lacks similarly sufficient allegations against Armistead and Pedersen.

Readers who have made it this far are familiar with Garland's questionable contributions to the sales process. As discussed at length above, Garland is alleged to have initiated and actively participated in the sales process as both a director and officer with the primary objective of securing a merger with a friendly bidder that would internalize Developer 2 at a premium price. In pursuit of this objective, he and the Director Defendants acknowledged, yet ignored, concerns that the Company's public stockholders would be shorted merger consideration.

In addition, Plaintiff has alleged that Elkort and Lyon also contributed to tilting the sales process toward Buyer. After Riverstone spurred the idea of take-

---

[829] *Id.* ¶¶ 24, 32–35.

private, at a time when the Company did not need to raise equity capital, management—including Garland, Elkort, and Lyon—kicked off the sales process with Riverstone in the room and able to gather Company confidential information.[830] Plaintiff alleges Garland and Lyon encouraged the Special Committee to retain Goldman, despite its known conflicts including advising Riverstone on a potential buyout of the Company.[831] Garland and Elkort pressed the Special Committee to favor a transaction that was Riverstone-approved.[832] Elkort "emphasized" to the Special Committee that "the need for Riverstone's support for any potential transaction should not be underestimated because Riverstone's rights to consent that would likely be implicated by the proposed transaction appeared to be very broad."[833] But, as Brookfield realized, the Consent Right was readily structurally circumvented.

Based on these facts, it is reasonably conceivable that Garland, Elkort and Lyon breached their fiduciary duties as officers by consciously pressing for a transaction with Buyer consistent with their personal and financial incentives, as

---

[830] Taking Plaintiff's group pleading as true, Armistead and Pedersen also participated in the sales process kickoff. However, unlike Elkort and Lyon, the Complaint does not allege that they took action to further their own interests or Riverstone's interests once the sales process was underway.

[831] Compl. ¶¶ 106–08; *see also id.* ¶ 139.

[832] *Id.* ¶ 117.

[833] *Id.* (alterations omitted).

well as Riverstone and Developer 2 interests.[834]  As alleged, their actions give rise

to a breach of the duty of loyalty, as they cannot escape their inherent conflicts.  But

even if it were a close call, at a minimum, the facts pled give rise to the reasonable

inference that Elkort and Lyon were at least recklessly indifferent or grossly

---

[834] *See Frederick Hsu*, 2017 WL 1437308, at *39; *Chen*, 87 A.3d at 687.  The Officer Defendants contend that the 220 materials undermine Plaintiff's allegations against them. *See* D.I. 85 at 23.  Plaintiff refutes the Officer Defendants' interpretation of those materials. *See* D.I. 82 at 37–40, 41.  The 220 documents used to draft the Complaint are incorporated by reference or integral to it, and therefore I may review documents cited in the Complaint "to ensure that the plaintiff has not misrepresented [their] contents and that any inference the plaintiff seeks to have drawn is a reasonable one." *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019).  "Section 220 documents, hand selected by the company, cannot be offered to rewrite an otherwise well-pled complaint," but can be offered to ensure the plaintiff is not taking documents out of context. *In re Clovis Oncology, Inc. Deriv. Litig.*, 2019 WL 4850188, at *14 n.216 (Del. Ch. Oct. 1, 2019).  The Court cannot weigh competing factual interpretations of incorporated documents on a motion to dismiss. *Owens on Behalf of Esperion Therapeutics, Inc. v. Mayleben*, 2020 WL 748023, at *9 (Del. Ch. Feb. 13, 2020), *aff'd sub nom. Owens v. Mayleben*, 241 A.3d 218 (Del. 2020).  It appears to me that Plaintiff has not misrepresented the 220 materials and has drawn reasonable inferences therefrom. *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013); *see also In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at *18 (Del. Ch. Jan. 27, 2021) ("The incorporation-by-reference doctrine does not enable a court to weigh evidence on a motion to dismiss.  It permits a court to review the actual documents to ensure that the plaintiff has not misrepresented their contents and that any inference the plaintiff seeks to have drawn is a reasonable one.  Where a defendant improperly and extensively uses Section 220 Documents in support of a Chancery Rule 12(b)(6) motion to support factual inferences that run counter to those supported in the complaint, the court may either exclude the extraneous matter from its consideration or convert the Chancery Rule 12(b)(6) motion into a motion for summary judgment so that the plaintiff may take discovery before the court determines if pre-trial dispositive relief is appropriate." (footnotes and internal quotation marks omitted) (quoting *Voigt*, 2020 WL 614999, at *9)).

negligent with respect to the steps Garland and the Board took to tilt the sale process in Buyer's favor.[835] Plaintiff has stated a claim against Garland, Elkort, and Lyon.

Plaintiff has failed to state a claim for breach against Armistead and Pedersen. Unlike Elkort and Lyon, the Complaint fails to allege anything specific about Armistead and Pedersen's involvement in the sales process.[836] The Complaint alleges that Armistead and Pedersen had long histories with Riverstone and were conflicted.[837] But the only allegations tethering Armistead and Pedersen to the process concern the Officer Defendants collectively.[838] With no allegations whatsoever tying Armistead to the process, it is not reasonably conceivable that Armistead breached his duty of loyalty or care by titling the process toward Buyer

---

[835] *See Mindbody*, 2020 WL 5870084, at *33 ("White was also involved in providing timing and informational advantages to Vista throughout the sale process. Plaintiffs allege that White, with Stollmeyer [director], populated Vista's substantial data room. . . . In view of these facts, it is reasonably conceivable that White was at least recklessly indifferent to the steps Stollmeyer took to tilt the sale process in Vista's favor."); *cf. KCG Hldgs.*, 2019 WL 2564093, at *18 ("The allegations support a pleadings-stage inference that the Director Defendants breached their duty of care by failing to employ a reasonable process that managed Jefferies' influence. Whether the Director Defendants' actions in this regard rose to the level of bad faith or merely state a claim for breach of the duty of care is a close call. The Court need not make this call in light of the sufficiency of Plaintiff's other allegations." (footnote omitted)).

[836] *Compare* Compl. ¶¶ 33, 34, 106, 117, 130, 139, 210, 213–14, *with id.* ¶¶ 32, 35, 45, 85–88, 210, 213–14.

[837] *See id.* ¶¶ 32, 35.

[838] *See, e.g.*, *Essendant*, 2019 WL 7290944, at *7 n.91 ("[G]roup pleading is not sufficient to state a claim of breach of duty against an individual fiduciary."); *see* D.I. 82 at 36 (citing Compl. ¶¶ 107–08, 116–17, 124, 126–27, 140, 187, 234).

in pursuit of his, Riverstone, or Developer 2's interests.[839] Plaintiff has not stated a claim against Armistead.

As for Pedersen, the Complaint alleges that Pedersen shared the Company's favorable financial growth on 2019 earnings calls.[840] Pedersen's statements are the backdrop against which Plaintiff outlines Garland's stock issuances, contending the issuances were not financially necessary and only done to secure CBRE's favorable votes. But Pedersen's statements are consistent with his position as CFO, and Plaintiff has not alleged that he utilized those statements to advance his own interests or Riverstone and Developer 2's interests. Nor has Plaintiff alleged those statements were false; rather, Plaintiff relies on the truth of those statements to outline the preferred stock issuance in stark relief. Plaintiff has not pled a breach of fiduciary duty by Pedersen.

---

[839] *Compare Baker Hughes*, 2020 WL 6281427, at *15–16, *with Frederick Hsu*, 2017 WL 1437308, at *39–40 (recognizing the lack of allegations against certain officer defendants, but inferring their involvement in management-level initiatives that were constructed to favor differentiated equity, and stating that "the claims against Kupietzky and Morrow strike me as weaker than the other claims in the case, but relative weakness is not grounds for dismissal" and "[g]iven the plaintiff-friendly standard that governs a Rule 12(b)(6) motion, these claims survive"). In *Frederick Hsu*, the Court found that, despite its scant allegations, the complaint stated a claim against those officers in view of their role in crafting management-level strategy and initiatives to shape the company to favor undifferentiated equity. Here, the Court is asked to assess a Board-level sales process that looped in conflicted management. There is no allegation that Armistead touched that process, nor are there allegations from which it would be reasonable to infer his involvement simply by virtue of his role as a Company offer and dual fiduciary.

[840] Compl. ¶¶ 85–88.

### 2. It Is Reasonably Conceivable That Garland Is Responsible For The False And Misleading Proxy.

Plaintiff also claims the Officer Defendants breached their duty of loyalty or, at a minimum, their duty of care by causing the Company to issue the materially incomplete and misleading Proxy to stockholders. "It is elementary that under Delaware law the duty of candor imposes an unremitting duty on fiduciaries, including directors and officers, to not use superior information or knowledge to mislead others in the performance of their own fiduciary obligations."[841] And those fiduciaries certainly cannot "use their position of trust and confidence" to withhold from stockholders material information "to further their private interests."[842] "Officers may breach their fiduciary duties to the extent they are involved in preparing a proxy statement that contains materially misleading disclosures or omissions."[843] This requires that the Court conduct an officer-by-officer analysis.[844]

---

[841] *Haley*, 235 A.3d at 718 (alteration, internal quotation marks, and footnote omitted) (quoting *McMillan*, 559 A.2d at 1283).

[842] *Id.* (alteration, internal quotation marks, and footnote omitted) (quoting *Guth*, 5 A.2d at 510); *accord Macmillan*, 559 A.2d at 1283.

[843] *Roche*, 2020 WL 7023896, at *18 (citing *Hansen*, 2018 WL 3025525, at *11 (holding that a complaint stated a claim against an officer for violation of the fiduciary duty of disclosure and noting that directors and officers of a corporation generally owe the same fiduciary duties)); *see also Baker Hughes*, 2020 WL 6281427, at *15–16; *Morrison I*, 2019 WL 7369431, at *25, *27.

[844] *See Roche*, 2020 WL 7023896, at *18; *Baker Hughes*, 2020 WL 6281427, at *15–16.

As explained, Plaintiff has pled the Board delegated preparation of the Proxy to the conflicted Officer Defendants. Plaintiff contends the Officer Defendants are collectively responsible for the allegedly false and misleading Proxy. Plaintiff's disclosure claim therefore involves a two-step analysis. The first step considers which Officer Defendants were involved in preparing the Proxy. The second addresses whether the Proxy is materially misleading.[845]

        **a.**    **The Complaint Pleads Only That Garland Was Involved In Preparing And Disseminating The Proxy.**

I turn first to the issue of whether the Officer Defendants were involved in preparing the Proxy and whether group pleading is sufficient to state a claim against all Officer Defendants. This Court recently addressed allegations that the companies' officers were responsible for disclosure deficiencies in *City of Warren General Employees' Retirement System v. Roche*[846] and *In re Baker Hughes Inc. Merger Litigation*.[847] In both cases, the Court held that a plaintiff fails to plead a claim against an officer based on disclosure deficiencies where "the Complaint is devoid of any allegations that [the officer] had any role in drafting or disseminating

---

[845] *See Roche*, 2020 WL 7023896, at *18–19 (noting, in the event the Proxy is misleading and Defendants' disclosure is insufficient, the resulting transaction may still be cleansed if ratified by a shareholder vote under *Corwin*).

[846] 2020 WL 7023896, at *18–19 (Del. Ch. Nov. 30, 2020).

[847] 2020 WL 6281427, at *15–16 (Del. Ch. Oct. 27, 2020).

the Proxy."[848]  The Court concluded the plaintiffs failed to state a claim against certain officer defendants where (1) the complaint's allegations did not specifically allege that certain officers were involved in preparing the proxy, and (2) it was not reasonably inferable from the Complaint or the Proxy that they were involved because those officers did not sign the Proxy.[849]

Here, the Complaint sufficiently alleges that Garland was involved in preparing and disseminating the Proxy.  Garland was the Company's CEO throughout the sales process and "an integral figure" during merger negotiations.[850] The Board resolutions approving the issuance of the Proxy authorized the Company's officers to prepare and issue the Proxy and, most significantly, Garland signed the Proxy.[851]  It is reasonable to infer that Garland was involved in preparing the disclosures in the Proxy in his capacity as an officer of the Company.[852]  Count II survives as to Garland.

---

[848] *Roche*, 2020 WL 7023896, at *19 (quoting *Baker Hughes*, 2020 WL 6281427, at *16).

[849] *Id.*; *Baker Hughes*, 2020 WL 6281427, at *16.

[850] *Roche*, 2020 WL 7023896, at *19.

[851] *Id.*; *see Baker Hughes*, 2020 WL 6281427, at *15–16 (holding that a CEO could be liable for breach of the duty of care for a deficient proxy where the CEO was involved in the negotiation of the merger and signed the proxy); *Hansen*, 2018 WL 3025525, at *11 ("Vance affixed his signature to the Proxy in his capacity as President and CEO and presented the information to the stockholders for their consideration.  This means he may be liable for material misstatements in the Proxy in his capacity as an officer [and] as a director.").

[852] *See Roche*, 2020 WL 7023896, at *19; *Baker Hughes*, 2020 WL 6281427, at *16.

The same cannot be said for Armistead, Elkort, Lyon, and Pedersen. Although the Board resolution delegated disclosure authority to the Officer Defendants generally, the Complaint contains no specific allegations that Armistead, Elkort, Lyon, or Pedersen were involved, and there is no indication from the Proxy itself that they were, as only Garland signed off on the disclosures. Plaintiff's case against Armistead, Elkort, Lyon, and Pederson "boils down to the unsubstantiated assertion" that they would have reviewed and authorized dissemination of the Proxy simply because they were Company officers.[853] This is "insufficient" to plead that Armistead, Elkort, Lyon, and Pederson "acted with *scienter* or were grossly negligent in connection with the failure" to prepare and file a materially complete and accurate Proxy.[854] Count II of the Complaint fails to state a claim for relief against them.[855]

### b. Plaintiff Has Alleged That Garland Prepared And Disseminated A False And Misleading Proxy.

I turn next to whether the Proxy was materially misleading. Plaintiff contends that Garland breached his duty of disclosure, and consequently his duties of care and loyalty, in preparing and disseminating a false and misleading Proxy. In a request

---

[853] *Baker Hughes*, 2020 WL 6281427, at *16.

[854] *Id.*

[855] *See id.*

for stockholder action, directors are under a duty to disclose fully and fairly all material facts within their control bearing on the request.[856] The duty of disclosure is not an independent duty, but derives from the duties of care and loyalty.[857] To state a claim for breach of the duty of loyalty, the Complaint must include well-pled allegations supporting a reasonable inference that Garland acted in bad faith or to further his own self-interest in disseminating the allegedly misleading Proxy.[858] To state a claim for breach of the duty of care, the Complaint must allege Garland was grossly negligent in preparing and filing the Proxy.[859] "Because fiduciaries must take risks and make difficult decisions about what is material to disclose, they are exposed to liability for breach of fiduciary duty only if their breach of the duty of care is extreme."[860]

Corporate fiduciaries can breach their duty of disclosure "by making a materially false statement, by omitting a material fact, or by making a partial

---

[856] *E.g.*, *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 480 (Del. 1989).

[857] *E.g.*, *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009).

[858] *Cf. Roche*, 2020 WL 7023896, at *19–20 ("For the reasons addressed above, the only potential claim against Roche for issuing a materially misleading Proxy sounds in the fiduciary duty of care because there is no well-pleaded allegation in the Complaint supporting a reasonable inference that she acted in bad faith or to further her own self-interest.").

[859] *See id.*

[860] *Morrison I*, 2019 WL 7369431, at *25 (alteration omitted) (quoting *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 157 (Del. Ch. 2004)).

197

disclosure that is materially misleading."[861] "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote," in that it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[862] "[T]his materiality test does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote."[863] Rather, a proxy must contain "information that a reasonable stockholder would generally want to know in making [his or her voting] decision."[864] "The issue of materiality of an alleged misstatement or omission in a prospectus is a mixed question of law and fact, but predominantly a question of fact. Nevertheless, conclusory allegations need not be treated as true, nor should inferences be drawn unless they truly are reasonable."[865]

---

[861] *Pfeffer*, 965 A.2d at 684 (quoting *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 916 (Del. Ch. 1999)).

[862] *Rosenblatt*, 493 A.2d at 944 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[863] *Morrison v. Berry* (*Morrison II*), 191 A.3d 268, 283 (Del. 2018) (internal quotation marks omitted) (quoting *Rosenblatt*, 493 A.2d at 944).

[864] *Id.* at 287.

[865] *Pfeffer*, 965 A.2d at 685 (internal quotation marks omitted) (quoting *Branson v. Exide Elecs. Corp.*, 645 A.2d 568 (Del. 1994) (TABLE), and also quoting *Feldman v. Cutaia*, 951 A.2d 727, 731 (Del. 2008)).

Plaintiff identifies ten categories of materially false and statements in the Proxy.[866] Plaintiff has adequately alleged that the Proxy was false or misleading with respect to many of them, based on fair characterizations of the disclosures and materials produced pursuant to Section 220.[867] Because the claim against Garland survives if any one of Plaintiff's identified deficiencies is sufficiently pled, I address only a handful of the Proxy's allegedly misleading disclosures.[868]

First, Plaintiff has adequately alleged that the Proxy did not disclose all material information about Goldman's compensation and conflicts. "Because of the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives, this Court has required full disclosure of investment banker compensation and potential conflicts."[869] Here, the Proxy disclosed neither Goldman's compensation nor its conflicts with respect to

---

[866] *See* D.I. 82 at 43–58.

[867] The Individual Defendants argue "[t]here was nothing materially misleading about the Proxy," D.I. 85 at 22, and that "[a]ll of Plaintiff's allegations are based on mischaracterizations of the 220 Materials." D.I. 74 at 41; *see also* D.I. 85 at 24. But, again, the Individual Defendants cannot rely on those materials "to rewrite an otherwise well-pled complaint" and overcome the reasonable inferences that can be drawn therefrom. *Clovis*, 2019 WL 4850188, at *14 n.216.

[868] Whether each of the ten categories was in facts inadequately disclosed and material will be determined through discovery.

[869] *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 832 (Del. Ch. 2011) (collecting cases).

Riverstone.[870] The Individual Defendants do not argue otherwise.[871] They instead claim that no disclosure obligation existed because Goldman's conflicts were well known in the market and disclosed to the Special Committee before they retained Goldman. These arguments miss the mark, as the *Company's stockholders* were entitled to be told all material information when considering the Merger, without having to extract it from publicly available information.[872] And disclosing conflicts to a disloyal special committee compounds, rather than excuses, the failure to disclose those conflicts to the electorate.

Second, Plaintiff contends that the Proxy failed to disclose all material information about the Consent Right, including that the Special Committee and its advisors confirmed that it did not prevent the Company from acquiring another company through a reverse triangular merger.[873] The Proxy described the Consent Right and Brookfield's reluctance to enter into a transaction without Riverstone's approval. But

---

[870] *See* Compl. ¶¶ 267–72.

[871] *See* D.I. 74 at 23–24.

[872] *See Zalmanoff v. Hardy*, 2018 WL 5994762, at *5 (Del. Ch. Nov. 13, 2018), *aff'd*, 211 A.3d 137 (Del. 2019).

[873] Compl. ¶ 254.

> [o]nce defendants travel down the road of partial disclosure of the history leading up to the Merger[,] they have an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events. Partial disclosure, in which some material facts are not disclosed or are presented in an ambiguous, incomplete, or misleading manner, is not sufficient to meet a fiduciary's disclosure obligations.[874]

In my view, Plaintiff has alleged that other material information about the Consent Right's overarching importance in the sales process was omitted from the Proxy. For example, any reasonable stockholder reading the Proxy would not have understood that a transaction could have been structured to avoid triggering the Consent Right—and that such a transaction was offered and was more lucrative for stockholders. The Proxy also fails to disclose that Riverstone and management badgered the Special Committee and bidders about the Consent Right's scope to emphasize Riverstone and Developer 2's interests. From the sales process alleged and the Company's deep and historic ties to Riverstone, it is reasonably conceivable the stockholders would have considered all information about the Consent Right—including how it was wielded in the sales process and by whom, potential bidders' responses to its invocation, and the potential to circumvent it with creative structuring—to be important in deciding how to vote on the Merger.

---

[874] *KCG Hldgs.*, 2019 WL 2564093, at *11 (alterations, citations, and internal quotation marks omitted) (quoting *Morrison II*, 191 A.3d at 283, and then quoting *Appel v. Berkman*, 180 A.3d 1055, 1064 (Del. 2018)).

The Individual Defendants argue that "the terms of the consent right were public, and any investor that had decided to invest in [Company] stock was well aware of these terms," as the Consent Right "had already been disclosed to [Company] investors, for years, in [the Company]'s public filings."[875] In support, the Individual Defendants point to three SEC Form 10-Ks.[876] But "our law does not impose a duty on stockholders to rummage through a company's prior public filings to obtain information that might be material to a request for stockholder action."[877] And even if those public filings disclose the existence of the Consent Right, the Consent Right's importance as implemented in the sales process would not have been in those filings.[878] Here, the Proxy purported to describe the sales process, but omitted any mention of how the Consent Right loomed over it.

Third, Plaintiff alleges that the Proxy was deficient in that it failed to disclose that Brookfield proposed to pay stockholders over $6 per share more than Buyer, and that the Special Committee believed that Brookfield's proposal was "superior"

---

[875] D.I. 74 at 20–21 (emphasis omitted).

[876] *Id.* at 20 (citing Kirby Decl. Exs. 3–5).

[877] *Zalmanoff*, 2018 WL 5994762, at *5 (citing *In re Trans World Airlines, Inc. S'holders Litig.*, 1988 WL 111271, at *10 (Del. Ch. Oct. 21, 1988) (Allen, C.) ("Nor can I agree that if a fact is material, that a failure to disclose it is necessarily cured by reason that it could be uncovered by an energetic shareholder by reading an SEC filing. Closer to an acceptable response is the assertion that the number could be derived from appraisal information contained in the proxy statement."), *abrogated on other grounds by Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110 (Del. 1994)).

[878] *See id.*; *Trans World Airlines*, 1988 WL 111271, at *10.

to all others received, including from Buyer.[879] "Delaware law does not require disclosure of a play-by-play of negotiations leading to a transaction or of potential offers that a board has determined were not worth pursuing."[880] And a disclosure claim will not be supported where it "boil[s] down to an argument that plaintiff disagreed with a Special Committee's decision not to pursue another acquisition proposal and that other stockholders should have been informed about the offer in case they, too, disagreed with the Special Committee."[881] However, the availability of a superior bid may be material and therefore may be required to be disclosed to stockholders.[882]

---

[879] *E.g.*, Compl. ¶ 192; *see id.* ¶¶ 261–65.

[880] *Comstock*, 2016 WL 4464156, at *15; *see also David P. Simonetti Rollover IRA v. Margolis*, 2008 WL 5048692, at *12 (Del. Ch. June 27, 2008) ("In the usual case, where a board has not received a firm offer or has declined to continue negotiations with a potential acquirer because it has not received an offer worth pursuing, disclosure is not required.").

[881] *In re OM Gp., Inc. S'holders Litig.*, 2016 WL 5929951, at *14 (Del. Ch. Oct. 12, 2016) (internal quotation marks omitted) (quoting *Comstock*, 2016 WL 4464156, at *15).

[882] *See Xura*, 2018 WL 6498677, at *12 ("From the public disclosures provided to Xura stockholders, it is reasonably conceivable that stockholders lacked the following material information when they voted to approve the Transaction: . . . (5) *Francisco Partners initially expressed interest in offering a superior bid* but somehow learned that Siris was Xura's counterparty and then moved its financial support to the buy-side of the Transaction . . . ." (emphasis added)); *cf. Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *15 (Del. Ch. June 30, 2014) ("The types of companies that may or may not have made an offer for Ramtron during the sales process has no bearing on the issue of whether or not to seek appraisal. *Furthermore, there are no allegations that any company made an offer for Ramtron that was of equal or greater value to the Cypress offer*. Dent has failed to allege adequately how including the details of rejected offers that offered less value for the Company than the Cypress bid would be material to a Ramtron stockholder in determining whether or not to seek appraisal. Accordingly, I conclude that this aspect of Dent's

Here, the Proxy omitted material information about Brookfield's superior offer. The Individual Defendants argue that Proxy disclosed that in July 2019 Brookfield offered a 20% premium for a transaction that did not include Developer 2 and a 15% premium for a transaction that did include Developer 2, and that this was sufficient to disclose the value of Brookfield's offers.[883] This argument misses the mark. Even assuming that information regarding Brookfield's bid was immaterial, the Delaware Supreme Court has "recognized that a partial and incomplete disclosure of arguably immaterial information regarding the history of negotiations leading to a merger might result in a materially misleading disclosure if not supplemented with information that would allow the stockholders to draw the complete picture."[884] The Proxy's disclosure does not state the monetary value of the July offer, and most importantly, it does not disclose or suggest that Brookfield offered even more value in August, September, and October 2019.[885] Without more, the reasonable stockholder would be left to believe that Brookfield's bid remained stagnant, when, in fact, it increased in value and became noticeably superior to other bids.

---

disclosure claim also fails to state a claim upon which relief can be granted." (emphasis added)).

[883] *See* D.I. 74, App. A at 2.

[884] *OM Gp.*, 2016 WL 5929951, at *12 (citing *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1281 (Del. 1994)).

[885] *See* Compl. ¶¶ 164–67, 173–79, 192–200.

The Proxy also fails to disclose that the Special Committee itself believed, as confirmed by Evercore's valuation analysis, that Brookfield's offer was more valuable than Buyer's.[886] The Individual Defendants reject this position and the Complaint's allegations, arguing that the Special Committee merely believed that Brookfield's proposal "could" be superior and that in any event Brookfield never submitted a "definitive, all-cash offer and proposed merger agreement."[887] The documents incorporated and integral to the Complaint show that the Special Committee and its advisors clearly told Brookfield that its offer was superior; and the October 31, 2019 Board presentation shows that the Special Committee's advisors told the Board that Brookfield's offer was worth vastly more to stockholders than Buyer's offer.[888] This information should have been disclosed to Company stockholders.[889]

Further, the fact that Brookfield did not submit a definitive offer does not excuse disclosure of Brookfield's final terms in view of the Complaint's allegations and the Proxy's overall disclosures about the sales process. Brookfield eagerly pursued the Company, even if that meant ceding to Riverstone's demands, until the

---

[886] *See id.* ¶¶ 192–200.

[887] D.I. 74 at 22.

[888] *See* Compl. ¶¶ 192–200.

[889] *Cf. In re Cogent, Inc. S'holder Litig.*, 7 A.3d 487, 511–12 (Del. Ch. 2010) (suggesting that a board should disclose its basis for rejecting a competitive bid and pursuing an allegedly inferior offer).

Special Committee imposed an unreasonable deadline. As alleged, it is reasonable to infer that Brookfield considered its late October 2019 offer as implying some commitment to a deal within thirty days, contingent on Riverstone's satisfaction in negotiations; Brookfield walked away and took its premium bid with it because the Special Committee ran out the clock.[890] It is reasonable to infer that the absence of the terms of Brookfield's final superior bid and the Board's recognition of that superiority rendered the Proxy materially misleading.

Accordingly, Plaintiff has pled that the Proxy was materially misleading and that Garland, who prepared the Proxy, was aware of its inaccuracies, and has therefore stated a claim for breach against him. Count II, to the extent it is based on the false and misleading Proxy, survives as to Garland.

### C. Plaintiff Has Stated Third Party Liability Claims.

As explained above, Plaintiff may establish that the Officer Defendants and Entity Defendants constitute a control group owing fiduciary duties. In the alternative, Plaintiff has also asserted the Entity Defendants are liable as

---

[890] *Cf. Xura*, 2018 WL 6498677, at *12 n.122 ("I acknowledge Defendants' argument that Plaintiff merely speculates regarding whether Francisco Partners ultimately would have made a bid for Xura and whether that bid would have been superior to the Siris bid. Plaintiff's response—that we will never know where the Francisco Partners' overture might have gone—is, likewise, well taken. Indeed, as a wise 'do-dah man' once observed, 'Sometimes your cards ain't worth a dime if you don't lay 'em down.' . . . In any event, what is conceivably material about Francisco Partners is not its initial expression of interest but the fact that it expressed interest, later declined to participate in the Go-Shop and then mysteriously joined forces with Siris on the buy-side of the Transaction.").

nonfiduciary outsiders to the Company, through theories of aiding and abetting (Count III), conspiracy together with the Officer Defendants and Browne (Count V), and tortious interference (Count IV). If Plaintiff succeeds in demonstrating a control group, the aiding and abetting and conspiracy claims against the Controller Defendants will be dismissed.[891]

### 1. Plaintiff's Claims for Aiding and Abetting and Civil Conspiracy Are Held In Abeyance Pending A Determination As To Whether The Controller Defendants Owe Fiduciary Duties.

For now, it is enough to say that the allegations about the Entity Defendants' involvement, set forth in my discussion of their potential role as controllers, are

---

[891] *See Wallace ex rel. Cencom Cable Income P'rs II, L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) ("[Aiding and abetting], which on its face assumes the officers, parents and affiliates to be 'non-fiduciaries,' seems inconsistent with plaintiff[']s primary argument that each defendant owes fiduciary duties to the [Company stockholders]. Nonetheless, I will not dismiss plaintiff[']s[] aiding and abetting claim as I may later decide, after discovery or at trial, that plaintiff[] cannot prove the pleaded requisite control necessary to establish the existence of a fiduciary relationship between each defendant and the [Company]."); *OptimisCorp v. Waite*, 2015 WL 5147038, at *57 (Del. Ch. Aug. 26, 2015) ("In those instances where a fiduciary takes actions that would amount to aiding and abetting by a non-fiduciary, that conduct amounts to a direct breach of fiduciary duties."), *aff'd*, 137 A.3d 970 (Del. 2016); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005) ("[C]ivil conspiracy is vicarious liability. It holds a third party, not a fiduciary, responsible for a violation of fiduciary duty. Therefore, it does not apply to the defendants which owe the [stock]holders a direct fiduciary duty."); *accord OptimisCorp*, 2015 WL 5147038, at *57 ("[I]t is highly doubtful that a conspiracy of fiduciaries is a legally cognizable cause of action.").

sufficient to plead knowing participation[892] and substantial assistance[893] for purposes

of aiding and abetting.[894]  While the Entity Defendants had the right to work in their

own interests by leveraging the Consent Right,[895] that right ends at the point the party

"attempts to create or exploit conflicts of interest in the board."[896]  Plaintiff has

[892] *See RBC*, 129 A.3d at 861–62 ("Knowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach." (alterations and internal quotation marks omitted) (quoting *Malpiede*, 780 A.2d at 1097)); *Agspring Holdco, LLC v. NGP X US Hldgs., L.P.*, 2020 WL 4355555, at *20 (Del. Ch. July 30, 2020) ("[A]ll that is required to show that a defendant knew something are sufficient well-pleaded facts from which it can reasonably be inferred that this something was knowable and that the defendant was in a position to know it." (quoting *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *20 (Del. Ch. Nov. 26, 2014)).

[893] *See In re Oracle Corp. Deriv. Litig.*, 2020 WL 3410745, at *11 (Del. Ch. June 22, 2020) (noting "the secondary actor must have provided assistance or participation in aid of the primary actor's allegedly unlawful acts" and that assistance must be substantial (alterations and internal quotation marks omitted) (quoting Restatement (Second) of Torts § 876 cmt. d (1979))).

[894] This is necessarily a fact-intensive inquiry, making claims for aiding and abetting "ill-suited for disposition on the pleadings."  *Clark v. Davenport*, 2019 WL 3230928, at *15 (Del. Ch. July 18, 2019) (internal quotation marks omitted) (quoting *In re Good Tech. Corp. S'holder Litig.*, 2017 WL 2537347, at *2 (Del. Ch. May 12, 2017) (ORDER)); *accord Oracle*, 2020 WL 3410745, at *11.

[895] *See Morrison v. Berry* (*Morrison III*), 2020 WL 2843514, at *11 (Del. Ch. June 1, 2020); *Morgan v. Cash*, 2010 WL 2803746, at *7–8 (Del. Ch. July 16, 2010).

[896] *Morrison III*, 2020 WL 2843514, at *11 (quoting *RBC*, 129 A.3d at 862).  The cases the Entity Defendants invoke to defend arms-length bargaining for their own benefit are distinguishable.  Unlike the alleged aider and abettor in *Jacobs v. Meghji*, 2020 WL 5951410, at *8 (Del. Ch. Oct. 8, 2020), the Entity Defendants had knowledge about the Company's process; the Special Committee's creation and role; Brookfield's proposal; and the dual fiduciary Individual Defendants' compliance with their fiduciary duties.  This case is also unlike *Morrison III*, in which the Court dismissed an aiding and abetting claim against a private equity acquirer, even though it allegedly "act[ed] together with the [target's chairman]," who "used silence, falsehoods, and misinformation" to mislead the board.  2020 WL 2843514, at *11 (internal quotation marks omitted).  The Court concluded it could not "reasonably infer that [the acquirer] knowingly advocated or assisted [the

alleged facts from which it is reasonable to infer that the Entity Defendants wielded the Consent Right and bargained with bidders in knowing tandem with the Company's dual fiduciaries tilting the Special Committee's sales process toward Riverstone's preferred bidder.

With this conclusion on aiding and abetting, it is not surprising that Plaintiff's factual allegations about the Entity Defendants also support a claim for civil conspiracy, as the claims often rise and fall together.[897] Plaintiff's allegations support a reasonable inference that the Entity Defendants worked closely with Browne and the remaining Officer Defendants throughout the sale process for the purpose of closing an all-cash deal with Buyer that took the Company private, internalized Developer 2, and left Riverstone and its dual fiduciaries with equity stakes in the new structure.

---

chairman's] deceptive communications," and therefore dismissed the claim because the acquirer "had the right to work in its own interests to maximize its value." *Id.* But unlike the acquirer in *Morrison III*, which was an arm's-length bargaining party with no alleged connection to any officer, director, or advisor, the Entity Defendants were tied to and held power over Company fiduciaries and were alongside or behind the fiduciaries every step of the way.

[897] *See Agspring*, 2020 WL 4355555, at *21; *see also Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1039–40 (Del. Ch. 2006). Because Plaintiff has not pled facts indicating that Armistead or Pedersen breached their duties or committed an unlawful act in furtherance of the conspiracy, Plaintiff has not stated a claim for civil conspiracy against them.

## 2. Plaintiff Has Pled Tortious Interference.

Count IV asserts the Entity Defendants tortiously interfered with the stockholders' prospective economic advantage in the superior Brookfield offer.[898] The parties have not briefed the doctrinal viability of a tortious interference claim if the Entity Defendants are held to be fiduciaries. For now, assuming the claim would go forward, allegations underpinning their *de facto* control support the elements of tortious interference. The Entity Defendants' three arguments to the contrary are unavailing. First, as explained, their right to compete and wield the Consent Right did not excuse their alleged improper actions. Second, Brookfield was a business opportunity as it was "prepared to enter into a business relationship but was dissuaded from doing so."[899]

Finally, proximate cause presents the difficult question of whether Riverstone's actions throughout the process caused Brookfield to walk away where

---

[898] *See* Compl. ¶¶ 308–13. To state such a claim, a plaintiff must plead "(a) the reasonable probability of a business opportunity, (b) the intentional interference by the defendant with that opportunity, (c) proximate causation, and (d) damages." *Organovo Hldgs., Inc. v. Dimitrov*, 162 A.3d 102, 122 (Del. Ch. 2017) (quoting *DeBonaventura v. Nationwide Mut. Ins. Co.*, 419 A.2d 942, 947 (Del. Ch. 1980)); *accord Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 886–87 (Del. Ch. 2009).

[899] *See Soterion Corp. v. Soteria Mezzanine Corp.*, 2012 WL 5378251, at *13 (Del. Ch. Oct. 31, 2012) (quoting *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *7 (Del. Ch. Jan. 20, 2009)) (noting the specific parties offering the business opportunity "performed extensive due diligence," executed multiple term sheets "outlin[ing] the major terms of the contemplated transaction[]," and had not "identified any business reasons for not proceeding with the transaction[]").

it would not have but for Riverstone's conduct.[900] The Entity Defendants assert it is the Company that proximately caused Brookfield to walk away, by declining exclusivity or by requiring Brookfield to submit its best and final offer within twenty-four hours, complete with an agreement with Riverstone about Developer 2.[901] "Except in rare cases, the issue of proximate cause is uniquely a fact issue."[902] Viewing Plaintiff's pleadings in the light most favorable to her, it is reasonably conceivable that the Entity Defendants' challenged actions drove Brookfield away.

Thus, in a world in which the Entity Defendants are not fiduciaries, Plaintiff has pled aiding and abetting, conspiracy, and tortious interference. These claims may still be dismissed if Plaintiff establishes the Entity Defendants are fiduciaries.

---

[900] *See id.* at *17 ("Delaware recognizes the traditional "but for" definition of proximate causation. . . . Our understanding of proximate cause evolved from circumstances in which a tortfeasor caused something to happen that harmed the victim. The harm might have had more than one possible cause. A supervening cause might be considered the 'real cause' if it took over control from yet another cause that might otherwise eventually have resulted in the same (or similar) harm.").

[901] *See* D.I. 72 at 50–52.

[902] *Good Tech.*, 2017 WL 2537347, at *2 (alteration omitted) (quoting *DiOssi v. Maroney*, 548 A.2d 1361, 1368 (Del. 1988)); *accord Everest Props. II, L.L.C. v. Am. Tax Credit Props. II, L.P.*, 2000 WL 145757, at *6–7 (Del. Super. Jan 7, 2000) (noting proximate cause need not be pled with precision, but rather need only put defendants on notice of the claims against them).

211

## III. CONCLUSION

The Motions are granted and denied in part. The Individual Defendants' Motion is **DENIED** as to Counts I and II. The Entity Defendants' Motion is **DENIED** as to Count IV. Counts III, V, VI are held in abeyance. With the exception of Count VI, all claims are **DISMISSED** as to Armistead and Pedersen. The parties shall submit an implementing order within twenty days of this decision.